Knut S. Johnson (CSB 125725)
Emerson Wheat (CSB 277456)
LAW OFFICE OF KNUT S. JOHNSON
1010 Second Avenue, Suite 1850
San Diego, California 92101
(619) 232-7080 (Phone)
(619) 232-7324 (Fax)
knut@knutjohnson.com

Attorneys for JOSE SUSUMO AZANO
MATSURA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES,<br><br>        Plaintiff,<br><br>    vs.<br><br>JOSE SUSUMO AZANO<br>MATSURA,<br><br>        Defendant. | CASE NO. 14-cr-0388-MMA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS:**<br>**(1) SECOND SUPPLEMENTAL MOTION FOR DISCOVERY;**<br>**(2) TO BE RELEASED FROM THE DISCOVERY PROTECTIVE ORDER**<br><br>**Time: 2:00 p.m.**<br>**Date: August 25, 2014** |

**TABLE OF CONTENTS**

I. INTRODUCTION……………………………………………………………..1

II. FACTS……………………………………………………………...2

   A. <u>Sempra</u>………………………………………………………....2

   B. <u>Rogue Agents</u>…………………………………………………9

   C. <u>The Government's Two Witnesses: Ernie Encinas, Marc Chase and their Manipulations of Mr. Azano and San Diego Politicians</u>…………..12

   D. <u>Seized Evidence Has Provided to Third Parties</u>………………………...20

III. SECOND SUPPLEMENTA DISCOVRY MOTION…………………………...20

   A. <u>Discovery Needed for Recusal Motion Based on U.S. Attorney Conflict</u>………………………………………………………......21

   B. <u>Discovery Needed for Dismissal Motion and To Discredit the Government Investigation at Trial</u>……………………………..……………23

   C. <u>Discovery Needed for Fourth Amendment Motions</u>……………….....25

   D. <u>General Discovery Needed</u>…………………………………….....27

IV. MOTION TO BE RELEASED FROM THE PROTECTIVE ORDER……….29

V. CONCLUSION……………………………………………………………30

# <u>TABLE OF AUTHORITIES</u>

**CONSTITUTIONAL AMENDMENTS**

    U.S. Const. Amend VI…………………………………....… …….22, 23

**CASES**

    *Berger v. United States*, 295 U.S. 78 (1935) …………………………………....21

    *Brady v. Maryland*, 373 U.S. 83 (1963) …………………………………..*1, 23, 27*

    *Giglio v. United States*, 405 U.S. 150 (1972)…………………………...………..27

    *Kyles v. Whitley*, 514 U.S. 419 (1995)……………………………….…...1, 23

    *Young v. United States*, 481 U.S. 787 (1987) ……....………………....………22

    *United States v. Alvarez*, 86 F. 3d 901 (9th Cir. 1996)…………...……...…...27

    *United States v. Henthorn*, 931 F. 3d 29 (9th Cir. 1991)………………...…..…...24

    *United States v. Moussaoui*, 382 F. 3d 453 (4th Cir. 2004)………..………....7

    *United States v. Neill*, 952 F. Supp. 834 (D.C. Dist. 1987)………………………7

    *United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999)………………28

    *People v. Lyons,* 47 Cal.2d 311 (1956) ………………………………………..22

    *People v. Trevino,* 39 Cal.3d 667 (1985) ……………………………...………22

**RULES**

    Fed. Rule Crim. Pro. 16(a)(1)(E)(i)……….……………………….……23, 27

**STATUTES**

    28 U.S.C. § 515…………………………………………………………..…...21

**OTHER RESOURCES**

    U.S. Attorneys Manual, § 3-2.170…………………………………21, 22, 23

# I.

## __INTRODUCTION__

The government indicted Mr. Azano for a single count of violating campaign financing laws.  The government has thus far produced a large volume of discovery to the defense, but there are significant documents and information that are missing.  Mr. Azano now seeks Court intervention for additional discovery by filing this Second Supplemental Discovery Motion requesting these missing documents and information information required for several pretrial and trial motions.

In motions Mr. Azano will argue that government misconduct, negligence, and ineptitude warrant relief.  If there is a trial, he will also argue that government conduct (whether negligent or intentional) creates a reasonable doubt in this case and impeaches the testifying agents and officers.  *See, e.g. Kyles v. Whitley*, 514 U.S. 419, 446-454 (1995) (discrediting the caliber of a police investigation is exculpatory and such evidence must be disclosed under *Brady v. Maryland*).

/ / /

/ / /

## II.

## <u>FACTS</u>

### A. Sempra

Mr. Azano and Sempra Energy ("Sempra") have been litigating against each other in Mexico and the United States for years.  The simple version of that litigation is that Mr. Azano assisted Ramon Sanchez-Ritchie in a civil case in Mexico, where Sempra has attempted to remove Mr. Sanchez-Ritchie from certain real estate near Ensenada, Baja California (the "Sanchez-Ritchie property").  Sempra covets the Sanchez-Ritchie property, which it needs to legally operate its liquefied natural gas terminal near Ensenada, Baja California, Mexico (the "Sempra LNG terminal").  Sempra (and/or its subsidiaries) has apparently spent close to a billion dollars[1] on the Sempra LNG terminal.  Mr. Sanchez-Ritchie has won all the court battles in Mexico and continues to own the property that Sempra covets for its billion dollar investment.

---

[1] See, http://www.energy.ca.gov/lng/documents/costa_azul/2006-07-25_Keller_Costa_Azul_LNG_Interagency.PDF

-   14-cr-0388-MAA

Mr. Sanchez-Ritchie sued Sempra in the United States District Court for the Southern District of California in case 10-cv-1513-CAB.  On September 18, 2012 Sempra counter-claimed and added Mr. Azano as a counter-defendant, alleging RICO violations based on bribery and extortion (which are false).  On October 13, 2013, Judge Bencievengo dismissed the Counter-Claim in its entirety and with prejudice.

The discovery provided by the government to date reveals that the U.S. Attorney investigated Sempra for Foreign Corrupt Practices Act ("FCPA") violations in the Spring of 2011, in the middle of the Azano-Sempra litigation.  Those allegations were based on suspicions that Sempra engaged in bribery of Mexican officials related to the Sempra LNG terminal.  Although heavily redacted, the discovery shows that on March 15, 2011 an FBI-302[2] reported that the evidence "clearly" indicated "the existence of a *quid pro quo* arrangement" with regard to a $7 million trust created by Sempra "in exchange for key permits required from the City of

_____

[2] An "FBI-302" is a report used by the FBI to record investigative activity.

- 3 -

-   14-cr-0388-MAA

Ensenada to build the Sempra LNG plant."  The FBI recommended opening a full FCPA investigation of Sempra.

According to another FBI-302, approximately six weeks later, on April 29, 2011, lawyers from the Jones Day law firm met with the Deputy Chief of the DOJ Fraud Section, an Assistant U.S. Attorney, and an SEC attorney (all names are redacted from the discovery, but as noted below, news reports state the names of the participants).  The Jones Day firm reported that their investigation of their client showed no wrongdoing.  A Jones Day attorney (apparently, the name is redacted) then "renewed his request" that the DOJ investigate a person whose name is redacted. Discovery and press reports clarify that Robert S. Brewer, Jr.[3] and Jones Day asked the DOJ to investigate Mr. Azano for the exact same allegations Sempra later brought in their counter-claim and which Judge Bencivengo dismissed.

Less than two weeks after the FBI-302 documenting the April 29, 2011 meeting was written, on June 1, 2011 U.S. Attorney Laura Duffy

wrote Robert S. Brewer, Jr.[4] of Jones Day a letter apparently co-signed by

Deputy Chief of the Fraud Section at Main Justice, Charles LaBella (Mr.

Brewer's former law partner) advising that they were dropping their

Sempra investigation after the internal self-investigation and presentation

by Mr. Brewer and Jones Day.

Within a few weeks, the U.S. Attorney filed an Application for Order

Authorizing Disclosure of Subscriber and Other Information (the

"Application") in case 11 MC 0853, signed by Assistant U.S. Attorney

Timothy Perry on behalf of U.S. Attorney Laura Duffy.[5]  The Application

parrots almost verbatim the now dismissed Sempra allegations about

_____

*(Footnote cont'd from previous page.)*

[3] Mr. Brewer also defended Sempra against whistleblower allegations
regarding the FCPA violations  discussed above.

[4] In addition to convincing the government on behalf of Sempra to
investigate the spurious and later dismissed claims against Mr. Azano, Mr.
Brewer appeared before this Court in a personal capacity, while a
candidate for DA.  He asked this Court to release from a protective order a
letter of reference written on behalf of Mr. Azano's son by DA Dumanis.
At that time, Mr. Brewer repeated false accusations that Ms. Dumanis may
have had a *quid pro quo* relationship with Mr. Azano.  As noted below (*see*,
footnote 6) , DA Dumanis has denied any such relationship and the letter
itself dispels any notion that it was written for any reason other than as a
favor after she was manipulated by the government's informant, Ernie
Encinas.

- 5 -

bribery and extortion.  The Application also asserts that "Agents of Sempra are in possession of an email chain in which Azano participated." (11 MC 0853 Application, page 5, lines 9-10.)

Mr. Azano believes that those "Agents of Sempra" illegally obtained that email chain (which may contain privileged communications), and in any event the U.S. Attorney's Office appears to have not told the Magistrate Judge the provenance of the e-mail chain.  The government cites that "email chain" in at least 8 pleadings filed with this Court asking for permission to perform searches but seems to never have explained how Sempra (much less the government) obtained that email chain.

Because the Application in large part merely regurgitates the allegations of bribery and extortion that were dismissed by Judge Bencivengo, it gives -- at the very least -- the appearance that the U.S. Attorney's Office is acting on behalf of Sempra against Sempra's perceived antagonist, Mr. Azano.  Furthermore, the Application affirmatively

---

*(Footnote cont'd from previous page.)*

5 The Application appears to be the first use of judicially authorized investigative tool in the investigation of Mr. Azano.

misrepresents that "the prosecution team involved in that investigation [of Sempra] does not overlap with the team handling the investigation of Azano and others." (11 MC 0853 Application, page 5, lines 14-20.)

A cursory review of the discovery, however, reveals that the same FBI special agent who recommended a full FCPA investigation of Sempra is *the same agent who continues to act as case agent on Mr. Azano's case*. That agent stated on tape that she had learned of Mr. Azano while investigating Sempra. *See*, recording 2737049.0003 produced in discovery, at approximately 6:05. The application does not clarify what "prosecution team" means, but case law show that the Department of Justice includes FBI agents when describing a "prosecution team." *See*, *e.g. United States v. Neill*, 952 F. Supp. 834, 838 (D.C. Dist. 1987) (IRS Special Agent member of "prosecution team"); *United States v. Moussaoui*, 382 F. 3d 453, 460 (4th Cir. 2004) (members of the "prosecution team" included FBI Special Agents).

In or about August 2012, the government asked the Court for and obtained a delayed-notification (or, "Sneak and Peak") warrant allowing them to search offices used by Mr. Azano. Among other things, the affidavit to support the Sneak and Peek Warrant argued the same Sempra

allegations (dismissed by Judge Bencievengo) in order to justify the secret

search.  That warrant (which will be the subject of a later motion to

suppress) makes numerous and significant material misrepresentations

and omissions, including misstatements of law (characterizing innocuous

conduct as criminal) and misstatements of fact based upon implausible

and illogical inferences.

Finally, the Chief of Corporate Security at Sempra is Dan

Dzwilewski, formerly the Special Agent in Charge of the FBI in San Diego

from 2003-2007.[6]   During that time, he was presumably the supervisor for

some or all of the case agents in this case earlier in their careers.

In sum, the evidence available to the defense gives at least the

appearance of the government pursuing Mr. Azano on behalf of Sempra,

after dismissing the Sempra investigation based on Sempra's investigation

of itself.[7]  The government has also created the appearance of misleading

_____

[6] *See* Mr. Dzwilewski's profile on Linkedin:
https://www.linkedin.com/pub/dan-dzwilewski/12/a50/343).

[7] The local media has reported on this extensively, and has noted that this
fails the "smell test."  In any event, the SEC appears to have reopened the
investigation of Sempra.  *See*,
http://www.10news.com/news/investigations/sec-begins-new-probe-into-

*(Footnote cont'd on next page)*

the Court to obtain Court ordered warrants and orders allowing the search

of Mr. Azano's property just after dismissing the Sempra allegations.  If

that appearance of conflict arises to an actual conflict, the defense will

move for various remedies.  However, as noted below, the simple

appearance of that conflict supports additional discovery.

## B. Rogue Agents

For years, the Department of Homeland Security ("DHS") has

engaged in a wide ranging, baseless, and bullying investigation of Mr.

Azano.  Citing unnamed confidential sources, DHS has investigated Mr.

Azano for a wide range of offenses that he did not commit, including gun

running, money laundering, and other serious crimes.  Neither agency has

ever found any evidence of such crimes -  because none exists  - and in the

Spring of 2013 Mr. Azano wrote a letter of complaint to DHS regarding the

harassment.

Despite not finding any evidence of any crime, DHS continued to

harass Mr. Azano, his family, and his employees.  For instance, defense

_(Footnote cont'd from previous page.)_

sempra-energy-over-bribery-allegations-031714 (Naming Jones Day and

_(Footnote cont'd on next page)_

-   14-cr-0388-MAA

investigation has revealed that in July 2012 DHS agets came to the home of

a pilot who worked for Mr. Azano.  According to Mr. Azano's pilot, the

agents then began a series of harassing calls as well.  DHS asked the pilot

to become a paid informant, promising that he would get a percentage of

any money seized from Mr. Azano.  DHS also asked the pilot to illegally

search Mr. Azano's personal belongings for them.  The discovery notes

that the DHS agent was Special Agent John Chakwin (Homeland Security

Investigations).

When Mr. Azano's pilot informed DHS that he had never seen any

illegal activity by Mr. Azano, DHS offered to clear up "anything from your

past."  Mr. Azano's pilot said that he would tell them about any crime he

saw, but he knew of no criminal conduct by Mr. Azano.  DHS agents

continued harassing the pilot, and even gave him a phone to use to call

DHS agents.  Among other threats, the agents told the pilot that "you are

refusing to cooperate and you will go down with [Mr.] Azano when he

goes to the grand jury."  Those agents stated that Mr. Azano was

---

*(Footnote cont'd from previous page.)*

Mr. Brewer as the attorneys involved).

- 10 -

dangerous to the pilot and went so far as to frighten the pilot's children. The agents continued harassing the pilot for months.

The pilot asked the agents to stop harassing him and his family, and stopped returning their calls.  In response, the agents pounded on the door to the pilot's home, scaring his wife and children.  The agents told the pilot that because the pilot was not returning their calls they thought Mr. Azano had killed him.  The agents said if the pilot did not keep in contact, they would return to his house, walk in his office, or do whatever they wanted to see him.  The pilot has stated again and again that he has never seen Mr. Azano do anything suspicious or illegal.

Other government harassment included patting down Mr. Azano's very young child, extended border searches, and other acts.  Other pilots and employees have heard  DHS ICE agents falsely accusing Mr. Azano of being an arms dealer, and those false accusations seem to have found their way into DHS/ICE computer systems.

The DHS investigation seems to stem from at least one mysterious and unnamed "Source of Information" ("SOI").  That SOI noted only that Mr. Azano is wealthy and travels a lot.  *See* discovery produced at

EM_AGT RPT_ROIs_000065, 000090, 001312.[8]  The defense, below, is

asking for discovery about that SOI(s).

### C. The Government's Two Witnesses: Ernie Encinas, Marc Chase and Their Manipulation of Mr. Azano and San Diego Politicians

The government has two important witnesses, Ernie Encinas

("Encinas") and Marc Chase ("Chase").  Encinas was a contractor whose

company provided security services for Mr. Azano and his family but who

never participated in any other business of Mr. Azano.  Encinas had been

with San Diego Police Department ("SDPD") for over 30 years and owned

a business called Coastline Protection and Investigations, Inc.

("Coastline").  Through Coastline and other businesses, Encinas provided

security guards and consulting services to establishments that were, or

which hoped to become, licensed to serve alcohol, including several bars

and nightclubs in the Gas Lamp District.  *See*, EM_PLDGS_00000195.

---

[8] Other DHS reports note "a SOI" that may or may not be the same SOI related to the purported information about Mr. Azano. *See*, discovery produced as EM_AGT RPT_ROIs_1491-1548, 1549-1567.  As noted below, the defense is entitled to discover the identity of this SOI and/or whether this is the same SOI throughout this case.

Encinas was aware that Mr. Azano was very generous and regularly donated hundreds of thousands of dollars to worthy causes.[9]  Mr. Azano became concerned about police widows, and asked Encinas to whom he should donate $100,000 to benefit them; Encinas had a "better" idea: he told Mr. Azano to help the campaign of a "friend" running for political office who would help police widows.  As Encinas later admitted to the FBI when asked why Mr. Azano donated to DA Dumanis: "Because of me.  Bonnie is a friend of mine."  Encinas later explained that he thought she would help him in Encinas's business in the Gas Lamp District.  *See*, 2737049.003, at approx. 13:00 minutes.

In June 2013, the FBI told the court "[t]here is probable cause to conclude that Encinas has sought to corruptly influence the SDPD through bribes."  *See*, EM_PLDGS_00000245 ("Wiretap Application").  The Wiretap Application argues that the government has evidence of corruption by

_____

[9] For instance, Mr. Azano donated: $75,000 in 2011 for  tsunami relief/Asian Film Festival; $50,000 to a grade school in 2011; $250,000 in 2009 to a child in Mexico needing medical treatment; $10,000 in 2011 to a law enforcement foundation, among other things.  He never sought or received publicity for these acts of charity.

Encinas.  According to the Wiretap Application, at least one SDPD officer

stated that Encinas "suggested that  because of campaign contributions he

and others had made to a local elected official, his clients were going to get

what they wanted."

The FBI's belief that Encinas bribed and manipulated political

figures does not only impeach Encinas's credibility; it also affirmatively

exculpates Mr. Azano.  There is no logical reason that Encinas would limit

his manipulation to politicians.  Indeed, by October 2013, the FBI

concluded in an affidavit for a search warrant:

> On behalf of his clients Encinas has lobbied both
> the SDPD and [former Mayor] Filner for among
> other things licensing for a large downtown night
> club.  Insofar as Encinas perceives Azano's illegal
> campaign contributions to have earned him special
> access to Filner these lobbying activities reflect
> Encinas's motive and state of mind in committing
> the campaign finance fraud.

Among the politicians who Encinas manipulated is DA Bonnie

Dumanis.  For instance, Encinas had Dumanis write a letter of reference

for Mr. Azano's son, despite the fact that DA Dumanis had never met the

- 14 -

son.[10]  DA Dumanis denied writing that letter at the request of Mr. Azano, and instead wrote the letter at the request of Encinas.  Discovery also shows that DA Dumanis called Encinas during the investigation.  *Call 2366.*[11]

Encinas's motive to support elected officials is plain from the discovery: he wanted their support to further his business in the Gas Lamp District (which it bears repeating had nothing to do with Mr. Azano) and he used Mr. Azano to financially support those politicians.  For instance, Encinas viewed Mr. Azano as his "main money guy."  He also bragged about "his resources" to support politicians and their support of his business, as when he complained about the SDPD Vice Squad harassing him, "but that, ya know, had Bonnie been there [elected mayor], ya know,

---

[10] According to the Union Tribune, "In her television appearance [DA Dumanis] said she did not personally know the younger Azano. She said she wrote the letter at the request of Ernesto "Ernie" Encinas, a retired San Diego police detective who worked for Azano." *See,* http://www.utsandiego.com/news/2014/Jul/09/dumanis-release-azano-letter/?#article-copy

[11] There is no evidence in the discovery that DA Dumanis ever did anything illegal, corrupt, or unethical.  Other than meeting Mr. Azano, DA Dumanis had no relationship of any sort with him or his family.  It bears

*(Footnote cont'd on next page)*

Bonnie would have been taking care of business for me."  He also claimed that Carl DeMaio "wanted my support" and "had – had I put all my en - all my resources to uh, DeMaio, there's a good chance he coulda won." *See*, 13-57-10 02187-001 at approx. 14:00.

The federal government ultimately turned Encinas into a confidential informant before charging him with any crime.  After co-defendant Ravi Singh was arrested, Encinas discussed that arrest with Mr. Azano while secretly recording him.  Although Encinas had been well prepared to try to obtain an admission, Mr. Azano repeatedly denied any involvement in paying Mr. Singh for any campaign conduct or otherwise violating the law.  When Encinas asks what he should tell law enforcement, Mr. Azano tells him that he would be happy to clarify anything.  See 2373049.002.wav.

Likewise, Encinas also tried to trick Mr. Singh into saying he or Mr. Azano had violated election laws.  Mr. Singh advised Encinas that any payment for his services related to the upcoming Dumanis DA reelection

---

*(Footnote cont'd from previous page.)*

noting that Encinas was able deceive and manipulate her as well as others,

*(Footnote cont'd on next page)*

-    14-cr-0388-MAA

campaign had to come from the campaign (in compliance with election laws) and not from any outside source (in violation of the law).  Mr. Singh also pointed out that they had previously done campaign work for Bob Filner in accordance with the law.  *See* 2737049.005.wav.

Chase, the government's other witness/defendant owned car dealerships where Mr. Azano purchased cars.  They met in 2010, and according to an FBI-302 that memorialized an interview of Chase, Chase became "involved [with Mr. Azano] because Azano looked like he had money."  Also according to the FBI-302, "Chase's main purpose for befriending Azano was to sell him things."  However, at one point in their "friendship" Mr. Azano received information that Chase was involved in criminal wrongdoing.  That information, according to Chase, "almost killed the entire relationship between Chase and Azano."  *See* EM_AGT RPT_ROIs_001035-001051.

Chase stated that he worked hard to get back in Mr. Azano's good graces, including reaching out to Mr. Azano's employees and family for

_____

*(Footnote cont'd from previous page.)*

including Mr. Azano.

help, including Encinas.  After some time (and convincing Mr. Azano he was not a criminal), "Azano came to know Chase better and they became friends again."  *See id*.

According to Chase, in the first half of 2011 Mr. Azano wanted to buy Symbolic[12], Chase's company.  Chase wanted to sell because the company owed a creditor millions of dollars.  At that time, Mr. Azano did not buy Chase's company, and Chase believed that Mr. Azano's reasoning was because of rumors of Chase's criminal activity.  However, Azano did agree to loan Chase $3 million with a promissory note because Chase was desperate to avoid bankruptcy.  Chase has paid the note down by $1 million.  *See id*.

Chase did not give up on selling Symbolic to Mr. Azano.  In August 2012, Chase convinced Mr. Azano to attend a high end car show in Pebble Beach, California.  Chase and his brother sat with Mr. Azano, who bought two cars.  The FBI-302 reports, "Capitalizing on Azano's high from the car purchases at that moment, Chase made a quick deal with Azano to sell

Azano 60 percent of Symbolic . . . and 40 percent of West Coast Acquisitions." *See id.*

According to Chase, Mr. Azano was to buy out a co-owner for $500,000 and give Chase specific property worth $1 million.  Chase and his brother wrote out a document detailing the agreement and "push[ed]" Mr. Azano to sign.  Chase received the property, which he immediately sold for $1,025,000.  Chase has never paid any of that back to Mr. Azano.  *See id.*

According to Chase, Mr. Azano said he believed that he had an ownership interest in Symbolic, introduced Chase as his business partner, and as of 2014, according to the FBI-302, Mr. Azano "may still believe he owns part of Symbolic."  A month after Chase manipulated Mr. Azano into signing the agreement and giving him the $ 1 million property, Mr. Azano wrote a check to Symbolic for $380,000.  Later, Symbolic, West Coast Acquisitions, and Chase wrote the checks to campaigns that form part of the factual basis in his plea and which total a fraction of the

---

*(Footnote cont'd from previous page.)*

12 Symbolic is the "dba" of South Beach Acquisitions, the company the government claims made the payments to the campaigns.  *See*, Chase Plea Agreement, ¶¶ 10-14.

$380,000.  According to the FBI-302, "Encinas instructed Chase on how to make the contributions."   Chase also wrote the checks as Encinas directed and then gave them to Encinas in his upstairs office.  EM_AGT RPT_ROIs_001035-001051.

### D. Seized Evidence Has Been Provided to Third Parties

Very quickly after the search of Mr. Azano's residences, third parties leaked information to others that could only have come from the materials seized from Mr. Azano.  Mr. Azano would prefer to make an in camera showing with regard to this issue as it reflects attorney-client communications and attorney work-product.  Nonetheless, he supports this request for discovery of communications between the government and third parties with this proffer.

### III.
### SECOND SUPPLEMENTAL DISCOVERY MOTION

Mr. Azano has repeated these requests in Exhibit A, without argument, to aid the Court in ruling on the individual requests.

**A. <u>Discovery Needed for Recusal Motion Based on U.S. Attorney Conflict</u>**

U.S. Attorney Laura Duffy has declared a conflict of interest in this case, but her office continues with the prosecution.  That alone creates the appearance of a conflict of interest by the entire U.S. Attorney's Office that should be explored by this Court and the defense to see if the entire U.S. Attorney's Office should be conflicted off the case.

According to some pleadings filed by the United States, citing 28 U.S.C. § 515 (*see*, for instance, a Motion for Service of Inventory and Order Thereon filed April 8, 2014 EM_PLDG_-S_2364), the United States has recused U.S. Attorney Laura Duffy, and appointed Cindy Cipriani as the "Acting U.S. Attorney" for this case.  Other pleadings in this case simply note that Ms. Cipriani is the "Acting U.S. Attorney" with no other explanation.

The U.S. Attorneys Manual, § 3-2.170, explains the process when U.S. Attorneys or their offices have a conflict (emphasis added):

> When U.S. Attorneys, or their offices, become aware of an issue that could require a recusal . . . ,

they must contact General Counsel's Office (GCO), EOUSA. . . .

A U.S. Attorney who becomes aware of circumstances that might necessitate a recusal of himself/herself or of the entire office, should promptly notify GCO, EOUSA, . . . . the USAO will submit a written recusal request memorandum to GCO. . . . (see USAM 3-2.300) pursuant to 28 U.S.C. Sec. 515. See USAP 3-2.170.001 (M).

The United States has not explained the conflict in this case to the Court or to the defense, nor has it explained how the U.S. Attorney could have a conflict.

An impartial prosecutor is an essential feature of the accused's Sixth Amendment right to a fair trial.  *Berger v. United States* 295 U.S. 78, 88 (1935); *People v. Lyons* 47 Cal.2d 311, 318 (1956); *see also People v. Trevino* 39 Cal.3d 667, 681 (1985).  A prosecutor with a personal and professional interest in the investigation, case filing, and conviction of a defendant is the antitheses of an impartial prosecutor.

As noted by the United States Supreme Court:

Prosecution by someone with conflicting loyalties 'calls into question the objectivity of those charged with bringing a defendant to judgment.'  [Citation.] It is a fundamental premise of our society that the state wield its formidable law enforcement powers in

- 22 -

> a rigorously disinterested fashion, for liberty itself
> may be at stake in such matters.

*Young v. United States* 481 U.S. 787, 810 (1987).

Without additional discovery, neither this Court nor the defense can

be assured that the AUSAs handling this case are conflict free.  For

instance, if Ms. Duffy has a conflict, but continues to decide personnel and

professional issues for these AUSAs, there is an appearance that the

decision making of the AUSAs is subject to conflicting loyalties.

Thus, the defense requests that this Court order the U.S. Attorney to

provide the following discovery under Federal Rules of Criminal

Procedure, Rule 16(a)(1)(E)(i) ("material to preparing the defense") and

under the Sixth Amendment:

1. The "written recusal request memorandum to GCO," as
   required by the U.S. Attorney's Manual, 3-2.170.
2. The reason for the recusal of the U.S. Attorney in this
   case.
3. E-mails, documents, letters, memoranda, or any other
   evidence (collectively, "communications") of any conflict.

**B.  Discovery Needed for Dismissal Motion and To Discredit the Government Investigation at Trial**

The discovery in this case shows many troubling issues related to

conflicts in the investigation and prosecution of Mr. Azano, as noted

above.  The defense requests that this Court order the U.S. Attorney to provide the following discovery under Federal Rules of Criminal Procedure, Rule 16(a)(1)(E)(i) ("material to preparing the defense"), *Brady v. Maryland*, and *Kyles v. Whitely, supra* (discrediting the caliber of a police investigation is exculpatory and such evidence must be disclosed under *Brady v. Maryland*):

1.  Any written or recorded communications between any Jones Day attorney and/or Robert S. Brewer, Jr. (or any other law firm) and any law enforcement agency (including the Office of the U.S. Attorney) regarding allegations about any conduct (criminal or otherwise) by Mr. Azano or any person or entity related to him in any way.

2.  Any written or recorded communications between any member of the "prosecution team" (including agents) and any employee or agent of Sempra (including Dan Dzwilewski), or any subsidiary of Sempra or related company.

3.  Any written or recorded communications between Sempra and SDPD, any other law enforcement agency (such as DHS -including ICE Special Agent John Chakwin), or any other third party regarding Mr. Azano.

4.  Any documents or other information about the "Source of Information" relied upon by DHS in its investigation of Mr. Azano.

5.  In *United States v. Henthorn*, 931 F. 3d 29, 31 (9th Cir. 1991), the government must examine personnel files  of law enforcement agents for *Brady* information.  In this case, the defense asks that the government perform a *Henthorn* review for any evidence that any agent has been disciplined or reprimanded in any way related to any investigation of Mr. Azano or any other person or entity.

6.  Reports, memoranda, and any evidence that shows Sempra's involvement in the LNG issues in Mexico, in particular, anything from the new SEC investigation of Sempra.

7.  Any evidence of government negligence in the investigation of Mr. Azano, including any information 1) that calls into question any reasons raised by DHS for their investigations of Mr. Azano and; 2) any evidence of any information provided to DHS or SDPD to support any investigation of Mr. Azano and any information that the initial information was false or inaccurate in any way.

## C.  Discovery Needed for Fourth Amendment Motions

The discovery in this case shows many issues related to the searches by the government, as noted above.  In addition, the discovery shows only one Title III wiretap, on Encinas's cell phone.  However, Mr. Azano

believes that the government has intercepted his United States and

Mexican phones and performed other electronic surveillance without

revealing it to the defense.

The defense requests that this Court order the U.S. Attorney to

provide the following discovery under Federal Rules of Criminal

Procedure, Rule 16(a)(1)(E)(i) ("material to preparing the defense") and

under the Fourth and Sixth Amendments:

1. Correspondence between agents and officers or any private
   individual (such as an employee or attorney for Sempra)
   regarding the drafting, editing, and preparation of any warrant
   application.
2. Notes or reports prepared and relied upon by any agents in
   preparing any warrant application.
3. Any documents or other information (including
   "correspondence," as defined above) regarding the provenance
   and other information related to the email chain referenced by
   the government to the Court: "Agents of Sempra are in
   possession of an email chain in which Azano participated."  (11
   MC 0853 Application, page 5, lines 9-10 as well as other
   pleadings.)
4. Any materials or correspondence related to any electronic
   surveillance of Mr. Azano, his family, his colleagues, or his
   businesses conducted by any agency (or contractor for any

agency), including the NSA, CIA, FBI, DHS, or the U.S. Attorney.

### D.  General Discovery Needed

The defense requests that this Court order the U.S. Attorney to provide the following discovery:

1. Any evidence of investigative incompetence or worse, which as noted above is discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) and Federal Rules of Criminal Procedure, Rule 16(a)(1)(E)(i) ("material to preparing the defense").

2. Rough notes of any interviews.  In particular, any rough notes of any interview of Mr. Azano, who notified arresting agents about what he perceived as wrongdoing by Jones, Day and other participants in the Sempra case.  Those agents failed to record any such information in their official reports.  Thus, such notes are discoverable if they contain discrepancies, such as omissions of pertinent information.  *See, e.g. See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. U.S.* 405 U.S. 150 (1972); *United States v. Alvarez*, 86 F. 3d 901, 904-905 (9th Cir. 1996) (citing *Kyles v. Whitely, supra*).

3. Any reports, notes, recordings or other evidence of corrupt activity by Encinas in relation to his business, as alleged in the affidavits for warrants.

4.  Any notes, correspondence, documents or other evidence related to any promises made to Encinas and Chase to not prosecute them for additional crimes.

5.  Any communications (recorded or otherwise) between Encinas and any political or elected official.

6.  Any names, identifying information, and all other information related to any "Sources of Information" referenced in any investigative report or affidavit.

7.  Any evidence related to a State Department or other "clearance" for Mr. Azano or any of his business entities to sell United States technologies overseas.

8.  Any press releases by any government agency regarding Mr. Azano or any related defendant.  Mr. Azano is entitled to a fair trial, and the defense is entitled to know everything that the government has told the public about this case.

9.  Any materials related to any agreements or alleged agreements between Chase and Mr. Azano.

10. Any correspondence between government counsel and counsel for any government witness (including Chase and Encinas), which is discoverable under *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1206 (C.D. Cal. 1999).[14]

---

[14] The District Court's order in *Sudikoff, supra*, at 1206 was as follows:

The government must disclose to the defendants all proffers by any witnesses receiving any benefit, whether immunity or leniency, in return for testimony. Included in this category are any proffers made by lawyers for such witnesses. By 'proffers' the Court

*(Footnote cont'd on next page)*

# IV.

## <u>MOTION TO BE RELEASED FROM THE PROTECTIVE</u>
## <u>ORDER</u>

The defense is not allowed to use the actual documents provided in discovery in any proceeding.  Mr. Azano asks to be relieved of that order so as to litigate motions in this case by presenting the relevant discovery to the Court.

---

*(Footnote cont'd from previous page.)*

> refers to statements that reflect an indication of possible testimony, whether or not it seems likely that the witness would actually so testify.  In addition, the government must disclose any notes or documents created by the government that reflect this information. Further, the government must disclose any material that indicates any variations in the witness's proffered testimony.
>
> The government must also disclose to the defendants any information in its possession that reveals the negotiation process by which the immunity agreement was reached. This includes materials authored by a witness, a witness's lawyer, or the government.

- 29 -

## V.
## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant the above motions.

Dated: July 30, 2014

Respectfully submitted,

___/S/ Knut S. Johnson___

**Knut S. Johnson, Esq. for**
Jose Susumo Azano Matsura