WILLIAM P. COLE
Acting United States Attorney (under 28 U.S.C. § 515)
California State Bar No. 186772
ANDREW G. SCHOPLER
HELEN H. HONG
Assistant U.S. Attorneys
California State Bar Nos. 236585/235635
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8068/6990
Fax: (619) 546-0631
Email: william.p.cole@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE SUSUMO AZANO MATSURA (1),<br><br>Defendant. | Case No.: 14CR0388-MMA<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO AZANO'S MOTION TO DISMISS COUNT 26 [111]**<br><br>Date: July 17, 2015<br>Time: 1:30 p.m.<br>Ctrm: Hon. Michael M. Anello |

/ /

/ /

/ /

/ /

**INTRODUCTION**

Section 922(g)(5)(B) straightforwardly prohibits possession of a firearm by "any person, who being an alien . . . has been admitted to the United States under a non-immigrant visa." 18 U.S.C. § 922(g)(5)(B). Exceptions permit some non-immigrants to possess firearms if the alien "is admitted to the United States for lawful hunting or sporting purposes," "is in possession of a hunting license or permit lawfully issued in the United States," or if the alien obtains a waiver from the Attorney General showing that he has resided continuously in the United States for at least 180 days and can show that possession would be in the interests of justice and would not jeopardize the public safety. 18 U.S.C. §§ 922(y)(2) and 922(y)(3). Because the statute is clear about what it forbids, it does not offend the Due Process Clause of the Constitution and is not "void for vagueness."

Nor does the statute offend any Second Amendment, substantive due process, or equal protection rights of aliens, like Azano, admitted into the United States on a non-immigrant visa. Literally millions of visitors are allowed to enter the United States every year on visas that by definition permit only "temporary" stays. Admission into the country as a tourist is a matter of legislative grace; the United States has the prerogative to limit firearms possession when exercising that grace without raising constitutional concerns. Because the Constitution does not forbid Congress from criminalizing the knowing possession of firearms by aliens admitted

on non-immigrant visas for temporary stays in the United States, Azano's motion to dismiss should be denied.

## II

## BACKGROUND

### A. Factual Background

As it relates to this motion, the Superseding Indictment alleges the following:

Jose Susumo Azano Matsura is a citizen of Mexico, who has not obtained legal permanent resident status in the United States.  <u>See</u> Superseding Indictment [42] ¶ 4. As of January 22, 2014, Azano was an alien "then-admitted to the United States under a non-immigrant visa," who did not have a hunting license or permit that would allow him to have a firearm.  <u>Id.</u> ¶ 33.  Nonetheless, on that date, agents located a black Sig Sauer P225 that had been shipped in interstate commerce in Azano's home.  As a result, Azano was charged in Count 26 of the Superseding Indictment with being an alien admitted on a non-immigrant visa in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(B).

### B. Statutory Background

Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, to "establish[] a detailed federal scheme" to govern the "distribution of firearms."  <u>Printez v. United States</u>, 521 U.S. 898, 902 (1997).  The legislation was aimed to address "the widespread traffic in firearms" and the "general availability" of firearms to persons "whose possession thereof was contrary to the public interest."

United States v. One Assortment of 89 Firearms, 465 U.S. 354, 364 (1984); see also

Barrett v. United States, 423 U.S. 212, 220 (1976) ("The history of the 1968 Act

reflects a . . . concern with keeping firearms out of the hands of categories of

potentially irresponsible persons[.]").  The Act identifies "prohibitors," or categories

of persons barred from possessing, shipping, transporting, or receiving firearms,

including felons, drug abusers, and illegal aliens.  18 U.S.C. § 922(h) (Supp. IV 1968)

(as of 2006 codified at § 922(g)).

In 1998, Congress added to the list of prohibitors, now including aliens who had

been admitted to the United States on a nonimmigrant visa.  As Senator Dick Durbin

explained, the purpose of the amendment was to address gun violence inflicted by

tourists visiting the United States on temporary visas.  144 Cong. Rec. S8640-41

(1998).  The Senator provided an example of a tourist going on a rampage at the

Empire State Building after purchasing a firearm in Florida.

> So in this case, a man from another nation, a tourist, bought a gun and
> killed innocent Americans.  I think that goes too far.  I think frankly, we
> ought to say that if you come into this country as our guest, not as a
> citizen of the United States, that we are going to restrict your right to
> purchase a firearm.  You are not a citizen of our country; we have a right
> to impose such restrictions on you.

Id. at S8641; see also id. at S8642 (Senator Craig "Our Second Amendment is

something that we honor, that many of us feel is a very important right of our citizens

under the Constitution.  It should not be abused by those who are guests in our

country, legally or illegally.").

The original proposal contained exceptions for some of the aliens captured by the prohibition: "categories of people which might in the ordinary course of events have a gun, need to purchase a gun for very legitimate purposes." <u>Id.</u>  Those included individuals admitted for "lawful hunting or sporting hunts---so you have someone who enjoys hunting and can legally do so in the United States, who comes here for that purpose, goes to the far west, wherever it might be, that person is exempt.  That person may purchase a gun while here for that purpose." <u>Id.</u>  Because Senator Craig viewed the proposed exemption to be too narrow, he requested and obtained an amendment that would exempt not only those <u>admitted</u> for hunting purposes, but also those "in possession of a hunting license or permit lawfully issued within the United States." <u>Id.</u> at S8642.  Senator Craig viewed hunting as a "lawful right and opportunity in this country.  Certainly, foreign citizens who are here that go through the legal and necessary steps should be allowed that opportunity and to acquire a gun for that purpose while here is necessary and fitting." <u>Id.</u>  The amendment was viewed to be "consistent with the original language of the amendment" and adopted as the language passed into law as section 922(g)(5)(B).

Section 922(g)(5)(B) provides that it is unlawful to possess a firearm if the person is

(5) . . . an alien----

(B)   except as provided in subsection (y)(2), has been admitted to the United States under a non-immigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(26)).

5

Subsection (y)(2) titled "Exceptions" provides that (g)(5)(B) does "not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is . . . (A) admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States." 18 U.S.C. § 922(y)(2). Aliens are also entitled to seek a waiver of the prohibition, if the alien demonstrates to the Attorney General that he has resided in the United States for a continuous period of not less than 180 days and obtains a statement from the embassy or consulate authorizing the alien to possess a firearm. 18 U.S.C. § 922(y)(3).

### III

### ARGUMENT

**A. 18 U.S.C. § 922(g)(5)(B) Is Not Unconstitutionally Vague**

The Fifth Amendment's Due Process Clause protects against criminal convictions based on impermissibly vague statutes. Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19 (2010); see also Johnson v. United States, 576 U.S. --, sl. op. at 3 (June 26, 2015). "'A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Humanitarian Law Project, 561 U.S. at 18-19 (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).

*14CR0388-MMA*

Section 922(g)(5)(B) straightforwardly applies to all aliens who have been "admitted to the United States under a non-immigrant visa." Azano claims no ambiguity there. An exception applies to some of those aliens who were "admitted to the United States for lawful hunting or sporting purposes." 18 U.S.C. § 922(y)(2). There, Azano finds fault with the term "sporting," which he interprets to mean broadly, "recreation." Because Azano was admitted on a B1/B2 visa, which allows him to participate in "legitimate activities of a recreational nature," he claims that section 922(y)(2) is unworkably vague because he cannot know whether "sporting purpose" means "recreational" activity. Mot. [111] at 2-5.

As the plain language conveys, "admitted . . . for lawful hunting or sporting purposes" means admitted to the United States in order to hunt (that is, shoot at animals), or to participate in hunting-like sporting activities, such as target shooting, or trap and skeet shooting. Cf. United States v. Lam, 20 F.3d 999, 1005 (9th Cir. 1994) (stating that hunting skunks in the yard is a "sporting purpose" within the meaning of a sentencing guideline permitting an adjustment if a weapon was possessed for "lawful sporting purposes").

To the extent that the phrase "sporting purpose" in isolation is ambiguous, the context and structure of the statute makes it clear: the exception was designed to apply in limited circumstances where an alien was lawfully admitted for a hunting or hunting-like purpose. See United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U. S. 365, 371 (1988) ("A provision that may seem ambiguous

*14CR0388-MMA*

in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."). That is consistent with the stated purpose of the exception. See 144 Cong. Rec. at S 8641 ("lawful hunting or sporting hunts---so you have someone who enjoys hunting and can legally do so in the United States, who comes here for that purpose, goes to the far west, wherever it might be, that person is exempt. That person may purchase a gun while here for that purpose"); id. at S8642 (Senator Craig supporting exemption because he viewed hunting as a "lawful right and opportunity in this country. Certainly, foreign citizens who are here that go through the legal and necessary steps should be allowed that opportunity and to acquire a gun for that purpose while here is necessary and fitting").

It is also consistent with the structure of the provision. Section 922(y)(2) first exempts those "admitted" for "lawful hunting or sporting purposes." It then goes on to exempt those who are already here (so not admitted for such a purpose), but obtain "a hunting license or permit lawfully issued in the United States." Under either scenario—whether admitted for the purpose or already here and permitted for the purpose—the exemption applies only to those engaged in activity traditionally associated with a firearm, like hunting or target shooting. The "license and permit" language thus makes clear that "hunting and sporting" are to be interpreted similarly.[1]

---

[1] Under either scenario, some law enforcement authority, whether the United States at the time admitting the alien for the hunting purpose or the state government issuing a hunting license, reviews the alien's fitness to possess the firearm.

8

A person of ordinary intelligence would thus understand that the phrase "sporting purpose" is to be read in tandem with "hunting purpose" and defined similarly.

Admission to the United States on a B1/B2 visa does not sow any confusion. Temporary visitors enter the United States for "business" (B1) or for "pleasure" (B2). 8 U.S.C. § 1101(a)(15)(B) (defining immigrant as an alien who has "a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure"); 22 C.F.R. § 41.31(a)(1) (same). Whatever the precise contours of "sporting purpose" may be, a person of ordinary intelligence would not equate it with all "pleasure."

Nor do the regulations defining "pleasure" inject any ambiguity. Regulations define "pleasure" to mean "legitimate activities of a recreational character, including tourism, amusement, visits with friends or relatives, rest, medical treatment, and activities of a fraternal, social, or service nature." 22 C.F.R. § 41.31. The phrase "recreational character" is defined broadly, to include varied activities like tourism, amusement, rest, or medical treatment, none of which is equivalent to a "sporting purpose" in common understanding. Thus, even if "recreation" in isolation could be interpreted to be a synonym of "sport" in some other contexts, that is a reading that is unreasonable here. "Recreational character" within the meaning of the visa is of greater scope. A person of ordinary intelligence would not equate "rest" or "medical treatment" ("recreational" activities within the meaning of 22 C.F.R. § 41.31(b)) to be the same as "sporting purpose" as used in section 922(y)(2). Accordingly, Azano

9

cannot rely on the use of the phrase "recreational character" as it is used in the visa context to render the phrase "sporting purpose" vague here. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) (A person whose conduct is clearly proscribed by a statute cannot, however, complain that the law is vague as applied to the conduct of others).

A person of ordinary intelligence would also understand that the "sporting purpose" exemption could not be read to virtually eliminate the prohibition on nonimmigrant firearm possession set forth in section 922(g)(5)(B). See New York State Dept. of Social Servs. v. Dublino, 413 U. S. 405, 419–420 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."). But under Azano's expansive reading of "sporting purpose" that would be the result. In Fiscal Year 2013, for example, close to 6 million non-immigrants visas were issued for tourists entering the United States on B2 or B1/B2 visas. See Report of the Visa Office, 2013, Nonimmigrant Visas Issued, Table XVII (Part I)

(available                                                                          at

http://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2013AnnualRep ort/FY13AnnualReport-TableXVII.pdf) (2013 Visa Statistics). Of those, 5,645,580 visitors entered on a B1/B2 visa and 114,526 entered on a B2 visa (for "pleasure" only, not "business and pleasure" like B1/B2 visa holders). A person of ordinary intelligence would understand that the statute could not be interpreted in a way that created an exempted class that amounted to almost the entire class of visitors entering

10

on non-immigrant visas.  Even without specific knowledge of those visa statistics, a person of ordinary intelligence would not interpret "sporting purpose" to exempt almost all tourists from the ban on possessing firearms.

The Fifth Circuit did not pronounce section 922(g)(5)(B) to be vague or ambiguous, as Azano suggests.  Mot. [111] at 4.  In <u>United States v. Orellana</u>, 405 F.3d 360, 366 (5th Cir. 2005), the defendant had entered the United States unlawfully. He later obtained "temporary protected status," and the question presented was whether section 922(g)(5)(A) forbade that defendant from possessing a gun as an "alien illegally or unlawfully in the United States from possession a gun."  There, the Fifth Circuit concluded that a person under temporary protected status could not be prosecuted under section 922(g)(5)(A), but never passed on the interpretation of sections 922(g)(5)(B) or (y)(2).  As a result, it has no bearing on the question presented here.

Because sections 922(g)(5)(B) and (y)(2) "provide a person of ordinary intelligence fair notice of what is prohibited," and does not pose the risk of "seriously discriminatory enforcement," <u>Humanitarian Law Project</u>, 561 U.S. at 18-19, the statute is not impermissibly vague.  Azano's motion to dismiss should be denied.  <u>See also</u> <u>United States v. Uresti-Careaga</u>, 281 Fed. Appx. 404, 405 (5th Cir. 2008) (unpublished) ("Our review of § 922(g)(5)(B) shows that it is sufficiently clear as to provide a person of ordinary intelligence a reasonable opportunity to know what is proscribed.").

11

## B. The Constitution Does Not Require the United States to Permit Temporary Visitors to Possess a Firearm

Azano asks this court to find that a foreign visitor develops a Second Amendment or due process right to possess firearms the moment he enters the United States, without limitation. His reasoning extends to the day visitor, entering the United States for an hour to shop at a mall on a B1/B2 visa; to the business executive entering the United States for a three-hour lunch with business partners; indeed, to all 5,645,580 foreigners visiting the United States on a B1/B2 visa, the 41,956 entering on a B1 visa, the 114,526 entering on a B2 visa, the 1,283,947 entering with a border crossing card, in short, each and every one of the 9,164,349 foreign nationals admitted into the United States in fiscal year 2013 alone. See 2013 Visa Statistics. According to Azano, the right would extend year after year to the millions of foreign nationals visiting the United States with the type of temporary non-immigrant visa he possesses, none of whom, by definition, maintain lasting, permanent, or even substantial ties to the United States.

Nothing in the Second Amendment or the Constitution otherwise commands that result. Indeed, all circuit courts confronted with the question have rejected constitutional challenges to section 922(g), limiting aliens' rights to possess firearms. See United States v. Carpio-Leon, 701 F.3d 974 (4th Cir. 2012); United States v. Portillo-Munoz, 643 F.3d 437, 442 (5th Cir. 2011); United States v. Huitron-Guizar, 678 F.3d 1164, 1168-70 (10th Cir. 2012); United States v. Flores, 663 F.3d 1022, 1022-23 (8th Cir. 2011); United States v. Toner, 728 F.2d 115, 128-29 (2d Cir. 1984)

(predecessor statute). And although only one other court with a decision available on Westlaw has been confronted with the constitutionality of section 922(g)(5)(B) specifically, it has upheld the statute in the face of constitutional attack. <u>United States v. Alkhaldi</u>, 2012 WL 5415787 (E.D. Ark. Sept. 17, 2012) (rejecting Second Amendment claim); <u>United States v. Alkhaldi</u>, 2012 WL 5415579 (E.D. Ark. Nov. 6, 2012) (rejecting Equal Protection claim). This court should do the same.

The prohibitions set forth in section 922(g)(5) are not complete. Lawful permanent residents are excluded from the prohibitions. Foreign nationals entering the United States pursuant to a visa waiver program are excluded from the prohibitions. Aliens admitted for a lawful hunting or sporting purpose, or who have a hunting license are excluded. 18 U.S.C. § 922(y)(2)(A). Some official representatives of foreign governments are excluded. <u>Id.</u> § 922(y)(2)(B). An official of a foreign government or a distinguished foreign visitor as designated by the Department of State is excluded. <u>Id.</u> § 922(y)(2)(C). And foreign law enforcement officers of a friendly foreign government entering on official business are excluded. <u>Id.</u> § 922(y)(2)(D).

Significantly, visiting aliens who can demonstrate more substantial ties to the United States may be excluded from the prohibitions as well. 18 U.S.C. § 922(y)(3). Those aliens—who have resided continuously in the United States for at least 180 days, and who can demonstrate that possession of a firearm would not jeopardize the public's safety—may petition the Attorney General for a waiver from the prohibitions

set forth in § 922(g)(5)(B).  The Attorney General is commanded to approve the petition, upon a determination that the petition would be in the interests of justice and would not endanger the public.  18 U.S.C. § 922(y)(3)(C) (providing that Attorney General "shall approve a petition" if the requisites are met).  Thus, far from imposing a blanket ban on all aliens' authority to possess a firearm, the statute provides a detailed scheme to ensure that aliens with legally insignificant ties to the United States are denied the privilege of possessing firearms while those with more substantial ties are afforded the right to seek the privilege.

That is entirely Congress's prerogative, as it legislates in the distinct sphere involving transitory aliens admitted as temporary visitors to the United States.  As Justice Jackson explained decades ago, "[t]he alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of right as he increases his identity with our society.  Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization."  Johnson v. Eisentrager, 339 U.S. 763, 770 (1950).

The class of aliens at issue here, even among non-immigrant visa holders, are among the lowest in the ascending scale of right.  Azano maintained just a B1/B2 visa. Accordingly, he was required to demonstrate that the purpose of his entry into the United States was solely temporary; that he intended to remain in the United States

14CR0388-MMA

only for a specific, limited period; and that he had a residence outside the United States as well as other binding ties to ensure that he would depart the United States at the end of his visit.  He was not permitted to work or study while here.  His home, by definition, lay outside United States borders.  His political allegiance, by definition, too, was to another country.  That he has property and family here, or that he "donates money to the community" (illegally in some cases to local election candidates), does not change his legal status:  he is purely a visitor, who is required to go home at the end of his temporary stay.  To the extent he touts more substantial ties, he is possibly in violation of the terms of his visa.  But at bottom, his visa cements his status as a transient, temporary visitor to the United States.

The question presented in this case, therefore, is whether the Second Amendment prohibits the infringement of such a foreign visitor's claim to bear arms.  That question is answered in the Ninth Circuit with a two-step inquiry.  United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013).  That inquiry first "asks whether the challenged law burdens conduct protected by the Second Amendment" and "if so, directs courts to apply an appropriate level of scrutiny."  Chovan, 735 F.3d at 1136.  That approach acknowledges that the Second Amendment "protects an individual right to keep and bear arms," but also permits restrictions on the right if they satisfy the appropriate level of scrutiny.  Id.  In short, it recognizes that rights under the Second Amendment are "not unlimited."  Id.; Carpio-Leon, 701 F.3d at 977 ("[T]he Second Amendment does not guarantee the right to possess for every purpose, to

possess every type of weapon, to possess at every place, or to possess by every person."); Huitron-Guizar, 678 F.3d at 1166 ("The right to bear arms, however venerable, is qualified by what one might call the who, what, where, when and why.").

Courts have taken different approaches in the first step of the two part inquiry when examining section 922(g) generally. Some have relied on the text of the Second Amendment and its identification of the "people" to show that illegal aliens are not part of the class of "people" afforded the privilege of bearing arms without governmental interference. See, e.g., Portillo-Munoz, 643 F.3d at 439-41; Flores, 663 F.3d at 1023. That is because the Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II (emphasis added). "In providing its protection to the 'the people,' the Amendment is distinguishable from the Fifth and Fourteenth Amendments, which provide protections to 'persons,'" which refers to all within United States borders, aliens and citizens alike. Carpio-Leon, 701 F.3d at 977. The word "people" is a "term of art," used also in the First and Fourth Amendments, that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." District of Columbia v. Heller, 554 U.S. 570, 580 (2008) (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990) (plurality opinion defining "people" within the meaning of the Fourth Amendment)).

16

The court in <u>Portillo-Munoz</u> like the plurality in <u>Verdugo-Urquidez</u> readily concluded that illegally present aliens are not a part of the political community, in part because they are "likely to maintain no permanent address in this country, elude detection through an assumed identity." 643 F.3d at 442.

Although B1/B2 visa holders are not unlawfully in the United States, they are not part of the national community or considered part of the community. By definition, they are visitors or tourists, pledging fidelity to another country, promising to return after the visit, unable to work or derive income from activities in the United States. <u>See, e.g.</u>, Visitor Visa, "Travel Purposes Not Permitted on Visitor Visas," available at travel.state.gov/content/visas/English/visit/visititor.html. They are not admitted on a host of other visas that carry more privileges, like the E, H, L, O, P, I, or J visas that allow work, or the F, M, or J visas that allow study. By definition, the visitor must certify that he "intends to leave the United States at the end of the temporary stay," that he "has permission to enter a foreign country at the end of the temporary stay," and that he has adequate funds to depart from the United States. 22 C.F.R. § 41.31. Accordingly, they are purely transitory visitors with no allegiance to the United States, or any stated intent to remain in the United States. <u>See</u> <u>United States v. Alkahaldi</u>, 2012 WL 5415787 at *4 (concluding that the defendant, who had entered on a student "F" visa, was not part of the "people" because he was admitted temporarily only).

17

As the Supreme Court observed in another context, "neither <u>the overnight visitor</u>, the unfriendly agent of a hostile foreign powers, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and some of its guests." <u>Mathews v. Diaz</u>, 426 U.S. 67, 96 S.Ct. 1883, 1891 (1976) (emphasis added). While some aliens, like lawful permanent residents, may claim membership in the community, and though the question may be more difficult for individuals admitted, for example, on protracted work visas, the B1/B2 visa holder remains simply a visitor. Like the "overnight visitor," the B1/B2 visa holder is not part of the relevant national community vesting him with Second Amendment rights.

The B1/B2 visa holder fares no better with the second approach courts have taken in defining the scope of the Second Amendment. That approach attempts to delimit the Second Amendment by looking at the rights that were historically recognized, not by defining "the people." Because the Second Amendment "codified a pre-existing right," those courts look at the "historical background" to determine whether conduct was protected by the Second Amendment and thus part of the pre-existing rights that had been enshrined in the Constitution, or if the privilege was limited by presumptively lawful regulatory measures, like prohibition on felons or the mentally ill. <u>Heller</u>, 554 U.S. at 626.

In <u>Heller</u>, the Supreme Court observed that the core right embodied in the Second Amendment "is the right of self-defense by law-abiding, responsible citizens."

Carpio-Leon, 701 F.3d at 979 (quoting Heller, 554 U.S. at 635)). "[M]ost scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike[.]'" United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp. Probs. 143, 146 (1986)). Thus, the right to bear arms was seen as a "political right," tied to civic responsibility. Carpio-Leon, 701 F.3d at 980-81; see also Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998) ("Alien men and single white women circa 1800 typically could speak, print, worship, . .. but typically could not vote, hold public office, or serve on juries. These last three were political rights, reserved for First-Class citizens. So, too, the right to bear arms had long been viewed as a political right."). For example, some colonial states disarmed individuals who refused to swear allegiance to the state or the country. Carpio-Leon, 701 F.3d at 980 (quoting Saul Cornell & Nathan DeDino, A Well-Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004). In Massachusetts, participants in Shay's Rebellion were required to take a loyalty oath before regaining any right to possess arms. Id. In "prefounding" England, "the right to bear arms allowed the government to disarm those it considered disloyal or dangerous." Carpio-Leon, 701 F.3d at 980.

The disarmament of individuals who were not part of the "virtuous citizenry," including those who failed to take a loyalty oath, suggests that temporary, transient visitors---who maintain fidelity to some foreign land---are not part of the "core" protected by the Second Amendment.  By definition, all B1/B2 visa holders are "disloyal"---in order to obtain a visa they must disclaim any intent to remain in the United States and demonstrate that they intend to return home on foreign lands.  Accordingly, they were (and are) not part of the "virtuous citizenry" expected to participate in political and civic activities.

That conclusion is buttressed, as the Fourth Circuit observed, by Congress's unique authority to define the United States community vis a vis aliens.  Carpio-Leon, 701 F.3d at 981.  That is a sphere "committed largely to the political branches . . . and on which we owe Congress special deference." Id. at 982.  Defining classes of aliens, like defining aliens as illegal, "emanates from the power to expel or exclude aliens which is a fundamental sovereign attribute exercised by the Government's political departments that is largely immune from judicial control."  Id. at 981 (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210 (1953)).  Because "regulation of aliens' entry into the United States draws on the exercise of national sovereignty, 'the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal government." Id. at 981 (quoting Mathews v. Diaz, 426 U.S. 67, 81 (1976)).

Over no "conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." <u>Fiallo v. Bell</u>, 430 U.S. 787, 792 (1977).

That is not to say that aliens enjoy no rights once in the United States as a matter of legislative grace. <u>See, e.g.</u>, <u>Plyler v. Doe</u>, 457 U.S. 202 (1982) (illegal aliens protected by Equal Protection Clause); <u>Bridges v. Wixon</u>, 326 U.S. 135, 148 (1945) (resident alien has First Amendment rights). But the government's unique role in defining the scope of the community underscores how the "core" right protected by the Second Amendment (those who pledged fidelity to the state and were law-abiding, responsible citizens) does not extend to the most temporary foreign visitors.

Even if temporary visitors maintained some Second Amendment right to bear arms, section 922(g)(5)(B) would pass muster under some form of means-end scrutiny. <u>See</u> <u>Huitron-Guizar</u>, 678 F.3d at 1169 ("We think we can avoid the constitutional question by assuming, for purposes of this case, that the Second Amendment, as a 'right of the people' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here---and still find § 922(g)(5) constitutional."). The level of scrutiny under Ninth Circuit law depends on "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." <u>Chovan</u>, 735 F.3d at 1138.

The core of the Second Amendment right according to <u>Heller</u> is the "right of law-abiding, responsible citizen to use arms in defense of hearth and home." 554 U.S. at 635. By definition, B1/B2 visa holders maintain "hearth and home" in a foreign

*14CR0388-MMA*

land. They must pledge to return home, and demonstrate sufficient ties abroad to convince authorities that they would, indeed, depart. 22 C.F.R. § 41.31. For many of the same reasons that it could be said that the aliens possess no Second Amendment rights at all, any rights they possess are on the margins of the constitution, not the "core."

Moreover, when a B1/B2 visa holder remains in the United States of sufficient duration to call a place his less-temporary home, he may seek a waiver from the Attorney General to use arms in defense of that home. 18 U.S.C. § 922(y)(3). Thus, the burden imposed by § 922(g)(5)(B) is mitigated by the waiver provision (as well as the other exceptions set forth in § 922(y)(2)). See Chovan, 735 F.3d at 1138 (acknowledging that exceptions for domestic violence misdemeanants with expunged, pardoned or set aside convictions or for those who have their civil rights restored lightens the burdens imposed by the prohibition).

Where the right infringed is not a core right, and the burden is mitigated by the exceptions, intermediate scrutiny is the most searching standard that could be applicable. See, e.g., Huitron-Guizar, 678 F.3d at 1169 (applying intermediate scrutiny to § 922(g)(5)(A) analysis); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) (intermediate scrutiny to § 922(g)(9) (domestic misdemeanants)); United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010) (intermediate scrutiny to § 922(g)(9)); United States v. Reese, 627 F.3d 792, 801-02 (10th Cir. 2010) (intermediate scrutiny to § 922(g)(8) (restraining orders)); United Staets v. Williams,

616 F.3d 685, 692-94 (7th Cir. 2010) (intermediate scrutiny for § 922(g)(1) (violent felons); United States v. Yancey, 621 F.23d 681, 684-85 (7th Cir. 2010) (intermediate scrutiny to § 922(g)(3) (drug users)); Chovan, 735 F.3d at 1138 (intermediate scrutiny to § 922(g)(9)). Intermediate scrutiny requires (1) the government's stated objective to be significant, substantial, or important and (2) a reasonable fit between the challenged regulation and the asserted objective. Chovan, 735 F.3d at 1139. Section 922(g)(5)(B) readily passes muster.

The "broad objective of § 922(g)—suppressing armed violence—is without doubt an important one." Yancey, 621 F.3d at 684; cf. Heller, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country."). When § 922(g) was first passed, Congress found that possession of firearms by some, including illegal aliens, created significant threats to commerce, safety, the continued operation of government and the free flow of speech. Pub. L. No. 90-351, § 1201 (1968). Section 922(g) thus broadly aimed to legislate restrictions to improve public safety. The 1998 amendments adding § 922(g)(5)(B) were intended to supplement the existing regulations, with prohibitions on aliens entering on non-immigrant visas. As the senators explained, the statute was a legislative response to actual violence visited upon citizens by foreign tourists who had been able to purchase firearms. 144 Cong. Rec. S8640-412 (1998). That public safety concern, like the animus for the other subsections in § 922(g), is an important, significant, and substantial one. See Chovan,

735 F.3d at 1139; <u>Huitron-Guizar</u>, 678 F.3d at 1170 ("The bottom line is that crime control and public safety are indisputably 'important' interests.").

The fit between § 922(g)(5)(B) and public safety is a reasonable one. This is particularly so when considering § 922(g)(5)(B) in tandem with the exceptions created in § 922(y)(2) and (y)(3), which significantly mitigates the burden for aliens who have more substantial ties to the United States. But the other non-immigrant visa holders (those who do not announce their intention to the Attorney General to possess a firearm, who are in the United States on a temporary basis, who are virtual unknowns to the United States government) were reasonably swept into Congress's reaction to a real-life example of tourists obtaining a firearm and using it against United States citizens.

Moreover, deference is particularly owed this determination given Congress's broad authority over immigration and naturalization matters. Any "policy toward aliens is vitally and intricately interwoven with . . . foreign relations and the war power" but also "the maintenance of a republican form of government" at home. <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 588-89 (1952). Because Congress's power over aliens is of a political character, its exercise of that power is subject "only to narrow judicial review." <u>Hampton v. Mow Sun Wong</u>, 426 U.S. 88, 101-02 n.21 (1976). "The responsibility for regulating the relationship between the United States and our alien visitors is committed to the political branches." <u>Matthews</u>, 426 U.S. at 81.

When Congress permits B1/B2 visa holders to enter the United States as a matter of legislative grace, it very well could see fit to ensure it does not increase (by potentially millions every year) the number of individuals possessing firearms and contributing to gun violence. And to the extent the framers viewed armament as a "political" right with civic dimensions, Congress's effort to preserve participation for its citizens (and those with substantial ties to the United States) is entirely consistent with its broader authority to self-govern. A "state's historical power to exclude aliens from participation in democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of political community." Foley v. Connelie, 435 U.S. 291 (1978); id. at 297 ("[A]lthough we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.").

The analysis does not change because Azano claims that he is a "trusted alien" entrusted with a "ten year visa" who has family and homes in the United States. Mot. [111] at 11. He entered on a B1/B2 visa. He is, by definition, a temporary visitor who is required to depart the United States and go home at the end of his trip. He may not work here. He may not earn income here. And to the extent he could have availed himself of section 922(y)(3), but did not, he limits the force of any constitutional complaint now. His failure to exhaust his statutory remedies forecloses his constitutional challenge here. And any challenge to the waiver provision (which acts like a licensing or permit scheme) would fail.

Because there is a reasonable fit to an important objective—public safety---§ 922(g)(5)(B) is constitutional under the Second Amendment.

The exceptions created in subsection (y)(2) do not pose any equal protection problem. Mot. [111] at 15 (complaining that Canadian citizen with a visa waiver or an "Afghani with a bow hunting license may possess a firearm while he may not). The equal protection component of the Due Process clause simply requires the government to "govern impartially." Alkhaldi, 2012 WL 5415579 at *3. Where allegedly similarly situated aliens are treated differently, the statute will be upheld if the government's classification passes rational basis scrutiny. Id. The challenging party has the burden of proving that the classification is "arbitrary and cannot conceivably advance a legitimate government interest." Id. The same complaint raised by here was rejected in Alkhaldi. For the reasons identified there, the classification drawn is rational.[2]

//


//

---

[2]    Azano raises a substantive due process challenge relying on McDonald v. Chicago, though the contours of the claim are not clear. Although McDonald held that the right to bear arms was incorporated in the concept of due process through the Fourteenth Amendment, the Fourteenth Amendment is not implicated here. Azano does not appear to suggest that the enforcement of § 922(g)(5)(B) somehow shocks the conscience within the meaning of the Fifth Amendment guarantee of due process either.

**IV**

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion to dismiss Count 26.

DATED: July 3, 2015                          Respectfully submitted,

s/ William P. Cole
s/ Andrew G. Schopler
s/ Helen H. Hong
WILLIAM P. COLE
Acting United States Attorney
ANDREW G. SCHOPLER
HELEN H. HONG
Assistant United States Attorney

*14CR0388-MMA*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

JOSE SUSUMO AZANO MATSURA (1),

      Defendant.

Case No.: 14CR0388-MMA

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

I, William P. Cole, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the foregoing brief on the parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 3, 2015

*s/ William P. Cole*

WILLIAM P. COLE