WILLIAM P. COLE
Acting United States Attorney (under 28 U.S.C. § 515)
California State Bar No. 186772
ANDREW G. SCHOPLER
HELEN H. HONG
Assistant U.S. Attorneys
California State Bar Nos. 236585/235635
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8068/6990
Fax: (619) 546-0631
Email: william.p.cole@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSE SUSUMO AZANO MATSURA (1), <br><br> Defendant. | Case No.: 14CR0388-MMA <br><br> **UNITED STATES' RESPONSE IN OPPOSITION TO AZANO'S MOTIONS TO DISMISS COUNTS 5 THROUGH 24 [112]** <br><br> Date: July 17, 2015 <br> Time: 1:30 p.m. <br> Ctrm: Hon. Michael M. Anello |

/ /

/ /

/ /

/ /

**INTRODUCTION**

Azano levies various challenges to the document obstruction counts in violation of 18 U.S.C. § 1519, Counts 5 through 24, contending generally that: (1) the federal government lacks jurisdiction to investigate local election contributions; (2) the statute does not cover falsity created by omissions; (3) the counts related to United States corporation donations are not falsities at all; and (4) the statute is vague. None requires dismissal of the Counts in the Superseding Indictment.

As explained further below, the FBI has jurisdiction to enforce the foreign national contribution provisions of campaign finance laws. Title 2, United States Code section 441e (now codified in Title 52) is not an election-oversight statute. Rather, it is Congress's latest attempt to limit foreign influence in all elections—local, state, and federal—tailored to address harms previously visited by foreign nationals funneling their funds to elected officials. As the Supreme Court has long recognized, that is Congress's role: to define the political community that may participate in elections, which by necessity excludes some (aliens) from those (citizens) who have permanent ties to the United States. Because the FBI has investigative authority over 441e offenses, obstruction efforts tied to such offenses are actionable under section 1519.

Second, Section 1519 is a broad statute, aimed at preventing obstruction of government investigations in many varied ways. The statute covers false entries in

records omitting required information, as well as falsified records entirely omitting information. Both Azano—as a part of a "committee" within the meaning of California election law—and the campaigns to which he donated, bore the responsibility of filing records of donations and expenditures under state law. Azano's calculated effort to conceal and cover up his financial participation in San Diego elections—by failing to record his donations and expenditures—falls squarely within the evils that section 1519 (and section 2(b)) were designed to redress.

Third, a motion to dismiss is not the appropriate vehicle for Azano to raise factual disputes relating to the counts charging him with falsification of records for donations funneled through corporations. He suggests that the donations provided by the corporations were merely that, donations by United States corporations. But crediting the allegations of the Superseding Indictment, as this court must, the corporations were mere conduits or straw donors for Azano, leading to the falsification of campaign finance records that hid the true source of the funds. That is a classic charge under section 1519.

Finally, section 1519 is not unconstitutionally vague as applied to Azano's conduct. None of the prohibited acts is so abstruse to implicate the Constitution's Due Process Clause. A person of ordinary intelligence would have fair notice of what the statute prohibits.

The motions to dismiss should be denied in full.

3

**BACKGROUND**

**A. Overview of Section 1519**

Section 1519, colloquially known as the "anti shredding" statute, was enacted in part by the revelation of "massive accounting fraud" at Enron and Arthur Andersen LLP.  <u>Yates v. United States</u>, 135 S. Ct. 1074, 1081 (2015).  Prior obstruction statutes reached only records destruction or falsification efforts when a person persuaded another to destroy records, but imposed no liability on individuals who shredded or falsified documents himself.  <u>Id.</u>  The Sarbanes-Oxley Act of 2002, 116 Stat. 745, addressed that gap with the passage of section 1519, which provides

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

Although the initial motivation for section 1519 was financial fraud, the legislative history confirms that the statute was intentionally broad.  <u>See</u> 148 Cong. Rec. 14,449 (2002) ("Section 1519 is meant to apply broadly[.]"); S. Rep. No. 107-146 at 14 ("Section 1519 is meant to apply broadly[.]").  "The intent of the provision is simple; people should not be destroying, altering, or falsifying documents to obstruct any government function."  S. Rep. 107-146 at 15.  That breadth simplifies

the proof required for a conviction under section 1519. For example, the statute requires proof only that a person (1) knowingly falsifies a record, (2) with the intent to obstruct or impede or influence the investigation of any matter or in contemplation of such matter and (3) the matter is within the jurisdiction of any department or agency of the United States. Section 1519 does not require a "pending or imminent proceeding or matter" at the time the obstructive conduct is taken. S. Rep. No. 106-146 at 15; see also United States v. Kernell, 667 F.3d 746, 755 (6th Cir. 2012). It requires simply that the obstructive conduct be taken in contemplation of a matter that may occur in the future, with the requisite intent. Nor does Section 1519 require proof of an intent to obstruct a federal investigation specifically. See, e.g., United States v. McQueen, 727 F.3d 1144, 1152 ("There is nothing in the language that says the defendant must also know that any possible investigation is federal in nature."); id. ("'Any matter within the jurisdiction' is merely a jurisdictional element, for which no mens rea is required."); United States v. Gray, 692 F.3d 514, 519 (2d Cir. 2012) ("[T]he plain language of the statute only requires the Government to prove that [a defendant] intended to obstruct the investigation of any matter that happens to be within the federal government's jurisdiction."); United States v. Yielding, 657 F.3d 688, 714 (8th Cir. 2011). It requires simply that an obstructive act be taken with the intent to obstruct a matter that happens to fall within the federal government's jurisdiction. And section 1519 does not require proof of a "nexus" (proof that the

defendant knew his obstructive acts would have the "natural and probable effect" of interfering with an investigation of any matter). Yielding, 657 F.3d at 713.

**B. Superseding Indictment Counts 5 Through 24**

As it relates to this motion, the Superseding Indictment alleges the following:

Jose Susumo Azano Matsura is a citizen of Mexico, who had never applied for, nor obtained, legal permanent resident status in the United States. As a result, Azano is a "foreign national" for the purposes of 2 U.S.C. § 441e,[1] prohibited from making donations and contributions in support of any candidate for elective office. See Superseding Indictment [42] ¶ 4.

Notwithstanding that prohibition, Azano participated in San Diego area elections in 2011, 2012 and 2013 in violation of federal law. Azano designed secret methods to finance candidates' campaigns with his coconspirators because he could not openly contribute as a foreign national. Id. ¶ 21d. The methods ranged from using conduits (or "straw donors") to donate to campaigns, political parties and independent expenditure committees, with Azano reimbursing the conduits for their donations later, id. ¶ 21e, f; to creating an independent expenditure committee and funding it with money from a company he owns, id. ¶ 21g; to funding in-kind donations of social media services to campaigns, id. ¶¶ 22h, i, j. Though the methods varied, the aim remained the same: funnel Azano's own illicit funds to candidates of his choosing.

---

[1] The statute is now codified at 52 U.S.C. § 30121.

Campaign donations are recorded by law. The Federal Election Commission maintains records of federal campaign contributions; the State of California maintains records of donations to political committees; and the City of San Diego maintains records of donations to campaigns and independent expenditure committees, as well as records of expenditures made by independent expenditure committees. Id. ¶¶ 16-17. Azano's efforts to conceal and cover up the source of his donations and contributions resulted in false entries in and falsified campaign records. For example, Azano caused the submission of falsified campaign contribution envelopes to a mayoral candidate in December 2011 and January 2012, purporting to contain donations from others when the donations were, in fact, coming from Azano. Id. ¶¶ 22b; 31(5)-31(18). Those documents attempted to conceal and cover up the fact that the donors all submitted funds for Azano's benefit, with the guarantee of reimbursement by him. But the documents omitted any reference to Azano at all. That, in turn, caused the submission of a false entry into the San Diego City Clerk's Record of Donations regarding the true source of the funds.

Similarly, Azano caused the submission of campaign checks identifying others as putative donors—varying from an individual, Mark Chase, to companies, South Beach Acquisitions and West Coast Acquisitions, and even a company he owned, AirsamN492RM, LLC—when the funds were, in fact, Azano's own (illegal) funds. Id. ¶¶ 22o-t; 31(20)-(23). That caused false entries in and falsified campaign records, as well.

Finally, Azano and his co-conspirator, Ravneet Singh, hid the funding source (Azano) for social media work conducted on behalf of the campaigns, knowing that the campaigns could not accept in-kind donations from foreign nationals.  As a result, they caused false entries to be made in campaign records, which now omitted the hundreds of thousands of dollars of work completed at Azano's behest.  Id. ¶¶ 22g-i, u-z; 31(19), (24).

Although Azano attempted to conceal and cover up his donations, the Federal Bureau of Investigation ("FBI") uncovered the origin of Azano's campaign donations.  The FBI is responsible for investigating the potential influence of foreign money in federal, state and local elections, as well as unlawful conduit contributions in federal elections.  2 U.S.C. §§ 441e, 441f; see also Superseding Indictment ¶ 18.

As a result, Azano and others were charged in Counts 5 to 24 of the Superseding Indictment with offenses in violation of 18 U.S.C. § 1519.   The Superseding Indictment charges that Azano and his coconspirators "did knowingly alter, conceal, cover up, falsify and make a false entry into a record and document with the intent to impede, obstruct and influence the investigation and proper administration of matters within the jurisdiction of the [FBI] – to wit, by concealing and covering up, in records specified below, the fact that [Azano] was the true source of the following campaign donations and contributions":

- Counts 5-18: false entries caused in the San Diego City Clerk's Record of Donations for mayoral candidate 1, hiding Azano as the source of conduit contributions made through co-conspirator Marc Chase, id. ¶¶ 22a-c;

- Counts 19, 24: false entries caused in the San Diego City Clerk's Record of Donations for mayoral candidates 1 and 3, hiding Azano as the donor financing in-kind donations for social media work, id. ¶¶ 22g-i, u-z;

- Count 20: a false entry caused in the San Diego City Clerk's Record of Independent Expenditure Committees supporting candidate 1, hiding Azano as the source of conduit contributions made through his company Airsam N492RM, LLC, id. ¶¶ 22d-f;

- Count 21: a false entry caused in the Federal Election Commission's Record of Donations, hiding Azano as the source of conduit contributions made through co-conspirator Marc Chase, id. ¶ 22o;

- Counts 22 and 23: false entries caused in campaign records hiding Azano as the source of conduit contributions made through co-conspirator Marc Chase and his companies, West Coast Acquisitions, and South Beach Acquisitions, id. ¶ 22p-t.

Based in part on the above conduct, Azano was also charged in Count 1 with a conspiracy to commit section 1519 offenses, as well.

9

## ARGUMENT

### A. Foreign National Contributions Made In Connection With Local, State and Federal Elections Are Matters Within the Jurisdiction of the FBI

Azano asserts that the federal government lacks jurisdiction over local election matters, divesting the § 1519 counts of a jurisdictional basis for prosecution.[2]  See Mot. [112] at 9-22.  In support of his contention, Azano refers to various law review articles and cases suggesting that states reserve the right generally to oversee their election processes.  While that may be true, 2 U.S.C. § 441e (now 52 U.S.C. § 30121) is not an election-oversight statute.  It does not regulate how local elections are conducted; it does not prescribe when or where local elections must take place; it does not identify who, among citizens, may vote in local elections.  Instead, it simply limits financial participation in American elections to those with permanent, lasting ties to the United States:  citizens and lawful permanent residents.  That is a "compelling interest" that the Supreme Court has blessed as an appropriate and necessary part of the process of self-governance:

> It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government. It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American self-government, and in thereby preventing foreign influence over the U.S. political process.

---

[2]  Even under Azano's theory, then, Count 21, charging falsification of records in connection with a federal election would survive.

Bluman v. Fed. Election Comm'n, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three judge court), aff'd 132 S.Ct. 1087 (2012). It follows, then, that section 441e (and the FBI's investigation of violations of section 441e) are matters within the jurisdiction of a United States' department and agency.[3]

As the court in Bluman noted, and as the Supreme Court has long recognized, "[s]elf-government . . . begins by defining the scope of the community of the governed and thus of the governors as well." Cabell v. Chavez-Salido, 454 U.S. 432, 439 (1981). "[T]he distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a state." Ambach v. Norwick, 441 U.S. 68 (1979). That process of political self definition, by its nature, requires the exclusion of those who are not United States citizens. The "exclusion of aliens from basic governmental processes is not a deficiency in the democratic system, but a necessary consequence of the community's process of political self definition." Cabell, 454 U.S. at 439 (quoted in Bluman, 800 F. Supp. 2d at 288).

This is particularly true given that "Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States." Nyquist v. Mauclet, 432 U.S. 1, 7 n.8 (1977). Any "policy

[3] The Supreme Court's summary affirmance of that "compelling interest" is binding on this court. Bluman v. Fed. Election Comm'n, 132 S.Ct. 1087 (2012); United States v. Blaine Cty., Montana, 363 F.3d 897, 904 (9th Cir. 2004); Seminole Tribe v. Florida, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result, but also those portions of the opinion necessary to that result by which we are bound.").

11

toward aliens is vitally and intricately interwoven with . . . foreign relations and the war power" but also "the maintenance of a republican form of government" at home. Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952). Congress may therefore further its compelling interest in protecting American democracy from foreign infiltration at all levels of government. Cf. U.S. Const. Art. IV, § 4 (Republican Form of Government Clause).

As a result, while "foreign citizens in the United States enjoy many of the same constitutional rights that U.S. citizens do," they may be denied certain rights and privileges when democratic self-governance is at stake. 800 F. Supp. 2d at 286-87. "For example, the Supreme Court has ruled that the government may bar aliens from voting, serving as jurors, working as police or probation officers, or teaching at public schools," all activities that form part of the democratic self definition process. Id. at 283; see also id. at 287 (collecting Supreme Court cases). Those Supreme Court cases "draw[] a fairly clear line: the government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'" Id. at 287. A "State's historical power to exclude aliens from participation in democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of political community." Id. (quoting Foley v. Connelie, 435 U.S. 291 (1978) (upholding law barring foreign citizens from serving as police officers)); see also id. ("[T]he government may reserve participation in its democratic political institutions for citizens of this country."); Foley, 435 U.S. at 297 ("[A]lthough we

extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.").

Political contributions and express advocacy expenditures are part of the process of democratic self-government that may be limited to citizens. 800 F. Supp. 2d at 288. Because the Supreme Court "has deemed activities of democratic self-government to include functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers," it follows that "spending money to influence voters and finance campaigns is at least as (and probably far more) closely related to democratic self-government." Id.

Section 441e is the latest in a long line of Congressional efforts to "define" the scope of the community that may legitimately try to sway elections in the United States. In 1935, a congressional investigation found that the Nazi party of Germany and other foreign organizations had paid for propaganda disseminated by "a large number of aliens who, although they had resided in this country for a number of years, had never made an effort . . . to become citizens." H.R. Rep. No. 153, 74th Cong., 1st Sess. 7 (1935). In response, Congress enacted the Foreign Agents Registration Act of 1938 ("FARA") to "identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment." Viereck v. United States, 318 U.S. 236, 241 (1943). FARA required each agent of a foreign principal to register with the

government and disclose certain information, including the principal's identity and the contractual terms of the agent's representation. FARA § 2.

FARA, however, did not limit the amounts that agents could spend to achieve their foreign principals' goals. In the early 1960s, an extensive series of hearings explored the effects of such spending. See Activities of Nondiplomatic Representatives of Foreign Principals in the United States: Hearings Before the S. Comm. On Foreign Relations, 88th Cong., 1st Sess. (1963). Agents of foreign principals testified regarding their efforts to induce policy decisions favorable to foreign governments and businesses, including by funneling contributions from foreign principals to Members of Congress. For example, the Philippine sugar industry, which had an interest in the United States government's allocation of federal sugar import quotas, contributed through the industry's registered agent to the campaigns of 20 members of Congress. Id. at 195-212. In 1966, Congress therefore amended FARA to prohibit any person acting under the direction and control of a foreign principal from "knowingly making any contribution 'in connection with an election to any political office.'" 18 U.S.C. § 613 (1970).

Even as amended, FARA did not prohibit foreign principals from making contributions directly rather than through agents. During the Watergate investigation, allegations surfaced that the Nixon campaign had received contributions from citizens of foreign countries. One such contribution investigated by the Watergate special prosecutor was made by a Greek industrialist soon after his firm was awarded a

contract to supply fuel to the U.S. Sixth Fleet.  <u>See</u> Seth Kantor, <u>Jaworski Eyes Probing Foreign '72 Gifts</u>, Wash. Post, Jan. 25, 1974, at A9.

Congress sought to limit such contributions when it enacted the Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101(d), 88 Stat. 1267.  That law expanded FARA's prohibition on campaign contributions by agents of foreign principals to encompass contributions by any "foreign national," in other words, any person who was not a United States citizen or lawful permanent resident. That extension, however, proved ineffective in limiting foreign national contributions through a "soft money loophole."  Those foreign nationals donated to political parties to finance activity at the state and local level, and gained unprecedented access to political leaders at the federal and state levels.

The controversy generated by reports of such fundraising led to a Senate Committee investigation on "foreign contributions and their effect on the American political system."  S. Rep. No. 167, 105th Cong., 2d Sess 11 (1998) ("Thompson Committee Report").  The Thompson Committee Report was nearly 10,000 pages long, and cataloged numerous instances of foreign nationals gaining access to political leaders through campaign contributions and donations.  For example, the investigation revealed efforts by agents of the Chinese government to devise "a seeding strategy of developing viable candidates sympathetic to the [People's Republic of China] for future federal elections . . . and financing American elections through covert means." <u>Id.</u> at 47, 2501-2512.  Those efforts included not only federal elections, but "state

elections as well." Id. at 2509. The Report identified a foreign national, who donated $100,000 to the elected state treasurer of California, who had responsibility for investment of billions of dollars in pension assets. Id. at 971-972, 5576-5581, 5584.

As a result of the Thompson Committee Report findings, Congress passed the current version of section 441e in 2002, which makes it unlawful for a "foreign national, directly or indirectly, to make"

- A contribution or donation in connection with a federal, state, or local election, 2 U.S.C. § 441e(a)(1)(A);

- A contribution or donation to a committee of a political party, id. § 441e(a)(1)(B); or

- An expenditure, independent expenditure or disbursement for an electioneering communication, 2 U.S.C. § 441e(a)(1)(C).

Section 441e is narrowly tailored to address the "compelling interest of limiting participation of non-Americans in the activities of democratic self-government"—whether at the local, state or federal level—and a proper exercise of Congressional authority.[4]

None of the cases Azano cites disturbs that conclusion. See Mot. at 10-22. The referenced cases touch on Congressional authority to impose federal regulations on

---

[4] As explained further in the response to Azano's Motion to Dismiss Counts 1 and 3 on constitutional grounds [107], section 441e is also not unlawful to the extent it prohibits contributions beyond those that create the danger of quid pro quo arrangements. See Mot. [112] at 20-21; Bluman, 800 F. Supp. 2d at 289 ("the majority opinion in Citizens United is entirely consistent with a ban on foreign contributions and expenditures").

16

state elections, as they relate to <u>citizens</u>—and have nothing to do with Congress's plenary authority to preserve a Republican form of government, oversee foreign relations, and set laws related to immigration by limiting foreign national influence in campaigns. <u>Oregon v. Mitchell</u>, cited by Azano, for example, decided only whether the federal government could require states to accept votes from "18-year-old <u>citizens</u> in state and local elections." 400 U.S. 112, 112 (1970) (emphasis added). <u>Pope v. Williams</u>, 193 U.S. 621, 632 (1904), decided whether a citizen of the United States had a constitutional right to vote in a state election, even though he had failed to comply with registration requirements under state law. <u>United States v. Reese</u> decided whether a general federal statute could be used to criminally charge inspectors of a municipal election who refused to count the vote of "a <u>citizen of the United States</u> of African descent." 92 U.S. 214, 215 (1876) (emphasis added).[5] <u>Minor v. Happersett</u> concluded that all women could be denied the right to vote in state elections, even though they were citizens of the United States. 88 U.S. (21 Wall.) 162, 177 (1874). And <u>Dred Scott</u> was not a decision about voting at all, but whether the Missouri Compromise was lawful and whether a slave was a citizen permitted to sue in federal court at all. 60 U.S. (19 How.) 393, 405 (1856). Putting aside the ignominy of those cited cases, none forbids Congress from excluding aliens from the democratic

---

[5]     And in <u>Reese</u>, the Supreme Court decided solely on statutory grounds that the conduct charged was not covered, not that the statute was an unconstitutional exercise of Congress's power. As the Court concluded, "Congress has not as yet provided by 'appropriate legislation' for the punishment of the offence charged in the indictment." <u>Reese</u>, 92 U.S. at 221.

processes of self-governance in the United States by limiting their financial contributions in local, state or federal elections.

It does not matter that some local jurisdictions may permit aliens to vote. Even if some jurisdictions permit non-citizens to vote, see Mot. [112] at 14-17, that is a matter of grace, not constitutional requirement. Sugarman v. Dougall, 413 U.S. 634, 649 (1973) (holding that "citizenship is a permissible criterion" in limiting voting rights). Moreover, Congress's measured response to the Thompson Committee Report by addressing the pressing harms—foreign money that could buy influence in American politics—does not somehow divest Congress of the authority to act simply because it did not go further in denying all aliens the right to vote at all. Cf. Buckley v. Valeo, 424 U.S. 1, 105 (1976) (Congress may "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind"). In any event, aliens' ability to vote in primary school board elections in Arlington, Virginia, for example, has no bearing here. Azano does not claim to vote in San Diego local, California state, or federal elections. See Mot. [112] at 14. Thus no disconnect between voting and contribution rights is presented here.

Section 441e is a valid exercise of Congressional power to ensure foreign money does not buy influence from any elected official or influence the outcome of an election in the United States. Any record keeping violation knowingly committed in contemplation of any matter within FBI's jurisdiction (like a section 441e investigation), with the intent to impede, obstruct, or influence such a matter is

14CR0388-MMA

properly the subject of an 18 U.S.C. § 1519 offense.[6]  See Yates v. United States, 135 S. Ct. 1074, 1083 (2015) (Section "1519 is a penal provision" covering "federal investigations or proceedings of every kind, including those not yet begun."); id. at 1085 n.5 (noting that the Senate Committee Report explained that "the intent of the provision is simple; people should not be destroying, altering or falsifying documents to obstruct any government function").

## B. Sections 1519 and 2b Cover the Conduct Alleged in Counts 19 and 24

Azano next moves to dismiss Counts 19 and 24 for failure to state an offense. The allegations in the indictment must be accepted as truth in analyzing whether a cognizable offense has been charged when challenged under Federal Rule of Criminal Procedure 12.  United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).  The four corners of the indictment serve as the basis for evaluating the sufficiency of an indictment, and a "motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence."  Id. (internal citation omitted).  Thus, motions to dismiss cannot be used to determine "general issues of guilt or innocence."  Id.

An indictment need contain only a "plain, concise and definite written statement of the essential facts constituting the offense charged[.]"  Fed. R. Crim. P. 7(c)(1).  As a result, it is often acceptable for an indictment to set forth the offense

---

[6] Thus, the FBI is in a different position than the Department of Labor as described in United States v. Facchini, 874 F.2d 638 (9th Cir. 1989).  See Mot. [112] at 20-21. While the federal government was not "empowered to act on the fraudulent claims of applicants for state unemployment benefits" there by statute, the FBI here is charged with enforcing section 441e and therefore "empowered to act" on the fraudulent records Azano created and caused to be created.

19

in the language of the statute itself, "as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Hamling v. United States, 418 U.S. 87, 118 (1974). The indictment must contain a "statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Id.

Counts 19 and 24 state a claim under § 1519. The Superseding Indictment charges that Azano and his coconspirators "did knowingly alter, conceal, cover up, falsify and make a false entry into a record and document with the intent to impede, obstruct and influence the investigation and proper administration of matters within the jurisdiction of the [FBI] – to wit, by concealing and covering up, in records specified below, the fact that [Azano] was the true source of the following campaign donations and contributions." For Count 19, that was causing the creation and submission of a San Diego City Clerk's office record that omitted any reference to $128,000 in in-kind services provided by Singh as financed by Azano. For Count 24, that was causing the creation and submission of a San Diego City Clerk's office record that omitted any reference to $191,950 in in-kind services provided by Singh as financed by Azano.

Under section 1519, that is sufficient to state a claim. Azano nonetheless claims that the omission of his donations from the campaign records cannot support a § 1519 prosecution because omissions are not actionable because he "had no duty to

report the donations." Mot. [112] at 23. But that is not true. Under California law, any person or group of person who donate or independently expend more than $10,000 on behalf of a candidate is considered a "committee." See San Diego Municipal Election Campaign Control Ordinance ("SDMECCO") § 27.2903; Cal. Gov. Code § 82013. "Committees" are required to disclose contributions and expenditures made in connection with an election. Cal. Gov. Code § 84203.5; SDMECCO § 27.2930. Those contributions must be reported on California Form 465 or Form 496, depending on the time of the contribution or expenditure. Id.

The value of the contributions (whether seen as a donation or independent expenditure) alleged in the Superseding Indictment ($128,000 in February 2012 for Count 19 and $191,950 in November 2012 for Count 24) renders Azano a "committee" within the meaning of San Diego and California election law. See San Diego Municipal Election Campaign Control Ordinance § 27.2903; Cal. Gov. Code § 82013. Accordingly, Azano was subject to a reporting duty. By Azano's own account, such a duty renders the omissions actionable under section 1519. See Mot. [112] at 23 ("A non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged."); see also United States v. Norman, 2015 WL 737649, *4-6 (E.D. Pa. Feb. 23, 2015) (collecting cases and concluding that "an omission can indeed constitute a violation of § 1519"); United States v. Taohim, 529 Fed. App'x 969, 974 (11th Cir. 2013)

21

(describing omission of information from a record book that served as basis for § 1519 prosecution).

Even if Azano had no independent duty to report his donations and expenditures,[7] Azano ignores the import of section 2(b) liability. By his actions, Azano willfully caused the campaign to make and submit falsified campaign records (or make records containing false entries). Under well-established law regarding section 2(b) liability ("whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal"), Azano is liable for the omission's he willfully caused from the campaigns' disclosures. 18 U.S.C. § 2(b).

Azano does not (and on the face of the indictment cannot) dispute that donations to campaigns "had to be reported to government agencies, which maintained records that the public and law enforcement agencies could access." Superseding Indictment ¶ 16. That is the prevailing law. Campaigns themselves are required to submit donation records under San Diego law. See Superseding Indictment ¶ 16; see also San Diego Municipal Code §§ 27.2930, 27.2931 (requiring disclosure of campaign contributions, which include, among other things, the "forgiveness of a debt or other obligation to pay for goods or services rendered, or reduction of the amount of the debt or other obligation to pay for goods or services

---

[7]    Courts have premised § 1519 liability on defendants who have no duty to create or retain records at all. See, e.g., United States v. Kernell, 667 F.3d 746, 756 (6th Cir. 2012) ("In addition, courts have imposed liability under § 1519 on defendants who clearly had no legal obligation to create or maintain the records at issue.").

rendered"). The campaign records submitted in this case were false: they omitted the in-kind donations financed by Azano. If Azano himself had submitted the campaign records that are the subject of Counts 19 and 24, he would have knowingly created and submitted a falsified record because the record did not contain entries about the money he had donated, a § 1519 offense. Azano does not evade criminal culpability by causing the campaign instead to submit the falsified record. See, e.g., United States v. Fairchild, 990 F.2d 1139, 1141 (9th Cir. 1993) (though defendant did not make false statements himself or direct anyone to make false statements, he could be held liable under 18 U.S.C. § 2(b) because of actions that caused false statements to be made to the government); United States v. Causey, 835 F.3d 1289 (9th Cir. 1987) (tax preparer may be held liable under § 2 for making a false tax claim when he causes another to file the tax claim); United States v. Rowland, 2014 WL 3341690 (D. Conn. July 8, 2014) (explaining section 2b liability for false statements made by a candidate to the Federal Election Commission, which were caused by the defendant, a political consultant, who attempted to conceal his efforts in the campaign); cf. United States v. Kanchanaluk, 192 F.3d 1097, 1042 (D.C. Cir. 1999) ("By thus causing political committees to report conduits instead of the true sources of donations, defendants have caused false statements to be made to a government agency."). Because Azano willfully caused the campaign to falsify a record of campaign donations (by concealing and covering up his funding of Singh's work), he "is punishable as a principal for the offense." 18 U.S.C. § 2(b).

These conclusions are not a result of any "ever-expanding theory of criminal liability under section 1519," but a result of the plain text of the statute and well-established law regarding § 2(b) liability as a principal. Mot. [112] at 24. Because the conduct alleged in Counts 19 and 24 falls squarely within the prohibition of "falsifying" or "making a false entry" in a record to "conceal" and "cover up" conduct, and willfully causing such acts, 18 U.S.C. § 1519 and § 2(b), the motion to dismiss Counts 19 and 24 should be denied.

### C/D. Azano's Challenge to Counts 20, 22 and 23 are Factual Defenses That Are Not Appropriate for a Motion to Dismiss

Azano contends that Counts 20, 22, and 23 should be dismissed because a donation by a United States corporation violates no laws, and the company identified as the donor in the challenged counts are each United States corporations. Mot. [112] at 24-27. That ignores, however, the language of the Superseding Indictment, charging Azano with "concealing and covering up . . . the fact that [Azano] was the true source of the . . . campaign donations and contributions," not the United States companies. See Superseding Indictment ¶ 20. The companies, therefore, were nothing more than "straw donors" acting at Azano's behest. Though Azano now refutes that allegation, an indictment is not defective simply because the facts alleged are disputed; rather, the facts alleged must be presumed to be true. Boren, 278 F.3d at 914; see also United States v. Sisson, 399 U.S. 267, 288 (1970) (a question of evidence is not a question about the sufficiency of the indictment); Rowland, 2014 WL 3341690 at *6 (where campaign consultant was charged with false statements in a

campaign document designed to hide his role in the campaign, claim that the document contained no false statement was a defense for trial, not a basis to attack the indictment).  Because the Superseding Indictment alleges that Azano was the true donor, not any United States corporation, he caused (with the requisite intent) the campaigns to make false records identifying a false donor.  That is sufficient to state a claim under § 1519.

**E. Section 1519 is not Unconstitutionally Vague**

Azano does not clearly identify what he complains is unconstitutionally vague in section 1519, but appears to raise three separate concerns:  (1) the phrase "in relation to or contemplation of such matter or case" is unclear; (2) the statute is vague as applied to claims relating to omissions in campaign records; and (3) that the statute is unclear to the extent it covers records regarding donations by United States corporations.  Mot. [112] at 27-29.

The Fifth Amendment's Due Process Clause protects against criminal convictions based on impermissibly vague statutes.  Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19 (2010).  "'A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Id. (quoting United States v. Williams, 553 U.S. 285, 304 (2008)). A person whose conduct is clearly proscribed by a statute cannot, however, complain that the law is vague as applied to the conduct of others.

Id. at 2719 (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

Courts have routinely rejected vagueness challenges to the phrase "in contemplation of" in section 1519. For example, the court explained in United States v. Kernell, that

> Courts considering the question have consistently held that the belief that a federal investigation directed at the defendant's conduct might begin at some point in the future satisfies the "in contemplation" prong. We articulated this principle clearly in United States v. Lanham, 617 F.3d 873 (6th Cir.2010). In Lanham, corrections officers intentionally placed an 18–year–old who had been arrested for speeding and eluding police in the general population cell as a punishment for attempting to assault a friend of the officers. Lanham, 617 F.3d at 879–80. When the young man was later sexually assaulted by inmates, the officers signed a statement that he was placed in general population because of the need to decontaminate available "detox" cells. Id. at 881. After being convicted under § 1519, the officers argued on appeal that they did not make their false statement "in contemplation" of an investigation because no investigation had begun at the time. Id. at 887. The Court affirmed the conviction, stating that "the falsification was presumably done in contemplation of an investigation that might occur." Id.

> While this interpretation makes "in contemplation" under § 1519 very broad, it is consistent with the legislative history and other cases to consider the question. See Jho, 465 F.Supp.2d at 636 ("[I]mposing a requirement that the matter develop into a formal investigation ignores the plain meaning of the statute and the legislative history."); see also United States v. Ionia Mgmt., S.A., 526 F.Supp.2d 319, 329 (D.Conn.2007) ("In comparison to other obstruction statutes, § 1519 by its terms does not require the defendant to be aware of a federal proceeding, or even that a proceeding be pending.").

667 F.3d 746, 755 (6th Cir. 2012); see also United States v. Moyer, 674 F.3d 192, 212 (3d Cir. 2012) ("in contemplation" clause not vague, though it "makes criminal

liability very broad under § 1519," this "is consistent with the legislative history and other cases to consider the question").

The scienter requirement of § 1519 mitigates the breadth of the "in contemplation" clause as well. See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 & n.14 (1982) (noting that "the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," and collecting cases). Specifically, it requires that the individual commit the omission "knowingly" and "with the intent to impede, obstruct, or influence" any matter that is within the jurisdiction of any department or agency of the United States. 18 U.S.C. § 1519. Accordingly, the statute does not criminalize innocent or inadvertent conduct, as suggested by the defendant. See also United States v. Yielding, 657 F.3d 688, 711 (8th Cir. 2011) ("[Section 1519] does not impose liability ... without an intent to impede, obstruct, or influence a matter. If it did, then the statute would forbid innocent conduct such as routine destruction of documents that a person consciously and in good faith determines are irrelevant to a foreseeable federal matter.").

The whole point of Azano's scheme was to evade detection for financing campaigns by concealing and covering up his monetary trail from authorities. As such, he cannot complain that he had no knowledge that his efforts to conceal that trail would result in an investigation. Thus, to the extent there are any ambiguities in the "contemplation" prong, Azano may not raise or rely on them. See Humanitarian Law

Project, 130 S.Ct. at 2720; Kernell, 667 F.3d at 752 (vagueness challenge to contemplation prong not available to defendant who obviously knew that investigation would result).

Nor is section 1519 vague for covering omissions in the false campaign records submitted. As the district court noted in Norman,

> the language of § 1519 gives a "person of ordinary intelligence a reasonable opportunity" to anticipate that knowingly making an omission with the intent to impede the investigation of a matter under federal jurisdiction is criminal conduct under the statute. Section 1519 describes a broad range of conduct—"alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry"—which as a whole, creates the clear impression that the statute is concerned with any intentionally deceptive behavior regarding records, documents, and objects. Omissions can, of course, be intentionally deceptive—as the saying goes, "a lie of omission is still a lie."

2015 WL 737649 at *6. And "even assuming for the purposes of the analysis that the statute criminalizes omissions without expressly saying so, its scienter requirement keeps it from being vague." Id. ("Specifically, it requires that the individual commit the omission 'knowingly' and 'with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States.'").

Finally, Azano's complaint about the companies is a factual dispute about the true source of the funds, and not the result of any vagueness in the plain language of the statute. Mot. [112] at 27; Boren, 278 F.3d at 914; see also United States v. Sisson, 399 U.S. 267, 288 (1970) (a question of evidence is not a question about the sufficiency of the indictment); Rowland, 2014 WL 3341690 at *6 (where campaign

28

consultant was charged with false statements in a campaign document designed to hide his role in the campaign, claim that the document contained no false statement was a defense for trial, not a basis to attack the indictment). Accordingly, he may not dress the factual claim as a constitutional vagueness challenge to seek dismissal. The motions should be denied.

### F. There Is No Error in Instruction to the Grand Jury

Azano's final contention is a derivative challenge based on the complaints above. Azano contends that the grand jury was mis-instructed because (1) local elections are not matters within federal jurisdiction; and (2) the conspiracy charge necessarily incorporated a defective understanding of the federal government's jurisdiction on the 1519 offenses. But because the jurisdictional argument lacks merit, as shown above, his challenge, here, too, must be denied.

## IV

## CONCLUSION

For the foregoing reasons, the Court should deny the motions to dismiss Counts 5 through 24.

DATED: July 3, 2015                     Respectfully submitted,

                                        s/ William P. Cole
                                        s/ Andrew G. Schopler
                                        s/ Helen H. Hong
                                        WILLIAM P. COLE
                                        Acting United States Attorney
                                        ANDREW G. SCHOPLER
                                        HELEN H. HONG
                                        Assistant United States Attorney

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

JOSE SUSUMO AZANO MATSURA (1),

      Defendant.

Case No.: 14CR0388-MMA

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

I, William P. Cole, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the foregoing brief on the parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 3, 2015

          *s/ William P. Cole*

          WILLIAM P. COLE