WILLIAM P. COLE
Attorney for the United States (Under 28 U.S.C. § 515)
California State Bar No. 186772
ANDREW G. SCHOPLER
HELEN H. HONG
Assistant U.S. Attorneys
California State Bar Nos. 236585/235635
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-6762/-8068/-6990
Fax: (619) 546-0631
Email: William.P.Cole@usdoj.gov / Andrew.Schopler@usdoj.gov
Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14CR0388-MMA |
| Plaintiff, | **UNITED STATES' RESPONSE IN OPPOSITION TO** |
| v. | |
| JOSE SUSUMO AZANO MATSURA (1),<br>    aka Mr. A.,<br>    aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>    aka Ravi Singh, | **DEFENDANT AZANO'S MOTIONS TO:**<br>**(1) SUPPRESS SEARCH WARRANT EVID.**<br>**(2) AUTHORIZE SUBPOENA FOR SEMPRA EMAIL CHAIN**<br>**(3) DISMISS INDICTMENT FOR CONFLICT OF INTEREST, OR RECUSE U.S. ATTORNEY'S OFFICE** |
| Defendants. | |
| | **DEFENDANT SINGH'S MOTIONS TO:**<br>**(1) SUPPRESS SEARCH WARRANT EVID.** |
| | Date:    October 6, 2015<br>Time:    1:30 p.m.<br>Judge:   Hon. Michael M. Anello<br>Ctrm:    3A |

# I

# INTRODUCTION

Defendants Azano and Singh now tilt at the search warrant windmill.  Although an overpowering array of evidence supported each search warrant application—including one affidavit that topped 100 pages—their primary attack is to deny the existence of probable cause.  Their motions should fail.

## II

## FACTS

The current motions mostly revolve around three disputed search warrants.  One is relevant to defendant Singh's claims: On October 29, 2013, a District of Columbia magistrate judge authorized a search warrant for Singh's business, the ElectionMall headquarters in Washington, D.C. Exh. 3.[1]

Two warrants are material to Azano's motions: On August 21, 2012, U.S. Magistrate Judge Jan M. Adler signed a delayed-notice, or "sneak-and-peek," search warrant for two San Diego accounting offices, where Azano's former accountant had recently worked. Exh. A.[2]  On January 21, 2014, U.S. Magistrate Judge Barbara L. Major authorized a search warrant for Azano's Coronado homes. Exh. B.[3]

We will discuss the facts surrounding each of these warrants as necessary in the argument sections below.

## III

## RESPONSE TO DEFENDANT SINGH'S MOTION TO SUPPRESS

**A.     THE ISSUING JUDGE DID NOT COMMIT CLEAR ERROR IN AUTHORIZING A SEARCH WARRANT FOR SINGH'S ELECTIONMALL OFFICE, SINCE THERE WAS OVERWHELMING PROBABLE CAUSE**

In a 32-page affidavit, agents set forth a colossal amount of evidence that defendant Singh was engaged in campaign finance fraud on behalf of two San Diego political

---

[1] "Exh. 3" refers to the search warrant affidavit for ElectionMall's office in Washington, D.C., which defendant Singh attached as Exhibit 3 to the Declaration of Jason M. Ohta in support of his motion to suppress.

[2] "Exh. A" refers to the sneak-and-peek search warrant and affidavit for the accounting offices at 1542 and 1536 Lancaster Point Way, San Diego, which Azano attached as Exhibit A to the Declaration of Knut S. Johnson in support of his motion to suppress.

[3] "Exh. B" refers to the search warrant affidavit for Azano's Coronado residences, which Azano attached as Exhibit B to the Declaration of Knut S. Johnson in support of his motion to suppress.

campaigns, and that the most likely place for him to keep records of those criminal activities was at his company ElectionMall's sole working office. Singh cannot show that the issuing judge committed clear error in finding probable cause to search that office.

### 1.    Defendant Bears the Burden to Show a Lack of Probable Cause

"The burden is on a defendant who seeks to suppress evidence obtained under a regularly issued search warrant to show the want of probable cause." *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir. 1962) (citations omitted).

### 2.    Standard of Review: Clear Error

Courts review the issuance of a warrant "for clear error, in order 'to determine whether the [judge] had a substantial basis to conclude that the warrant was supported by probable cause.'" *United States v. Fernandez*, 388 F.3d 1199, 1252 (9th Cir. 2004) (citing *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984) (per curiam)). In *Upton*, the Supreme Court emphasized that probable-cause rulings require a "deferential standard of review," and that "the task of a reviewing court is not to conduct a de novo determination of probable cause." *Id.* at 728, 733.

### 3.    Governing Law: Probable Cause

"The probable cause standard for a search warrant is whether, based on common sense considerations, there was 'a fair probability that contraband or evidence of a crime [would] be found in a particular case.'" *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (citing, among other cases, *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Gates*, 462 U.S. at 230-31 (adopting "totality-of-the-circumstances approach" to probable cause). The Ninth Circuit's oft-quoted explanation of *Gates*' "fair probability" standard makes clear that the probable-cause threshold is certainly lower than a preponderance of the evidence:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

*Fernandez*, 388 F.3d at 1254 (citations omitted).

*14CR0388-MMA*

### 4.  The Search Warrant Affidavit for Singh's ElectionMall Office Was Supported by Overwhelming Probable Cause

The search warrant affidavit conclusively showed that Singh provided unreported in-kind contributions to two separate political campaigns and that Azano secretly financed this unreported campaign work.  Furthermore, it established that the most reasonable place to seek evidence of these campaign finance crimes was at Singh's sole physical working office.

a.  *Probable Cause of Criminal Activity*

In summary, the affidavit set forth the following staggering amount of evidence that campaign finance crimes were committed:

Singh's In-Kind Contributions to Candidate 1; Azano's Financing

- On February 26, 2012, an ElectionMall director emailed a request for Azano to pay invoices totaling $200,000, including a $75,000 invoice relating to Candidate 1's campaign to "PROMOTE: Online Outreach **Any of the following: Display Ads, Banner Ads, Text Ads, Key Ad Word Placement." Both Azano and Singh were cc'ed on the email. Exh. 3, at 1965, ¶¶19-20.

- On March 13, 2012, the same ElectionMall director emailed Azano with new invoices, including one that increased the cost from $75,000 to $100,000 for Candidate 1's campaign "Online Outreach" and another for $28,000 for "Google key ad words advertising, design charges, media buys, and placement charge." Exh. 3, at 1966, ¶¶21-22.

- That same day, Azano responded by email that he refused to pay the additional $25,000 for Candidate 1's campaign "Online Outreach," writing, "No more money that wasn't the agmt with Ravi [Singh] we will only transfer what I told him." Exh. 3, at 1966, ¶22.

- On April 13, 2012, an Azano-affiliated company wired $174,979 to an ElectionMall bank account. Exh. 3, at 1966, ¶22.

Singh's In-Kind Contributions to Candidate 3; Azano's Financing

- According to Candidate 3's campaign manager:

  - In early October 2012, Singh and his associates moved into Candidate 3's campaign office and offered to handle "social media efforts, such as boosting Facebook 'likes' and online branding." Exh. 3, at 1969, ¶33.

  - Singh said his fee would be "taken care of" and gave the campaign manager the impression that Singh intended to perform campaign

4

services without conducting the mandatory reporting. Exh. 3, at 1969-70, ¶33.

     o  Singh in fact worked for Candidate 3's campaign, using social media to make Candidate 3's Facebook "likes" grow exponentially and "burying news about other candidates amidst positive media coverage of [Candidate 3] online." Exh. 3, at 1970, ¶34.

- Candidate 3's campaign did not pay Singh for his work, nor did it list Singh's work as an in-kind contribution on any of its public filings. Exh. 3, at 1970, ¶35.

- No independent expenditure committee reported Singh's work as a contribution to Candidate 3's campaign. Exh. 3, at 1970, ¶35.

- On October 15 and October 29, 2012, an Azano-affiliated company wired ElectionMall payments of $96,980 and $94,975, respectively, which tended to confirm that Azano made sure Singh's expenses for Candidate 3 were "taken care of." Exh. 3, at 1970, ¶36.

- On December 3, 2012, during Candidate 3's inauguration, Azano's head of security introduced Azano to Candidate 3's campaign manager, explaining that Azano "helped fund the [Candidate 3] campaign's social media efforts [that is, through Singh's social media campaign work]," according to the campaign manager. Exh. 3, at 1972, ¶44.

- At the inauguration, during a conversation about Singh, a high-profile political consultant told Candidate 3's campaign manager that he "did not want to know any more about Singh because he believed [Candidate 3]'s campaign was running an 'IE' [independent expenditure] out of the campaign offices." Exh. 3, at 1972, ¶44.

<u>Further Evidence of Azano's Involvement in Campaign Finance Fraud</u>

- In addition, the affidavit recounts a mountain of evidence—from bank and telephone records, to informant and cooperator information, to surreptitious recordings—that establish that Azano used conduits and other means to violate campaign finance laws. Exh. 3, at 1959-79, ¶¶1-66.[4]

       b.   *Probable Cause that Evidence Would Be Found at ElectionMall Office*

A search warrant affidavit must establish "only a reasonable nexus between the activities supporting probable cause and the locations to be searched." *Fernandez*, 388 F.3d at 1253 (citation omitted). Here the affidavit did so by setting forth evidence that the

---

[4] The United States is *not* relying for probable cause on the affidavit's discussion of Singh's wiretapped conversations, in which he admitted having possession of a Candidate 3 "voter file" that Azano purchased, which was worth $50,000. Exh. 3, at 1971-72, ¶¶38-42. *See also* Doc. 188, at 9 (this Court's order on mootness of wiretap motions).

ElectionMall office to be searched was its "sole working office in the United States," and that other listed ElectionMall business locations were "virtual offices where no substantive business would be conducted." Exh. 3, at 1980 n. 7; 1981, ¶71. Furthermore, according to Candidate 3's campaign manager, when Singh left Candidate 3's campaign offices he took his computers and files with him, whereas most of the campaign's materials were moved to a San Diego storage unit. *Id.*; Exh. 3, at 1970, ¶35; 1981, ¶71. This suggests that "Singh and ElectionMall centrally maintain files for the projects on which they have worked." Exh. 3, at 1981, ¶71.

In addition, agents who went to the Washington, D.C.-based ElectionMall office observed computers there and "filing cabinets in Singh's office." And Singh once mentioned that someone in Washington, D.C., might send an invoice out for his work. Exh. 3, at 1981, ¶¶70-71. Finally, the search warrant affiant—an FBI Special Agent with a decade of experience, a specialization in public corruption, and a Certified Public Accountant license—concluded that there was probable cause to believe that "Singh maintains records of ElectionMall's activities at this location." Exh. 3, at 1959, ¶1; 1980-81, ¶70. "[A] magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *Fernandez*, 388 F.3d at 1253 (citation omitted).

Thus, U.S. Magistrate Judge Deborah Robinson did not commit clear error in authorizing the search warrant for ElectionMall's office. She had a substantial basis for concluding there was a "fair probability" that evidence would be found there; that is, "it would be reasonable to seek the evidence in the place indicated in the affidavit." *Fernandez*, 388 F.3d at 1254 (citations omitted).

**B.     SINCE AGENTS FOLLOWED A RIGOROUS AND JUDICIALLY-APPROVED ELECTRONIC SEARCH PROTOCOL—AND SINCE SINGH FAILS TO IDENTIFY *ANY* EXTRACTED DIGITAL EVIDENCE THAT WAS OUTSIDE THE WARRANT'S SCOPE—HIS MOTION TO SUPPRESS FOR AN UNCONSTITUTIONALLY OVERBROAD SEIZURE SHOULD BE DENIED**

The ElectionMall affidavit included a six-page long electronic search protocol, which the search warrant incorporated by reference. Exh. 3, at 1983-1988, ¶74(a)-(l);

1995 n. 1. This protocol was inspired by the Ninth Circuit's en banc opinion in *United States v. Comprehensive Drug Testing, Inc.* ("*CDT*"), 621 F.3d 1162 (9th Cir. 2010) (en banc). That decision recognized "the reality that over-seizing is an inherent part of the electronic search process" and held that this called for issuing judges to exercise "greater vigilance" regarding the process of segregating electronic data. *Id.* at 1177 (per curiam opinion). The concurring opinion went on to advise a precautionary search protocol for digital evidence cases. *Id.* at 1179-80 (Kozinski, C.J., concurring). The constitutional concern animating this decision was the need to prevent "the government from overseizing data and then using the process of identifying and segregating seizable electronic data 'to bring constitutionally protected data into . . . plain view.'" *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013) (quoting *CDT*, 621 F.3d at 1171 (per curiam opinion)).

Thus, while defendant Singh is correct that the "wholesale seizure of intermingled electronic documents that were reviewed by the government after the fact and without judicial oversight" might raise constitutional problems, no such abuses occurred here. Singh Mem., at 9. The incremental search, forensic imaging, identification, segregation, and extraction of relevant digital data involved extensive judicial direction and oversight. Far from "flagrantly disregard[ing]" the search warrant's terms, agents followed the prescribed search protocol to the letter. Singh Mem., at 9-10. This procedure was evidently so successful that Singh is unable to identify even *one* item of extracted digital data that was outside the warrant's scope.

Since the judicially-authorized electronic search protocol was detailed and rigorous, and since Singh fails to identify any extracted digital evidence that was outside the warrant's scope, his motion to suppress for an unconstitutionally overbroad seizure should be denied.

//

//

//

*14CR0388-MMA*

**C.      MOREOVER, THE "GOOD FAITH" EXCEPTION TO THE EXCLUSIONARY RULE APPLIES, SINCE THE AGENTS' RELIANCE ON THE FACIALLY VALID ELECTIONMALL SEARCH WARRANT WAS OBJECTIVELY REASONABLE**

Even assuming for the sake of argument that the warrant was deficient, the agents' objectively reasonable reliance upon it means that the exclusionary rule's "good faith" exception applies, and no evidence should be suppressed. *United States v. Leon*, 468 U.S. 897, 922 (1984) ("[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."); *see also Herring v. United States*, 555 U.S. 135, 143 (2009) ("[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.") (citations and internal punctuation omitted).

None of the "good faith" exception's caveats pertain here: (1) the issuing judge was not misled by false information in the affidavit; (2) the magistrate judge did not wholly abandon her judicial role; and (3) the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (citations omitted).

## IV

## RESPONSE TO DEFENDANT AZANO'S VARIOUS MOTIONS

**A.      AZANO HAS FAILED TO CARRY HIS BURDEN TO ESTABLISH STANDING TO CHALLENGE THE SNEAK-AND-PEEK SEARCH WARRANT FOR THE ACCOUNTING OFFICES, BECAUSE HE HAS NOT SHOWN ANY PERSONAL CONNECTION TO THE PLACE SEARCHED AND ITEMS SEIZED**

Defendant Azano has not shown that he had exclusive use of the accounting offices that were the target of the sneak-and-peek search, or that he had personal ownership or custody of any of the items seized. Thus, he has failed in his threshold task of establishing standing[5] to contest the sneak-and-peek search of the accounting offices, and his motion to suppress the fruits of that search should be denied.

---

[5] In the Fourth Amendment context, the Supreme Court has expressly rejected the "rubric of 'standing'" in favor of the "legitimate expectation of privacy" standard.

*14CR0388-MMA*

### 1. **Defendants Bear the Burden of Establishing Standing**

"The burden is on the defendants to establish that, under the totality of the circumstances, the search or the seizure violated their legitimate expectation of privacy." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1026 (9th Cir. 2010) (citation omitted).

### 2. **Governing Law: Standing to Challenge Business Office Search**

To establish standing, a defendant must show that: (1) the defendant has exhibited, by his conduct, an actual subjective expectation of privacy in the area searched or the item seized; and (2) the defendant's expectation is one that society recognizes as objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

A defendant's task is harder when the place searched is a business. "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987) (citation omitted); *see also Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (plurality opinion) ("Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property."). Unlike "the nearly absolute protection of a residence, the 'great variety of work environments' requires analysis of reasonable expectations 'on a case-by-case basis.'" *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009) (citation omitted).

"[E]xcept in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched *and* the materials seized." *SDI Future Health, Inc.*, 568 F.3d at 698 (emphasis added). "[I]t is crucial to Fourth Amendment standing that the place searched be 'given over to [the defendant's] exclusive use." *Id.* at 695-96 (citation omitted). Furthermore, the Ninth Circuit has "rejected managerial authority alone as sufficient for Fourth

---

*Minnesota v. Carter*, 525 U.S. 83, 87 (1998). But the term "standing" is employed here as a useful shorthand for that concept.

*14CR0388-MMA*

Amendment standing," and "to be merely a shareholder of a corporation, without more, is also not enough." *Id.* at 696.

In assessing whether defendants have shown a strong enough personal connection to justify their standing to challenge a business search, the Ninth Circuit looks to the following non-exclusive factors:

- <u>Personal Ownership of Item</u>: "whether the item seized is personal property [rather than business property] or otherwise kept in a private place separate from work-related material" (the personal ownership factor is "important," but *not* "sufficient by itself to confer standing in this [business] context");

- <u>Personal Custody of Item</u>: "whether the defendant had custody or immediate control of the item when the officers seized it;" and

- <u>Precautionary Measures</u>: "whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization."

*SDI Future Health, Inc.*, 568 F.3d at 698, 698 n. 7.

### 3.   Defendant Azano Has Not Established His Standing to Challenge the Search of the Accounting Offices

Azano has utterly failed to show that any of the items seized during the search of the accounting offices were: (1) his personal property, rather than business property; (2) in his custody or immediate control at the time they were seized; or (3) subject to precautionary measures that he set up to secure the items seized or the place searched from any interference without his explicit authorization. *See SDI Future Health, Inc.*, 568 F.3d at 698. Indeed, Azano's former full-time accountant told agents that only two other employees worked in that office space as of his recent departure—and Azano was not one of them. Exh. A, at 007, ¶16; 044, ¶51.

Furthermore, Azano has demonstrated no explicit ownership or managerial control over these business offices, and certainly not the sort of day-to-day access and tightly-held control needed to confer standing. In 2011, an Azano-related company, MSA LLC, "simultaneously purchased both properties for approximately $400,000," but MSA does not list either of these addresses as its "entity address" or "address for service of process."

*14CR0388-MMA*

Exh. A, at 044, ¶52.   At the time of the search, EA Group, LLC, listed one of these addresses as its "entity address," but EA Group is owned by Azano's son, not Azano. *Id.*

In *United States v. SDI Future Health, Inc.*, the Ninth Circuit found a much stronger case for workplace standing to be insufficient.   There the defendants owned the business, managed it from offices within the building searched, and the company had security measures in place to protect its business records. 568 F.3d at 698. The Court held that the defendants' "ownership and management do not necessarily show a legitimate expectation of privacy," because "neither claims to enjoy 'exclusive use' of the places searched—that is, the entire SDI office." *Id.*   Similarly, the Court found the business's security measures to be unpersuasive, since they were "relevant only to the standing of the corporation itself, not of its officers." *Id.*   As a result, the Court reversed the District Court's suppression of evidence and remanded for further fact-finding. *Id.* at 699.

A review of the office-search caselaw demonstrates that Azano's facts fall far short of the benchmark necessary to confer standing. *See, e.g.*, *United States v. Cella*, 568 F.2d 1266, 1270, 1283 (9th Cir. 1977) (hospital corporate officer who was management's "de facto controlling force" lacked standing to challenge the seizure of business records from the hospital print shop, even though he had "access to and control of the print shop operations," where the items seized were not his personal property); *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991) (CEO lacked standing to challenge search warrants for "documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit"). *Cf. Hill v. United States*, 374 F.2d 871 (9th Cir. 1967) (president and owner of Inter-American Loan Service, Inc.—defendant Robert Hill—lacked standing to challenge the seizure of certain corporate files that were not in his physical custody, since "[t]he papers were the papers of I.A.L.S., not of Hill"). *Compare United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1117 (9th Cir. 2005) (owner-operators of small, family-run business who "exercised full access to the building as well as managerial control over its day-to-day operations" had standing to challenge wiretap at business).

Consequently, this Court need not reach the merits of Azano's motion to suppress the fruits of the accounting office sneak-and-peek search, as he lacks standing to challenge that warrant.

**B.  JUDGES ADLER AND MAJOR DID NOT COMMIT CLEAR ERROR IN AUTHORIZING SEARCH WARRANTS FOR THE ACCOUNTING OFFICES AND AZANO'S HOMES, SINCE EACH AFFIDAVIT WAS SUPPORTED BY OVERWHELMING PROBABLE CAUSE**

The search warrant affidavits for the accounting offices and for Azano's residences contained many of the same facts as the ElectionMall search warrant affidavit, discussed above.  In other words, they had a daunting amount of probable cause.

### 1.  Burden, Standard of Review, and Governing Law: Probable Cause

As detailed in section III.A above, a defendant moving to suppress evidence from a search warrant bears the burden of showing that the issuing judge lacked a substantial basis for the probable cause finding.  Probable cause exists if the totality of the circumstances raises "a 'fair probability,' or a 'substantial chance,' of discovering evidence of criminal activity." *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) (citations omitted).

### 2.  The Search Warrant Affidavit for Azano's Residences Had Overwhelming Probable Cause

The 103-page affidavit supporting the search warrants for Azano's Coronado homes included essentially all the same facts as the search warrant affidavit for Singh's ElectionMall office, which itself had overwhelming probable cause.  *Compare* Exh. B *with* Exh. 3; *see* discussion above in section III.A.  But the search warrant affidavit for Azano's homes goes even farther, including additional probable cause concerning: (1) Azano's dozens of illegal straw contributions to Candidate 1's campaign, Exh. B, at 29-34, ¶¶59-66; (2) codefendant Encinas's information about Azano's knowledge of the prohibition against foreign national contributions, Exh. B, at 28-29, ¶¶56-58; (3) Encinas's information about Azano's conduit contributions to Candidate 3's campaign; and (4) extensive evidence concerning Azano's tax crimes. Exh. B, at 13-28, ¶¶28-55.

Defendant Azano attempts to whittle away this mountain of probable cause with a few toothpicks of legal grievance.  For example, he objects to three paragraphs about wiretapped calls between Singh and Encinas—that is, calls he was not a party to and thus lacks standing to challenge. Doc. 190-1, at 12-13; Exh. B, at 47-49, ¶¶96-99. *See United States v. Chase*, 692 F.2d 69, 70 (9th Cir. 1982) (per curiam) ("[A] defendant cannot challenge the legality of a search warrant on the ground that the information establishing probable cause for the warrant was obtained as a consequence of an illegal search or seizure of a third party.") (citations omitted); *see generally* Doc. 165, USA Wiretap Suppression Resp., at 9-10.  Furthermore, even as to Singh (who *does* have standing), this Court has already ruled that Singh's wiretap calls "can be completely excised from the supporting [search warrant] affidavits without diminishing or otherwise undermining the existence of probable cause." Doc. 188, at 9.

Similarly, Azano objects to the limited use of evidence from the sneak-and-peek warrant at the accounting offices—another search he lacks standing to contest.  Finally, Azano incorporates his arguments concerning evidence of tax crimes and campaign finances crimes, which are addressed and dispensed with in the next section.

In short, even if this Court were to excise the wiretap information, the sneak-and-peek information, and *all* the newly added information, the affidavit would still be left with all the probable cause that justified the search of the ElectionMall offices, as discussed above in section III.A.  Thus, Azano's motion to suppress the search warrant evidence from his homes has no merit.

### 3. The Sneak-and-Peek Search Warrant Affidavit for the Accounting Offices Established Probable Cause of Many Crimes

Even if Azano had standing to contest the search of the accounting offices—which he does not—he cannot carry his burden of establishing that the search warrant affidavit for those offices was deficient.[6]  He attempts to do so by attacking the probable cause for

---

[6] In addition to Azano's lack of standing, his motion to suppress may be moot.  The United States has not yet identified any evidence from the sneak-and-peek search of the

*14CR0388-MMA*

1   six of the crimes described in the affidavit.  Since the campaign finances crimes alone

2   would have justified the search and seizure of any evidence we might use in this trial, we

3   address Azano's arguments about those crimes first and then offer more abbreviated

4   treatment of his other arguments.

5              a.    *Campaign Finance Crimes*

6          According to the affidavit, Azano's former full-time accountant admitted to agents

7   that he made a $1,000 conduit payment to Candidate 1's campaign, at Azano's behest.

8   Exh. A, at 8, ¶17.

9          A number of factors buttress the reliability of his account. First, agents corroborated

10  many details of his story, from his co-workers and their connection to Azano to his former

11  office location and its connection to Azano-affiliated companies. Exh. A, at 7-8, ¶¶16-17;

12  9-10, ¶¶23-24.  Second, and more important, agents independently corroborated Azano's

13  interest in supporting Candidate 1's campaign. Public records, tax records, and news

14  reports confirmed that Azano was the manager and sole member of Airsam, LLC, which

15  sponsored a political action committee that spent over $100,000 supporting Candidate 1's

16  campaign. Exh. A, at 6, ¶12; 8, ¶18. *See, e.g.*, *United States v. Bishop*, 264 F.3d 919, 926,

17  926 n. 4 (9th Cir. 2001) (holding there was "sufficient corroborative evidence to find

18  Holmes was a reliable informant" where, among other details, the "location of the storage

19  unit was verified by the police").

20         Third, the accountant's confession to assisting in illegal conduit payments further

21  enhances his credibility.  "Admissions of crime . . . carry their own indicia of credibility—

22  sufficient at least to support a finding of probable cause to search." *United States v.*

23  *Harris*, 403 U.S. 573, 583 (1971); *see also Bishop*, 264 F.3d at 925 (informant's veracity

24  "may also be established by admission against penal interest") (citation omitted);

25  *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (same); *United States*

26  *v. Estrada*, 733 F.2d 683, 686 (9th Cir. 1984) (holding that an informant's "statements

27

28  accounting offices that it intends to use at trial.  But we are not yet prepared to foreswear
    the use of all evidence from this location.

14

about past and present involvement in the manufacture of PCP with appellants constituted admissions against his penal interest," which strengthened the reliability of his accusations against them).

Finally, the accountant's information was properly deemed reliable because it was detailed and based on first-hand knowledge. *See, e.g.*, *Angulo-Lopez*, 791 F.2d at 1397 (personal knowledge more reliable than hearsay in assessing informant's tip); *Estrada*, 733 F.2d at 686 ("A detailed eye-witness report of a crime is self-corroborating; it supplies its own indicia of reliability.") (citation omitted).

Azano quibbles with this seemingly impregnable probable-cause case on four fronts. First, he claims that the $1,000 conduit payment "would amount to a misdemeanor." Doc. 190-1, at 7. Of course, this argument ignores entirely more than $100,000 that the Azano-affiliated PAC funneled into Candidate 1's campaign. Regardless, Rule 41 does not limit search and seizure authority to felonies; rather, a warrant may issue to obtain "evidence of a crime." Fed. R. Crim. P. 41(c)(1).

Second, Azano maintains that the affiant "utterly ignored the public filings that showed" that he had no control over the Airsam-supported PAC that provided over $100,000 to Candidate 1's campaign. Doc. 190-1, at 7. Yet those "ignored" public filings are even more damning for Azano's cause. Those records show that the PAC received over 87% of its $118,000 in monetary contributions from Azano's one-member company Airsam ($100,000) and Azano's employee and co-conspirator Ernesto Encinas ($3,000). Exh. E; *see also* Exh. D.

His third line of attack is to underscore the fact that during the interview the accountant was unable to locate "a copy of the [$1,000 conduit payment] check in his briefcase" and that "[p]ublicly available campaign disclosures compiled by [Candidate 1]'s campaign do not appear to show any such donation." Exh. A, at 8, ¶17; Doc. 190-1, at 7. While the affiant responsibly included this information in the affidavit, it is not fatal to probable cause. The unsuccessful search "in his briefcase" for a copy of the check does not mean that he never wrote such a check, nor does the failure to locate

the payment among "[p]ublicly available campaign disclosures."  The court only needed to find a "fair probability" or "substantial chance" that the conduit payment occurred, based on the totality of the circumstances, including the accountant's detailed, eyewitness account, which was corroborated in several ways, and which also constituted a statement against penal interest.

Finally, Azano faults the affidavit for failing to mention an FEC advisory opinion that "a foreign owned corporation may donate to a PAC." Doc. 190-1, at 8.  Even if this were true, however, it does not change the fact that no individual may use straw donors to make conduit contributions. 52 U.S.C. § 30122. And, regardless of whether the payments were legal or illegal, the fact that an Azano-related PAC was contributing over $100,000 to Candidate 1's campaign provided strong corroboration for the accountant's claim that Azano used him to make conduit contributions to Candidate 1.

As a result, the totality of the circumstances supported a fair probability or substantial chance that Azano committed campaign finance crimes.

### b. *Tax Crimes*

The affidavit also established that Azano evaded federal income taxes on $35 million in personal income. According to bank records, between 2010 and 2011 Azano's personal checking account received over $35 million. Exh. A, at 5, ¶7.  Yet he never filed any personal federal tax returns in 2010 and 2011.  Exh. A, at 5, ¶10.

The affidavit examined Azano's businesses to determine whether the $35 million in income was reported in the business tax filings, which might possibly excuse Azano's failure to file personal income tax returns.  But during this period, Azano's businesses reported only about $2 million in income, which came nowhere close to accounting "for the $35 million in funds that are also omitted from Azano's personal federal tax returns." Exh. A, at 6, ¶12.

Considering all the circumstances—including possible innocent explanations for the disparity between the funds entering Azano's bank accounts and the income amounts reported by him and his associated businesses—the agent, in consultation with an IRS

agent, concluded that "there is almost certainly no legitimate explanation for Azano's failure to account for the approximately $35 million wired to his personal checking account in 2010 and 2011." Exh. A, at 6, ¶13.  These facts, coupled with those expert opinions, more than establish probable cause. *See United States v. Michaelian*, 803 F.2d 1042, 1045 (9th Cir. 1986) ("Insofar as the IRS agent's conclusions based on examination of [defendant's] tax returns are concerned, it is clear that the opinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation under the *Gates* totality of the circumstances approach.") (citations omitted).

Rather than contesting these facts or suggesting they are inadequate to establish probable cause, Azano instead offers a tax tutorial on his businesses' potential innocent explanations for their IRS filings. Doc. 190-1, at 4-7. This argument wholly misapprehends the significance of the businesses to the probable cause analysis:  the business tax returns were not alleged to be fraudulent.  They were examined merely to determine whether Azano claimed something closer to $35 million in income in *any* IRS filing, given that he failed to file any personal returns.

Accordingly, Azano's gripe about improperly classifying Azano's businesses as "corporations" instead of "limited liability companies" is irrelevant.  Even assuming that such entities have different tax obligations, Doc. 190-1, at 4-5, the affiant never accused Azano of "evading taxes with [] the limited liability companies," as he claims. Doc. 190-1, at 5.  Rather, he believed Azano was evading his *personal* income tax liabilities, and he examined the business taxes merely to exclude a possible defense—that is, that Azano was reporting this income through his businesses.

In any event, "the fact that some of these acts, if reviewed separately, might be consistent with innocence is immaterial. Our review, like the magistrate's initial determination, is based on the totality of the circumstances." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1993) (citations omitted).  The totality of the circumstances here offered a substantial basis to conclude that Azano committed tax crimes.

//

1

2        c.    *Other Crimes*

3    Azano raises similar unavailing objections to the other crimes alleged in the

4    affidavit.  For example, he claims the affidavit failed to establish probable cause for the

5    crime of structuring deposits to evade reporting requirements, Doc. 190-1, at 9,

6    notwithstanding evidence that on one day a co-conspirator "deposited $9600 cash in one

7    account and $1700 cash in another account" and, *during a five-year period*, deposited

8    about "$2,000 to $9,000 every two-to-ten days." Exh. A, at 9, ¶23; 10, ¶25.  Azano's

9    position defies ridicule.

10    Since the campaign finance and tax crimes alone support probable cause for the

11    seizure of any items we might possibly introduce at trial, the United States will not

12    belabor the point.  As the Court can see from a review of the detailed affidavit, each crime

13    alleged in the sneak-and-peek warrant was amply supported by probable cause.

**C.    THE SNEAK-AND-PEEK SEARCH WARRANT AFFIDAVIT PROVIDED "REASONABLE CAUSE" FOR DELAYED NOTICE. AMONG OTHER REASONS, IMMEDIATE NOTICE WOULD HAVE EXPOSED AND JEOPARDIZED THE ONGOING, COVERT INVESTIGATION.**

    In the search warrant affidavit, the agent set forth a number of reasons for delayed

notice, including the fact that immediate notification would expose and thereby jeopardize

the hitherto covert investigation.  This rationale, by itself, was sufficient to authorize

delayed notification.  And in conjunction with the other reasons, Judge Adler was amply

justified in authorizing the delay.

**1.    Governing Law: Delayed-Notice Search Warrants**

    A judge may authorized delayed notice if "the court finds reasonable cause to

believe that providing immediate notification of the execution of the warrant may have an

adverse result . . ., except if the adverse results consist only of unduly delaying a trial."

18 U.S.C. § 3103a(b)(1); *see also* Fed. R. Crim. P. 41(f)(3).  An "adverse result" is

defined as:

    (A)    endangering the life or physical safety of an individual;

    (B)    flight from prosecution;

18

1    (C)    destruction of or tampering with evidence;

2    (D)    intimidation of potential witnesses; or

3    (E)    otherwise seriously jeopardizing an investigation . . .

4    18 U.S.C. § 2705(a)(2).

5    ## 2.    There Was More Than Reasonable Cause for Delayed Notification

6    The agent concluded that immediate notification would most likely cause Azano to

7    "temporarily suspend his criminal activity," thereby "foreclose[ing] any possibility of a

8    continued covert investigation into the above-described criminal activity." Exh. A, at 20,

9    ¶63. This rationale, standing alone, justified the delayed notice. *Cf. Warshak v.*

10   *United States*, 532 F.3d 521, 524, 526 (6th Cir. 2008) (noting that magistrate judge

11   authorized delayed-notice search warrant for corporate president's email account to avoid

12   "seriously jeopardiz[ing] the investigation" into fraud and money laundering charges, and

13   pointing out that this same rationale would not justify future delayed-notice searches,

14   since the now-indicted defendant currently had "ample notice of the investigation").

15   In addition, the affidavit supports a number of other reasons for granting delayed

16   notice.  First, there was the possibility that Azano or his coconspirators might flee the

17   United States, since Azano had private aircraft in which he had flown to "France, Spain,

18   the United Kingdom, the United Arab Emirates, Saudi Arabia, Bahamas and Canada," and

19   the "United States lacks an extradition treaty with the United Arab Emirates and Saudi

20   Arabia." Exh. A, at 19, ¶61.  In addition, Azano is "well-connected in Mexico" and a

21   Mexican citizen, and "the United States has limited ability to obtain extradition of

22   fugitives from Mexico in fraud cases."  Exh. A, at 19, ¶61.  While Azano points out that

23   he had family and financial ties in the United States, Doc. 190-1, at 11, he also had never

24   become a U.S. legal permanent resident and he had multiple Mexican-based companies.

25   Second, the affidavit set forth probable cause to believe that "Azano has entered

26   into a conspiracy to use threats of extreme violence to extort a cash settlement from

27   Sempra." Exh. A, at 18-19, ¶58; *see also* Exh. A, at 13-16, ¶¶36-50 (reciting evidence

28   suggesting Azano bribed a Mexican mayor to help shut down a rival's natural gas plant

*14CR0388-MMA*

1  and that Azano co-conspirators threatened to sabotage and set fire to the plant).  These

2  facts, along with the substantial probable cause of his other nefarious activities, provided

3  reasonable cause to believe that he or his co-conspirators might intimidate, threaten, or

4  endanger witnesses.

5       Third, Azano's access to "advanced surveillance technology" gave him

6  "information-gather capabilities that are equal to, and most likely superior to, those of our

7  investigative team," especially since he would not "face the same legal constraints as our

8  investigative team." Exh. A, at 19, ¶59. If he were notified of the investigation, these

9  resources would give Azano an unprecedented ability to frustrate and "aggressively resist

10  the investigative effort" by conducting surveillance of potential witnesses and agents

11  alike. *Id*.

12       Fourth, Azano's Mexican connections, many well-documented criminal and

13  fraudulent activities, and "employment of former SDPD officers" provided reasonable

14  cause to believe that premature notice would prompt him to destroy evidence and threaten

15  witnesses. Exh. A, at 20, ¶62.

16       While Azano may protest these reasons now, Judge Adler did not need to find them

17  beyond a reasonable doubt, or even by a preponderance of the evidence.  He merely

18  needed to find there was "reasonable cause" to justify the delay.  The threat to the

19  then-covert investigation—as well as the additional four reasons discussed above—amply

20  justified his decision to permit delayed notice.

21

22  **D.    MOREOVER, THE "GOOD FAITH" EXCEPTION TO THE EXCLUSIONARY RULE APPLIES, BASED ON THE AGENTS' OBJECTIVELY REASONABLE RELIANCE ON THE FACIALLY VALID SEARCH WARRANTS FOR THE ACCOUNTING OFFICES AND FOR AZANO'S RESIDENCES**

23

24       The "good faith" exception under *United States v. Leon*, 468 U.S. 897 (1984),

25  discussed in section III.C above regarding the search of Singh's ElectionMall office,

26  applies with equal force to the searches conducted pursuant to the facially valid warrants

27  for the accounting offices and for Azano's residences.

28

*14CR0388-MMA*

In addition, it is not clear that a violation of the delayed-notice provisions of Federal Rule of Criminal Procedure 41(f)(3) and 18 U.S.C. § 3103a(b) would justify suppression of evidence, since these rules are creatures of statute, not of the Fourth Amendment. *See, e.g.*, *United States v. Williamson*, 439 F.3d 1125, 1132 (9th Cir. 2006) (noting that "suppression is rarely the proper remedy for a Rule 41 violation," and pointing out the few exceptions). *Compare United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) (holding that the complete "absence of a notice requirement in the warrant" rendered it "constitutionally defective").

**E.   AZANO HAS FAILED TO MAKE THE "SUBSTANTIAL PRELIMINARY SHOWING" NECESSARY FOR A *FRANKS* HEARING, BECAUSE THE SEARCH WARRANT AFFIDAVITS WERE NEITHER FALSE NOR MISLEADING**

The search warrant affidavits here were truthful and complete, and consequently defendant Azano cannot carry his burden to show the need for a *Franks* hearing.

### 1.   Burden, Governing Law: *Franks* Hearing

To obtain a *Franks* hearing, the defendant bears the burden of making a "substantial preliminary showing," by a preponderance of the evidence, that "material false statements or omissions" were: "(1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) necessary to the finding of probable cause." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (internal punctuation omitted) (quoting, among other authorities, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)); *see also United States v. Jordan*, 291 F.3d 1091, 1100 (9th Cir. 2002).

### 2.   Azano Cannot Meet His Burden for a *Franks* Hearing

Defendant Azano has failed to make *any* showing—let alone a substantial one—that the search warrant affidavits included any falsehoods or omissions, or that any of the language he quibbles with was necessary to the probable cause determination.   For example, Azano objects to a statement in the search warrant affidavit for his homes that he "'never again created his own political action committee. ¶ 70." Doc. 190-1, at 13. Azano claims that statement is false because "he never <u>before or after</u> created a PAC." *Id*.   Yet regardless of his semantic triflings, the affidavit established that Azano was the manager

and sole member of Airsam LLC, and that Airsam sponsored the PAC in question. Exh. B, at 14, ¶31; 34-36, ¶¶67-71. Even the "public filings" that Azano claims show he did not control the PAC instead support the inference that he did. Those records show that the PAC received over 87% of its $118,000 in monetary contributions from Airsam ($100,000) and co-conspirator Ernesto Encinas ($3,000). Exh. E; *see also* Exh. D.

Since Azano has failed to identify any falsehoods or material omissions of any sort, let alone ones that were essential to probable cause, his motion for a *Franks* hearing should be summarily denied.

**F.   AZANO'S MOTION TO DISMISS THE INDICTMENT UNDER THE COURT'S SUPERVISORY POWERS OR, IN THE ALTERNATIVE, TO RECUSE THE U.S. ATTORNEY'S OFFICE—WHICH IS IN FACT A CAMOUFLAGED MOTION FOR RECONSIDERATION—SHOULD BE DENIED FOR THE REASONS GIVEN IN THIS COURT'S PRIOR RULINGS ON THESE ISSUES**

Although it is cloaked in the sheep's clothing of a motion to dismiss, defendant Azano all but concedes that his latest salvo is the same legal wolf this Court has repeatedly slain under other guises. Doc. 189-1, at 16. The United States refers the Court to the prior briefing and rulings on: the recusal, conflict-of-interest, and Sempra email chain issues, *e.g.*, Doc. 58-60, 73, 116, 154, 168 at 2 ¶2, 188 at 2; and Singh's motion to dismiss under the Court's supervisory powers, which Azano joined. *E.g.*, Singh Wiretap Suppression Mem., at 48-49; Doc. 165, 180-81, 188 at 10. For all the same reasons, Azano's repurposed arguments about dismissal and recusal should again be rejected.

**G.   FOR SIMILAR REASONS, AZANO'S RENEWED REQUEST TO SUBPOENA THE SEMPRA EMAIL CHAIN SHOULD BE DENIED YET AGAIN**

When Judge Major quashed Azano's Rule 17 subpoenas for the Sempra email chain, she pointed out that Azano "does not explain how any of the requested documents will impact the probable cause determination or otherwise support any of his motions to suppress." Doc. 154, at 6. Azano's latest recycled motion to authorize this subpoena suffers from the same failing.

As a threshold matter, Azano fails to explain how the requested information could possibly undermine the eight pen register and subscriber information applications in

which the Sempra email chain was mentioned.[7]  The Sempra email chain information was irrelevant to the request for a pen register and trap and trace device.  Pen/trap data is available merely upon the applicant's certification that it is "relevant to an ongoing criminal investigation," without *any* factual showing. 18 U.S.C. § 3122(b)(2).  And even if Azano's wildest speculation improbably turned out to be true—that Sempra agents "illegally obtained" the email chain, Doc. 189-1, at 17—this would not prohibit the United States' use of that information, since Sempra was not a state actor.  "[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States*, 447 U.S. 649, 656 (1980).

At any rate, the United States does not intend to introduce at trial any of the Azano pen, subscriber, or cell site information generated by those orders.  And despite Azano's baseless claim that the pen and subscriber applications "were relied upon in the warrants for Mr. Azano's homes," he has failed to identify any particular section of the search warrant affidavit that relied on pen register, cell site, or subscriber information arising from these applications, nor has he explained how any such reliance would have been necessary to the probable cause determination. Doc. 190-1, at 15.

For the reasons this Court has previously rebuffed Azano's attempts to subpoena the Sempra email chain, this latest motion to authorize a subpoena should be denied.

//
//
//
//
//
//

---

[7] Each application includes a statement to the effect that Sempra agents were in possession of an email chain in which Azano participated, followed by the identification of Azano's email address. *See, e.g.*, case number 11MC0853; EM_PLDGS_00000301.

# V

## **CONCLUSION**

Defendant Azano and Singh's motions to suppress search warrant evidence should be denied, and Azano's various repurposed motions to dismiss, recuse, and issue subpoenas should again be rejected.

DATED: September 29, 2015                    Respectfully submitted,

WILLIAM P. COLE
Attorney for the United States
(Under 28 U.S.C. § 515)

/s/ *Andrew G. Schopler*
ANDREW G. SCHOPLER
HELEN H. HONG
Assistant United States Attorneys

*14CR0388-MMA*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 14CR0388-MMA |
| Plaintiff, | |
| v. | **CERTIFICATE OF SERVICE** |
| JOSE SUSUMO AZANO MATSURA (1),<br>    aka Mr. A.,<br>    aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>    aka Ravi Singh,<br>ELECTIONMALL, INC. (3),<br>MARCO POLO CORTES (4), | |
| Defendants. | |

I, the undersigned, declare under penalty of perjury that I have served the foregoing document on the above-captioned party(ies) by:

■  electronically filing it with the U.S. District Court for the Southern District of California using its ECF System, which electronically notifies the party(ies).

☐  causing the foregoing to be mailed by first class mail to the parties identified with the District Court Clerk on the ECF System.

☐  causing the foregoing to be mailed by first class mail to the following non-ECF participant at the last known address, at which place there is delivery service of mail from the United States Postal Service:

Executed on September 29, 2015.

/s/ *Andrew G. Schopler*
ANDREW G. SCHOPLER
Assistant U.S. Attorney

25