

**FILED**

Sep 11 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ AKR          DEPUTY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 07 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>JOSE SUSUMO AZANO MATSURA,<br>AKA Mr. A, AKA Mr. Lambo,<br><br>Defendant - Appellant. | No. 17-50387<br><br>D.C. No. 3:14-cr-00388-MMA-1<br>U.S. District Court for Southern<br>California, San Diego<br><br>**MANDATE** |

The judgment of this Court, entered May 16, 2019, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Jessica F. Flores Poblano
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* <br><br> v. <br><br> RAVNEET SINGH, AKA Ravi Singh, *Defendant-Appellant.* | No. 17-50337 <br><br> D.C. No. 3:14-cr-00388-MMA-2 |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* <br><br> v. <br><br> JOSE SUSUMO AZANO MATSURA, AKA Mr. A, AKA Mr. Lambo, *Defendant-Appellant.* | No. 17-50387 <br><br> D.C. No. 3:14-cr-00388-MMA-1 <br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Michael M. Anello, District Judge, Presiding

Argued and Submitted March 13, 2019
San Francisco, California

Filed May 16, 2019

Before:  MILAN D. SMITH, JR., PAUL J. WATFORD,
and ANDREW D. HURWITZ, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

# SUMMARY[*]

---

## Criminal Law

The panel reversed Jose Susumo Azano Mastura's and Ravneet Singh's convictions on count 37 for falsification of campaign records, affirmed all other convictions, vacated the sentences, and remanded for resentencing, in a case in which Azano, a foreign national, and his co-conspirators sought to influence local politicians during the 2012 San Diego election cycle by providing campaign contributions.

Rejecting appellants' contention that Congress lacks the power to prohibit foreign nationals from donating and contributing to state and local elections, the panel held that Congress acted within its constitutional authority in enacting 52 U.S.C. § 30121(a).  Bound by the Supreme Court's summary affirmance in *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012), the panel rejected appellants' contention that § 30121(a) violates foreign nationals' First Amendment rights.

The panel rejected appellants' contention that 52 U.S.C. § 30109(d), the penalty provision applicable to violations of § 30121, requires that the government prove that a defendant

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

harbors the specific intent to evade § 30121, not merely the intent to commit unlawful conduct. As to the jury instruction on the charge that Singh aided and abetted Azano's unlawful donations, the panel rejected Singh's argument that the district court's failure to include the element that Singh knew Azano lacked immigration status constitutes reversible error. The panel held that the instructions as a whole adequately covered the element of Singh's knowledge of Azano's immigration status.

Appellants contested their convictions under counts 5 through 37, arguing there was insufficient evidence to satisfy the material elements of 18 U.S.C. § 1519 (falsifying campaign records).

- Singh argued that § 1519 requires an affirmative act, and that a mere omission, without an affirmative duty, cannot satisfy the actus reus element. The panel held that an omission satisfies the actus reus element for § 1519. The panel observed that Singh was not simply convicted under § 1519, but under 18 U.S.C. § 2(b) (willfully causing an act to be done which if directly performed by him or another would be an offense against the United States) in conjunction with § 1519, in which scenario the actus reus element merges with the mens rea element to focus liability on the person harboring the criminal intent. The panel wrote that the government thus did not need to prove that Singh prepared the campaign disclosure forms or had a duty to report Azano's patronage; rather, that the campaign had a duty to report the information was enough, and § 2(b) authorized holding accountable those with the intent to conceal or falsify records.

- Regarding causation under § 2(b), the panel held that the government presented sufficient evidence for a jury to find that Singh willfully caused the Bonnie Dumanis primary mayoral election campaign to file falsified reports, and therefore affirmed appellants' convictions under count 32.  The panel found insufficient evidence that Singh willfully caused the Bob Filner general mayoral election campaign to file falsified reports, and therefore reversed the convictions under count 37.

- Regarding the § 1519 element of an investigation by the United States of a matter within its jurisdiction, the panel held that a jury could reasonably infer that Singh contemplated an investigation due to unlawful activity and intended to direct that investigation away from himself.  Singh argued that any investigation of his conduct is not within the jurisdiction of the United States because his conduct involved a local campaign and the falsified campaign disclosure forms violated only state and local law.  The panel rejected this contention because the campaign disclosure forms were sought in connection with the FBI's investigation of a federal crime.

- As to counts 5 through 31 and 33 through 36, the panel concluded that a reasonable jury could find beyond a reasonable doubt that Azano concealed his identity from these campaigns by recruiting straw donors, and that he willfully caused both campaigns to file false reports with the intent of obstructing a potential investigation.

Rejecting Singh's challenges to his conspiracy conviction, the panel held that the jury instructions adequately covered Singh's multiple conspiracy theory, and

that there was sufficient evidence to show a single conspiracy.

The panel affirmed Azano's conviction under 18 U.S.C. § 922(g)(5)(B) for unlawfully possessing a firearm as a nonimmigrant visa holder.  Applying intermediate scrutiny to Azano's Second Amendment challenge, and assuming without deciding that the Second Amendment extends to nonimmigrant visa holders, the panel held that § 922(g)(5)(B)'s prohibition on firearm possession and ownership by nonimmigrant visa holders serves an important public interest in crime control and public safety, without substantially burdening a nonimmigrant visa holder's assumed Second Amendment right.  The panel rejected Azano's contentions that his possession of a gun as a B2 visa holder fell within the "pleasure" designation in 22 C.F.R. § 41.31.(b)(2) or automatically qualified as a "sporting purpose" pursuant to 18 U.S.C. § 922(y)(2).  The panel also rejected Azano's contention that § 922(g) is unconstitutionally vague as applied to B1/B2 visa holders.

The panel held that the district court did not abuse its discretion in denying Azano's motion for a new trial based on alleged ineffective assistance of his trial counsel, and declined to entertain his ineffective-assistance claim on direct appeal.  The panel held that Singh waived his argument that the district court abused its discretion in denying his motion to sever his trial from all defendants except Azano.  The panel held that the record does not support Singh's claim that the joint trial compromised his due process rights.

## COUNSEL

Harold J. Krent (argued), IIT Chicago-Kent College of Law, Chicago, Illinois; Todd W. Burns, Burns & Cohan, San Diego, California; for Defendant-Appellant Ravneet Singh.

Charles M. Sevilla (argued), San Diego, California, for Defendant-Appellant Jose Susumo Azano Matsura.

Helen H. Hong (argued), Mark Pletcher, Billy Joe McLain, and Phillip L.B. Halpern, Assistant United States Attorneys; Robert S. Brewer Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

Charles H. Bell Jr. and Terry J. Martin, Bell McAndrews & Hiltachk LLP, Sacramento, California, for Amici Curiae California Campaign and Election Law Attorneys.

## OPINION

M. SMITH, Circuit Judge:

Jose Susumo Azano Matsura aspired to participate in developing San Diego and turning it into the Miami Beach of the west coast. To help achieve this goal, Azano and his co-conspirators sought to influence local politicians during the 2012 San Diego election cycle by providing campaign contributions. However, as a foreign national, Azano was prohibited by federal law from donating or contributing to American campaigns.

A jury convicted Azano and Ravneet Singh of various crimes stemming from the campaign contributions; Azano

was also convicted of violating federal firearms law.  Azano and Singh (together, Appellants) now appeal, raising a litany of constitutional, statutory, and procedural arguments. Although we affirm the district court in large part, we reverse their convictions on count thirty-seven (obstruction of justice in violation of 18 U.S.C. § 1519).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Factual Background

Azano ran a successful technology business based in Mexico City, but maintained a family home in San Diego. Although Azano's wife and children are United States citizens, he is neither a naturalized United States citizen nor a permanent resident.  Azano, a citizen of Mexico, entered the United States in January 2010 on a B1/B2 visa, which allows visitors entry for pleasure or business if the noncitizen "intends to leave the United States at the end of the temporary stay."   22 C.F.R. § 41.31(a)(1).   Azano traveled weekly back and forth from San Diego to Mexico City for business purposes.

At trial, the government introduced evidence that Azano had an interest in developing San Diego, and particularly the Chula Vista waterfront area.  The government introduced testimony that in order to achieve his development goals, Azano believed that he needed government cooperation, which included a relationship with the mayor of San Diego. Azano had previously formed such relationships in Mexico by making campaign contributions to candidates for various offices.  Azano set about implementing a similar strategy in San Diego.  With the aid of his co-conspirators, Azano sought to secure the favor of San Diego mayoral candidates who he believed would support his development plans. Azano first supported Bonnie Dumanis during the 2012

8                    UNITED STATES V. SINGH

primary elections, but when she lost, he supported Bob
Filner in the general election.  Azano did so despite the fact
that federal law prohibits "a foreign national, directly or
indirectly," from making "a contribution or donation of
money or other thing of value . . . in connection with a
Federal, State, or local election."  52 U.S.C. § 30121(a).

Azano's funding scheme involved a number of people.
Ernie Encinas, head of Azano's security team, was a former
San Diego police officer with useful political connections
who helped represent Azano's interests within the two
campaign organizations.   Marco Polo Cortes provided
lobbying connections and helped facilitate initial meetings
with the two campaign staffs.  Mark Chase was a local car
dealer and Azano's "good friend," who arranged straw
donors to donate to the Dumanis mayoral campaign, and
later disguised Azano's donations to Filner's political action
committee (PAC) and other entities by writing checks from
his personal and business accounts.  Edward Susumo Azano
Hester, Azano's son, recruited straw donors to give to the
Dumanis campaign.

Singh was the CEO of ElectionMall, a media platform
offering a "one-stop sho[p] of technology to candidates and
political parties running for office."  Singh first worked with
Azano on a Mexican presidential campaign in 2011.  This
professional relationship continued into the mayoral
campaigns of Dumanis and Filner.  Aaron Rosheim, the
former director of web strategy at ElectionMall, testified that
Azano paid ElectionMall for work on the San Diego
campaigns.  For this work, Singh billed Azano's Mexican
companies, using the code names "Betty Boop" for
Dumanis's campaign and "Plastic Man" for Filner's
campaign.  Evidence also suggested that Singh tried to
conceal any paper trail of his work for Azano.  An internal

ElectionMall email from Singh with the subject title "OLD invoices for Mr. A" stated: "Please don't have cynthia or anyone else send things with a code name.  And then list the clients name in a [sic] email. That is stupid and dangerous for me."  Additionally, in response to an email from Encinas about forming a PAC for Dumanis, Singh stated, "I am not responding to this email. Bec[au]se of the legal ram[i]fications."

## II.  Procedural Background

A federal grand jury returned a Third Superseding Indictment (the Indictment) charging four individuals—Azano, Singh, Cortes, and Hester—and one corporate defendant, ElectionMall, with illegally conspiring to commit campaign finance fraud in the 2012 San Diego mayoral elections.  The government later dropped ElectionMall as a defendant and the four individuals were tried together.  After trial, Cortes and Hester reached plea agreements and pled guilty to participating in the campaign contribution scheme.  Encinas and Chase, who had been charged as co-conspirators in a separate indictment, both also pled guilty to participating in the campaign contribution scheme.

Appellants were charged in count one of the Indictment with conspiracy to violate the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30109(d)(1)(A) and 30121(a)(1)(A),[1] for unlawful campaign donations by a foreign national, and conspiracy to falsify campaign records, in violation of 18 U.S.C. § 1519.  Both were charged in count three with the substantive offense of making unlawful campaign donations as a foreign national.  Singh was charged in counts thirty-two and thirty-seven with the

---

[1] Previously codified at 2 U.S.C. § 441e.

substantive offense of falsifying campaign records in violation of 18 U.S.C. § 1519. Azano was similarly charged in counts five through thirty-seven with the substantive offense of falsifying campaign records. Finally, Azano was charged in count four with making a conduit contribution in connection with a federal election, in violation of 52 U.S.C. §§ 30109(d)(1)(A) and 30122, and in count thirty-nine with unlawfully possessing a firearm as an alien in violation of 18 U.S.C. § 922(g)(5)(B).

A jury found Appellants guilty on all the counts with which they were respectively charged. On October 27, 2017, the district court sentenced Azano to three years in custody and three years of supervised release, and on August 31, 2017 sentenced Singh to fifteen months in custody and three years of supervised release. Appellants timely appealed.

## ANALYSIS

Appellants raise a number of claims contesting their convictions. We address each in turn.

## I

Appellants first argue that 52 U.S.C. § 30121 is unconstitutional on two grounds: (1) it exceeds Congress's jurisdiction to legislate concerning state and local elections, and (2) it violates foreign nationals' First Amendment speech rights. We review the constitutionality of a statute de novo. *United States v. Jones*, 231 F.3d 508, 513 (9th Cir. 2000).

We first consider the genesis of § 30121. As donations and contributions have grown more important to the campaign process, so too has concern over foreign influence in American elections. In 1966, Congress amended the

Foreign Agents Registration Act to prohibit foreign governments and entities from contributing to American political candidates.  *See* Pub. L. No. 89-486, § 8, 80 Stat. 244, 248–49.  Subsequently, Congress banned all foreign nationals[2] from making such contributions.  *See* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101(d), 88 Stat. 1263, 1267.

Still, suspicions of foreign influence in American elections remained a pervasive concern.  Following the 1996 election, the Senate Committee on Governmental Affairs investigated foreign campaign contributions.  *See* S. Rep. No. 105-167 (1998).  The Committee Report identified efforts by agents of the People's Republic of China to "influence U.S. policies and elections through, among other means, financing election campaigns."  *Id.*, pt. 1, at 47.  The report focused chiefly on federal elections, but also referred to a "seeding program" to develop individuals to run in state and local elections.  *Id.*, pt. 2, at 2509.

In response to the Committee Report, Congress enacted the Bipartisan Campaign Reform Act of 2002 (BCRA), which amended FECA and further limited foreign nationals' ability to participate in elections.  *See* Pub. L. No. 107-155, § 303, 116 Stat. 81, 96.  As amended, § 30121(a) currently states,

---

[2] A "foreign national" is "a foreign principal" or "an individual who is not a citizen of the United States or a national of the United States . . . and who is not lawfully admitted for permanent residence."  52 U.S.C. § 30121(b).

It shall be unlawful for—

(1) a foreign national, directly or indirectly, to make—

(A) a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation in connection with a Federal, State, or local election;

(B) a contribution or donation to a committee of a political party; or

(C) an expenditure, independent expenditure, or disbursement for an electioneering communication . . .

52 U.S.C. § 30121(a).

## A

Appellants challenge whether Congress has the power to prohibit foreign nationals from donating and contributing to state and local elections.  Due to the federal government's plenary power over foreign affairs and immigration, we find that Congress has such a power.

The federal government has the "inherent power as sovereign to control and conduct relations with foreign nations."  *Arizona v. United States*, 567 U.S. 387, 395 (2012); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318–19 (1936).  The Constitution grants the federal government an "undoubted power over the subject of immigration and the status of aliens."  *Arizona*, 567 U.S. at

394; *see also* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). Thus, where, as here, Congress has made a judgment on a matter of foreign affairs and national security by barring foreign nationals from contributing to our election processes, it retains a broad power to legislate. The Supreme Court has recognized that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). A prohibition on campaign donations and contributions by foreign nationals is necessary and proper to the exercise of the immigration and foreign relations powers. *See* U.S. Const. art. I, § 8, cl. 18. Accordingly, Congress was within its power when it acted to protect the country's political processes after recognizing the susceptibility of the elections process to foreign interference.[3]

Appellants assert that because the Constitution "intended to preserve to the States the power . . . to establish and maintain their own separate and independent governments," Congress may not legislate over state and local elections *at all*. *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.). In *Mitchell*, the Court found unconstitutional a provision of the Voting Rights Act that set the voting age for state and local elections at eighteen. *Id.* at 117–18. Similarly, in *James v. Bowman*, the Court struck down a federal statute criminalizing bribery in state and local elections. 190 U.S. 127, 142 (1903).

---

[3] Importantly, § 30121(a)(1) bars only foreign nationals from making donations and contributions and does not reach the actions of American citizens or permanent residents.

We find these cases inapposite.  They discuss Congress's authority to regulate state elections as they relate to citizens of the United States.  In contrast, § 30121(a)(1) regulates only foreign nationals, which is within the ambit of Congress's broad power to regulate foreign affairs and condition immigration.  Therefore, the case before us is readily distinguished from *Mitchell* and *James*.

Accordingly, we hold that Congress acted within its constitutional authority in enacting § 30121(a).

## B

We next consider Appellants' First Amendment challenge.  The district court determined § 30121(a) does not violate foreign nationals' First Amendment rights, concluding that "it is bound by [the decision in *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012)] due to the Supreme Court's summary affirmance."  Appellants argue that we are not bound by the summary affirmance, because "a summary affirmance by [the Supreme] Court is a 'rather slender reed' on which to rest future decisions."  *Morse v. Republican Party of Va.*, 517 U.S. 186, 203 n.21 (1996) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983)).  Further, because *Bluman* considered foreign national participation in a *federal* election—not, as here, a *state or local* election—Appellants argue that the summary affirmance poses no bar.

"[T]he Supreme Court's summary affirmances bind lower courts, unless subsequent developments suggest otherwise. . . . Although . . . the Supreme Court is more willing to reconsider its own summary dispositions than it is to revisit its prior opinions, this principle does not release the lower courts from the binding effect of summary affirmances."  *United States v. Blaine Cty.*, 363 F.3d 897,

904 (9th Cir. 2004) (citing *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975)).  And, although "[t]he precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions," *Green v. City of Tucson*, 340 F.3d 891, 902 (9th Cir. 2003) (quoting *Anderson*, 460 U.S. at 784 n.5), *Bluman did* decide the precise issue present in this case.  In *Bluman*, a plaintiff sought to donate money to federal candidates *and* a candidate running for the New York state senate.  800 F. Supp. 2d at 285.  Thus, we agree with the district court that we are bound by the Supreme Court's summary affirmance in *Bluman*.

## II

The penalty provision applying to violations of § 30121 requires that an individual act "knowingly and willfully" when making a prohibited donation or contribution:

> (1)(A) Any person who *knowingly and willfully* commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure—
>
> (i) aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both . . .

52 U.S.C. § 30109(d) (emphasis added).  Appellants argue that the district court committed reversible error by failing to properly instruct the jury as to the required mental state. Appellants argue that *Ratzlaf v. United States*, 510 U.S. 135 (1994), requires that the government prove that the defendants harbored the specific intent to evade § 30121, not

merely the intent to commit unlawful conduct. Singh additionally argues that the district court erred by failing to instruct the jury that "knowledge of Azano's immigration status was a material element of the crime."

"We review the formulation of jury instructions for abuse of discretion, but review de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Liew*, 856 F.3d 585, 595–96 (9th Cir. 2017).

## A

In its jury instructions covering Azano's principal offense, the district court stated the intent element for §§ 30109(d)(1)(A) and 30121 as follows:

> Fourth, defendant acted knowingly and willfully.
>
> . . .
>
> *An act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids, and again not by mistake or accident.* In other words, a person acts "willfully" when he acts with a bad purpose to disobey or disregard the law.
>
> *It is not necessary for the government to prove that the defendant was aware of the specific provision of the law that he is charged with violating.* Rather, it is sufficient for the defendant to act knowing that his conduct is unlawful, even if he does

not know precisely which law or regulation
makes it so.

Azano objected to this instruction, and proposed instead the
jury be told that "in order to find that a defendant knowingly
and willfully committed the crime charged in this count, you
must find that he knew his actions violated the prohibition
on foreign national contributions at the time he performed
them." Similarly, the jury instruction for Singh's charge
required only "knowledge that some part of his course of
conduct was unlawful," not that he knew specifically of the
prohibition on foreign national contributions.[4]

"The word 'willfully' is sometimes said to be 'a word of
many meanings' whose construction is often dependent on
the context in which it appears." *Bryan v. United State*s,
524 U.S. 184, 191 (1998). There are two primary
interpretations of "willfully" in the criminal context.
Generally, "to establish a 'willful' violation of a statute, 'the
Government must prove that the defendant acted with
knowledge that his conduct was unlawful.'" *Id.* at 191–92
(quoting *Ratzlaf*, 510 U.S. at 137). Alternatively, a willful
violation may require proof that the defendant knows the
specific legal prohibition or law that his conduct violates.
*See, e.g.*, *Ratzlaf*, 510 U.S. at 149. In *Ratzlaf*, a case
involving domestic financial transactions, the Court held
that "willfulness" required the government to prove that the
defendant knew "not only of the bank's duty to report cash
transactions in excess of $10,000, but also of his duty not to
avoid triggering such a report." *Id.* at 146–47. In other
words, the government had to show that the defendant knew
the precise prohibition at issue. Similarly, several tax

---

[4] Although Singh's proposed jury instructions did not clearly request
a heightened standard, we nonetheless address his arguments.

18                    UNITED STATES V. SINGH

statutes require proof that the defendant was aware of the
provision she is charged with violating.  *See, e.g.*, *Cheek v.
United States*, 498 U.S. 192, 201 (1991); *United States v.
DeTar*, 832 F.2d 1110, 1114 (9th Cir. 1987).  Cases
requiring this heightened standard "involved highly
technical statutes that presented the danger of ensnaring
individuals engaged in apparently innocent conduct."
*Bryan*, 524 U.S. at 194.

    In contrast, § 30121 is not a technical statute, nor does it
present the same concern of inadvertently ensnaring
uninformed individuals.  In *Ratzlaf*, the Court discussed how
an identical action—structuring a transaction—could have
different legal and tax implications simply by varying the
amount of the transaction.  510 U.S. at 145.  Because the line
between liability and innocent conduct in that case was so
narrow, the requirement of a heightened standard was
necessary.  We see no such narrow line in § 30121, which
simply prohibits foreign nationals from donating or
contributing to candidates or political parties.  Azano
suggests that it may be difficult to discern whether a specific
donation is prohibited since foreign nationals may still
donate to "issue advocacy," but the Court did so clearly in
*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 456
(2007).  Azano further suggests it may be difficult to discern
what is prohibited because only in the last thirty-five years
were donations to political candidates and parties
criminalized.  Yet, it is our "traditional rule that ignorance of
the law is no excuse" from liability and Azano's distinctions,
then, provide no basis to apply the heightened standard.
*Bryan*, 524 U.S. at 196.

    Azano next points to *United States v. Goland*, 959 F.2d
1449 (9th Cir. 1992), which involved a jury instruction using
the heightened *Ratzlaf* standard to define "willfully" in

§ 30109(d)(1)(A). Azano argues that because we have previously endorsed a heightened standard, we should do so again. However, *Goland* addressed only whether the district court abused its discretion by failing to instruct the jury that it may not infer the defendant's specific intent to violate FECA simply from his failure to adhere to administrative or civil provisions. *Id.* at 1454. We did not consider whether § 30109(d)(1)(A) *requires* a heightened standard. Similarly, in *United States v. Whittemore*, 776 F.3d 1074, 1078–81 (9th Cir. 2015), we assessed only whether the jury instruction given by the district court adequately allowed the jury to consider the defense's theory, not which standard was required. Neither case provides meaningful guidance for the question presented here.

Azano also cites language in the district court's opinion in *Bluman* for the proposition that "seeking criminal penalties for violations of [§ 30121]—which requires that the defendant act 'willfully'— . . . require[s] proof of the defendant's knowledge of the law." 800 F. Supp. 2d at 292 (citation omitted). However, this statement played no role in the judgment of the panel, and the court provided no support for it besides a citation to *United States v. Moore*, 612 F.3d 698, 702–04 (D.C. Cir. 2010) (Kavanaugh, J., concurring), a case considering an entirely different statute. Not an essential part of the holding and with no analysis, this language in *Bluman* does not persuade us that the heightened specific intent standard is appropriate for this statute.

Instead, we find persuasive the analysis of a sister circuit that addressed whether the defendants acted "knowingly and willfully" pursuant to § 30109(d)(1)(A) when charged with violating FECA's reporting requirements under § 30104. In *United States v. Benton*, the court held that the district court did not abuse its discretion when giving a jury instruction

adopting the *Bryan* standard of willfulness. 890 F.3d 697, 715 (8th Cir. 2018). It rejected the defendant's argument that "willfully" under FECA falls within the exception for highly technical statutes. We reach the same conclusion here. Appellants make no showing that § 30109(d)(1)(A) requires application of the heightened standard.

Nor does the rule of lenity require that we interpret "willfully" to require a heightened standard. While "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Skilling v. United States*, 561 U.S. 358, 410 (2010) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)), Azano asks us to conclude that *any* criminal statute that imports a willfulness mens rea is somehow vague or ambiguous. This does not comport with the Supreme Court's case law, as we generally apply the willfulness standard articulated in *Bryan*, and require the heightened specific intent standard only in exceptional cases. *See* 524 U.S. at 194–95 ("[W]e held that these statutes 'carv[e] out an exception to the traditional rule' that ignorance of the law is no excuse and require that the defendant have knowledge of the law." (footnote omitted) (second alteration in original) (quoting *Cheek*, 498 U.S. at 200)).

Azano's related argument that a heightened specific intent standard properly applied to the conspiracy charge fails for the same reasons. Because it appropriately applied the *Bryan* standard, the district court did not abuse its discretion in stating the mens rea requirement for counts one or three. Moreover, the evidence proffered at trial indicated that Appellants took steps to conceal their actions, which suggests that they possessed knowledge that their actions were unlawful, not that they unwittingly engaged in criminal conduct.

**B**

As to the charge that Singh aided and abetted Azano's unlawful donations, the district court's jury instruction stated:

> The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping [Azano] to commit the crime of making donations and contributions by a foreign national aggregating at least $25,000 in calendar year 2012, in violation of Title 2, United States Code, Sections 441e(a)(1)(A) and 437g(d)(1)(A).

Singh objected and proposed, in part, that the jury be told that "the government must prove . . . beyond a reasonable doubt . . . that Ravneet Singh knew that Mr. Azano was not a United States citizen or legal permanent resident." Singh argues that the district court's failure to include the material element that he *knew* Azano lacked immigration status constitutes reversible error.

The government agrees that Singh's knowledge of Azano's immigration status was a material element of the charged crime, but argues that the element was included within the district court's broader instructions. That Singh was charged with aiding and abetting the making of donations *by a foreign national* implies that Singh must know that Azano was a foreign national. The government also points to various places in the record where the parties noted this requirement. For example, the prosecutor stated, "We have to prove that the defendant knew that [Azano] was a foreign national."

We agree with the government.  "The jury must be instructed as to the defense theory of the case, but the exact language proposed by the defendant need not be used, and it is not error to refuse a proposed instruction so long as the other instructions in their entirety cover that theory." *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir. 1981). Although the district court could have properly included an express instruction regarding Singh's knowledge of Azano's immigration status, the instructions, as a whole, adequately covered that element.  The instructions stated, "The evidence must show beyond a reasonable doubt that [Singh] acted with the knowledge and intention of helping [Azano] to commit the crime of making donations and contributions by a foreign national."  The jury thus knew that in order to find Singh guilty, it had to find that Singh was aware that Azano was a foreign national.

The arguments and evidence presented at trial further clarified this requirement.  Singh's primary defense was that he did not know Azano's immigration status.  Defense counsel stated in his closing argument, "The government has absolutely failed to prove beyond a reasonable doubt that Ravi Singh knew that Mr. Azano was not a citizen nor a green card holder and therefore was ineligible to do anything."  In response to this theory, the government presented ample evidence of Singh's knowledge.  First, Singh's relationship with Azano started with services relating to the Mexican presidential election in 2011 in connection with which he traveled to Mexico with Azano. The Appellants' relationship continued thereafter, and Singh performed other work for Azano's Mexican businesses. Next, Singh took clear steps to conceal Azano's involvement in the campaigns.  In emails, Singh admonished coworkers for improper use of code names, and refused to communicate

about relevant topics directly due to the "legal ram[i]fications."

In sum, we find that the jury instructions sufficiently covered the required mental state, as required by § 30109 and Singh's defense theory.

**III**

Appellants contest their convictions under counts five through thirty-seven, arguing there was insufficient evidence to satisfy the material elements of § 1519. "We review the sufficiency of the evidence de novo." *United States v. Kaplan*, 836 F.3d 1199, 1211 (9th Cir. 2016). We "view[] the evidence in the light most favorable to the prosecution" and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, and "was intended to prohibit, in particular, corporate document-shredding to hide evidence of financial wrongdoing." *Yates v. United States*, 135 S. Ct. 1074, 1081 (2015). It provides that

> [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519. "In order to prove a violation of § 1519, the Government must show that the defendant (1) knowingly committed one of the enumerated acts in the statute, such as destroying or concealing; (2) towards 'any record, document, or tangible object'; (3) with the intent to obstruct an actual or contemplated investigation by the United States of a matter within its jurisdiction." *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015).

The government offered two theories on the falsification of records charges. For counts thirty-two and thirty-seven, the government argued that Singh failed to disclose that Azano paid for Singh's social media services rendered to both the Dumanis and Filner campaigns. Dumanis's campaign manager, Jennifer Tierney, discussed payment options with Singh, who responded that he would "voluntarily help" to "break[] into the San Diego market" after being warned "[t]hat no one could pay someone to volunteer in a campaign." For the Filner campaign, campaign manager Ed Clancy testified that when discussing payment options, Singh responded, "Don't worry. It's taken care of." The government argued that these material omissions caused the campaigns to file false entries on campaign disclosure reports. For Azano's remaining counts, the government argued that he made false statements to the campaigns by using strawmen donors to conceal his political donations. Azano never donated himself, but instead instructed others to write checks on his silent behalf, with the promise of reimbursement. The government argued that these straw donors caused the campaigns to file false entries on campaign disclosure reports.

## A

Appellants first argue that the government failed to introduce evidence to satisfy *any* of the material elements of

§ 1519 for counts thirty-two and thirty-seven.  We assess each element in turn.

### 1.  Actus Reus

The government relied on Singh's omission to satisfy § 1519's actus reus element.  Singh argues that the language in § 1519 requires an affirmative act, and that a mere omission, without an affirmative duty, cannot satisfy the element.  Yet, many courts, including our own, have found that an omission with the requisite mental state satisfies the element.  *See, e.g.*, *United States v. Taohim*, 529 F. App'x 969, 974 (11th Cir. 2013) (per curiam); *United States v. Moyer*, 674 F.3d 192, 207 (3d Cir. 2012); *United States v. Schmeltz*, 667 F.3d 685, 687–88 (6th Cir. 2011); *United States v. Jackson*, 186 F. App'x 736, 738–39 (9th Cir. 2006); *see also United States v. Lanham*, 617 F.3d 873, 887 (6th Cir. 2010) ("Material omissions of fact can be interpreted as an attempt to 'cover up' or 'conceal' information.").  None of these decisions analyzed in depth the question before us; they instead *assumed* that an omission with the requisite intent satisfies § 1519.  But Singh cites no case that has held that an omission does not satisfy the requisite intent.

Two district courts have provided more extensive analysis on the issue and concluded that an omission constitutes a "false entry" within the meaning of § 1519.  *See United States v. Croley*, No. 1:14-CR-29-2 (WLS), 2016 WL 1057015, at *5–6 (M.D. Ga. Mar. 14, 2016); *United States v. Norman*, 87 F. Supp. 3d 737, 743–46 (E.D. Pa. 2015).  *Croley* found that the plain language of § 1519 "does not exclude a knowing and intentional omission being construed as a false report." 2016 WL 1057015, at *5.  *Norman* noted the lack of authority on this precise issue, but drew from the generally accepted premise that an omission with the requisite mental state constitutes a deceptive practice, and

relied on a comparison to "an analogous statute," 18 U.S.C.
§ 1005. 87 F. Supp. 3d at 744. Section 1005 prohibits "any
false entry in any book, report, or statement of [a] bank . . .
with intent to injure or defraud such bank . . . or to deceive
any officer of such bank." 18 U.S.C. § 1005. Both §§ 1519
and 1005 prohibit false entries with the requisite mental
state, and "[u]nder § 1005, 'an omission of material
information qualifies as a false entry.'" *United States v.
Weidner*, 437 F.3d 1023, 1037 (10th Cir. 2006) (quoting
*United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990)).

We find the district courts' analyses convincing. It is
difficult to differentiate between the culpability of one who
intentionally omits information, and one who conceals or
falsifies information. It may also be difficult to differentiate
between acts of concealment and omission. Imagine, for
example, an individual who omits the detail of a specific,
identifiable tattoo from a witness statement, in order to
conceal the identity of a perpetrator. In such a situation, the
omission *is* an act of concealment or falsification.

Singh observes that the text of § 1519 lists only
*affirmative* prohibited acts, and relies on the "interpretive
canon, *expressio unius est exclusio alterius*, 'expressing one
item of [an] associated group or series excludes another left
unmentioned.'" *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S.
73, 80 (2002) (alteration in original) (quoting *United States
v. Vonn*, 535 U.S. 55, 65 (2002)). But "[h]owever well
[statutory canons such as *expressio unius*] may serve at times
to aid in deciphering legislative intent, they have long been
subordinated to the doctrine that courts will construe the
details of an act in conformity with its dominating general
purpose." *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344,
350 (1943). Congress intended for § 1519 to apply to a
broad range of conduct. *See* S. Rep. No. 107-146, at 14

(2002) ("Section 1519 is meant to apply *broadly* to any acts to destroy or fabricate physical evidence *so long as they are done with the intent* to obstruct, impede, or influence the investigation or proper administration of any matter . . . .") (emphasis added)).  This supports the conclusion that an omission satisfies § 1519's actus reus element, especially since terms such as "conceal" and "false entry," specifically listed in the statute, refer to similar actions.

Singh further argues that even if he omitted the information that Azano was paying him for the social media services he provided to the campaigns, he had no duty to disclose that information.  He claims that since he played no role in preparing the campaign disclosure forms, his connection to any actions taken was particularly tenuous. This argument has merit.  In most of the cases where courts affirmed § 1519 convictions based on omissions, the defendants either prepared the record or document, or were responsible for doing so.  *See, e.g.*, *Taohim*, 529 F. App'x at 974 n.2 (finding that the jury could reasonably have found the defendant responsible for the report at issue); *Moyer*, 674 F.3d at 207 (finding that a chief of police had a legal duty to disclose certain information in his report).  The campaign disclosure forms for the mayoral candidates in this case were filed pursuant to San Diego's Municipal Code section 27.2930(a) and California Government Code section 84200.5—both of which imposed the reporting requirements on *campaigns* and *candidates*, not on individuals "volunteering" or providing services to the campaigns.

However, Singh was not simply convicted under § 1519. Instead, the jury instructions and the Indictment disclosed that the government proceeded under 18 U.S.C. § 2(b) in conjunction with § 1519.  "[Section 2(b)] is intended 'to impose criminal liability on one who causes an intermediary

to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged. . . .'" *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir. 1987) (second alteration in original) (quoting *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir. 1983)). It specifically prohibits a person from "willfully caus[ing] an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. § 2(b).

Under this theory of liability, the actus reus element merges with the mens rea element to focus liability on the person harboring the criminal intent. *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994) ("Under section 2(b), the intermediary committing the *actus reus*, the physical aspect of a crime, may be blameless and, therefore, is not the person whom society seeks to punish. To fix blameworthiness on the actual malefactor, § 2(b) merges the *mens rea* and *actus reus* elements and imposes liability on the person possessing the 'evil intent' to cause the criminal statute to be violated."). Thus, the government did not need to prove that Singh prepared the reports or had a duty to report Azano's patronage; rather, that the campaign had a duty to report the information is enough. *See United States v. Fairchild*, 990 F.2d 1139, 1141 (9th Cir. 1993) (finding liability under § 2(b) because defendant's actions caused false statements to be made to the government).

Proceeding under this theory is in line with Congress's intention that § 1519 be broadly construed:

> Finally, [section 1519] could also be used to prosecute a person who actually destroys the records himself *in addition to one who persuades another to do so*, ending yet

another technical distinction which burdens
successful prosecution of wrongdoers.

S. Rep. No. 107-146, at 15 (emphasis added).  Where, as
here, the campaign lacked the requisite intent because it was
unaware of Azano's payments due to Singh's silence, § 2(b)
authorized holding accountable those with the intent to
conceal or falsify records.

## 2.  Causation Under Section 2(b)

"When a defendant's culpability is based, not on his own
communications with the federal agency, but on information
furnished to the agency by an intermediary, the element of
intent takes on a different cast than it does if a direct
violation of [the underlying statute] is asserted."  *Curran*,
20 F.3d at 567.  By proceeding pursuant to § 2(b), the
government had to show that Singh "willfully" caused the
false reporting.  18 U.S.C. § 2(b).  Singh argues that *Curran*
compels us to use the *Ratzlaf* standard, which would require
that he must have known "the reporting requirements and
intended to cause them to be evaded."  But, under either the
*Ratzlaf* or *Bryan* standard, we find the evidence sufficient to
affirm count thirty-two for Singh's actions in connection
with the Dumanis campaign, although insufficient to affirm
count thirty-seven in connection with his actions regarding
the Filner campaign.

The government presented sufficient evidence for a jury
to find that Singh willfully caused the Dumanis campaign to
file falsified reports, and so we affirm Appellants'
convictions under count thirty-two.  The government
established that Singh had a long history of providing his
professional services in connection with political campaigns
and elections, that he had operated ElectionMall since 2003,
and had even run for a political office himself at an earlier

time.  Tierney testified that she warned Singh "[t]hat no one could pay someone to volunteer in a campaign," and "[t]hat if any payments were made, those would have to be reported to the campaign, and we would have to report them on a [Form] 460."  Knowing these reporting requirements, Singh still offered to "voluntarily help" and concealed Azano's payments by using code names and invoicing through separate companies.  The jury reasonably could have found that Singh knew campaign disclosure reports required disclosing in-kind contributions, and that he withheld his funding to prevent such disclosures.[5]

Regarding Appellants' convictions pursuant to count thirty-seven—causing the Filner campaign to file false reports—we find the evidence insufficient to sustain either conviction.  When the Filner campaign asked about payment for Singh's social media services, Singh stated, "Don't worry. It's taken care of." Clancy, the campaign manager, did not respond with any questions, and later admitted, "I made a mistake . . . . I internalized the information . . . . I should have let somebody know."  Singh's statement cannot reasonably be construed as willfully causing the Filner campaign to file falsified reports.   Instead, Singh's statements suggested that he was being paid by a third party, yet the campaign failed to note this in the reports.  This cannot meet even the *Bryan* standard of willfulness, and so we reverse both convictions under count thirty-seven.

---

[5] On this point, Singh also argues that the jury instructions were erroneous.  Due to the overwhelming evidence we have recited, however, we find any instructional error harmless beyond a reasonable doubt.  *See Neder v. United States*, 527 U.S. 1, 9–10 (1999).

### 3.  Investigation

Singh also argues that the government did not show that his actions were taken with "the intent to impede, obstruct, or influence the investigation or proper administration of any matter."  18 U.S.C. § 1519.  He cites cases that focus on the nexus between the action and an investigation to argue that the government erred "by conflating the intent to commit the underlying crime with the intent to impede a subsequent investigation."

On its face, the statute is particularly broad regarding the investigation element.  One need not impede, obstruct, or influence an actual ongoing investigation; instead, the mere fact that the defendant contemplates an investigation satisfies this element.  *United States v. Gonzalez*, 906 F.3d 784, 793–96 (9th Cir. 2018).  Congress intentionally relaxed this requirement to allow the statute to reach more broadly. *See* S. Rep. No. 107-146, at 14–15 ("This statute is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter.  It is also sufficient that the act is done "in contemplation" of or in relation to a matter or investigation.").[6]

Reading the section broadly, the government presented sufficient evidence to prove this element.  The government established that Singh had a long history of involvement in campaigns and elections, and that he was warned about the

---

[6] Our sister circuits have similarly interpreted the section broadly. *See, e.g.*, *United States v. Moore*, 708 F.3d 639, 649 (5th Cir. 2013); *United States v. Kernell*, 667 F.3d 746, 755 (6th Cir. 2012); *United States v. Gray*, 642 F.3d 371, 378–79 (2d Cir. 2011).

reporting requirements in the San Diego mayoralty campaigns. Still, Singh stated he would "voluntarily help" and did not disclose any payments by Azano. Singh limited any paper trail by using code names and admonishing those discussing Azano's payments in emails. From this evidence, a jury could reasonably infer that Singh contemplated an investigation due to unlawful activity and intended to direct that investigation away from himself.

**4. Jurisdiction**

Lastly, Singh argues that any investigation of his conduct is not within the jurisdiction of the United States, because it involved a local campaign, and the falsified campaign disclosure forms violated state and local laws, not federal law. Section 1519 requires that the conduct "influence the investigation or proper administration of *any matter within the jurisdiction of any department or agency of the United States*." 18 U.S.C. § 1519 (emphasis added).

Singh misconstrues the focus of the investigation. We agree that violations of state campaign disclosure laws do not fall within the jurisdiction of the United States; however, the Federal Bureau of Investigation (FBI) has jurisdiction to investigate violations of FECA. This extends to state and local elections insofar as the FBI investigates donations by a foreign national. Here, the FBI did investigate the campaigns, due to Azano's foreign nationality. That the reports were filed pursuant to state law has no bearing since they were sought in connection with the investigation of a federal crime.

Singh cites *United States v. Facchini*, 874 F.2d 638 (9th Cir. 1989) (en banc), and *United States v. Ford*, 639 F.3d 718 (6th Cir. 2011), to support his argument. Both cases involved prosecutions pursuant to 18 U.S.C. § 1001, and

both cases found no "direct relationship . . . between the false statement and an authorized function of a federal agency or department." *Facchini*, 874 F.2d at 641; *see also Ford*, 639 F.3d at 720–22.  In contrast, the government here focused on donations and contributions *by a foreign national*, and those fall within the jurisdiction of the FBI.[7]

## B

Azano also argues there was insufficient evidence to affirm his remaining convictions under counts five through thirty-one and thirty-three through thirty-six.  We conclude that the government presented sufficient evidence to show that Azano willfully caused the campaigns to make false entries on campaign disclosure forms with the intent of obstructing a potential investigation.  Chase testified that Azano asked him to recruit straw donors for the Dumanis campaign and make a large donation to a Filner PAC, and promised to reimburse him for those donations.  Azano also tasked his employee, Jason Wolter, and his own son, Hester, to "recruit . . . friends . . . to write a $500 check to the campaign."  The government presented a ledger seized from Azano's home that tallied all straw donations obtained. Azano made no direct donations, but his U.S.-based company, AIRSAM, made a $100,000 donation to fund a Dumanis PAC.  A local newspaper article traced the money back to Azano, questioning whether the donation was legal due to Azano's immigration status.  The government noted that, subsequently, Azano never made another donation

---

[7] Singh argues that the rule of lenity directs us to resolve any ambiguity in § 1519 in his favor.  But even if we were to agree that the statute is ambiguous, we would refuse to apply the rule of lenity in this case given the strong evidence that Appellants knew that their actions were unlawful.  *See United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008).

through AIRSAM.  All of the evidence presented allowed a rational trier of fact to find that Azano knowingly caused the campaigns to make false entries on campaign disclosure forms with the intent to obstruct a potential investigation.

Azano additionally argues that there was insufficient evidence to convict him of count thirty-three, which involved a $100,000 donation from AIRSAM to a Dumanis PAC.  While Azano correctly notes that AIRSAM may legally donate to a PAC, *see Citizens United v. FEC*, 558 U.S. 310, 372 (2010), the government proceeded under the theory that AIRSAM was a straw donor for Azano, who had no constitutional right to donate.  We find that the government presented sufficient evidence that Azano put the funds into AIRSAM's account to disguise the donation, much like the straw donations provided by U.S. citizens. The government presented documentation showing that AIRSAM's bank account did not have the funds on May 8, 2012—the date on the check to Dumanis's PAC—to pay the $100,000 pledged.  The government then presented bank statements showing transfers from Azano's personal bank account ($125,000) and from his Mexican company ($300,000) into AIRSAM's account.

In summation, we hold that an omission satisfies the actus reus element for § 1519.  A reasonable jury could have found beyond a reasonable doubt that Singh's omission willfully caused Dumanis's campaign to file false reports, and so we affirm Azano's and Singh's convictions under count thirty-two.  Furthermore, a reasonable jury could have found beyond a reasonable doubt that Azano concealed his identity from these campaigns by recruiting straw donors, and that he willfully caused both campaigns to file false reports.  We therefore affirm Azano's convictions under counts five through thirty-six.  Finally, finding the evidence

insufficient to prove that Singh willfully caused the Filner campaign to file false records, we reverse Appellants' convictions under count thirty-seven.

## IV

Singh next appeals his conviction for conspiracy, charged in count one.  First, he argues that the court failed "to instruct the jury that evidence of more than one conspiracy was presented to the jury."  We review de novo whether the jury instructions adequately cover the defendant's theory of the case.  *Liew*, 856 F.3d at 595–96.

We find that the following jury instruction adequately covered Singh's multiple conspiracy theory:

> [The jury] must decide whether the conspiracy charged in Count 1 of the Indictment existed, and, if it did, who at least some of its members were.  If you find that the conspiracy charged did not exist for the charged Count, then you must return a not guilty verdict for that Count, even though you may find that some other conspiracy existed.  Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty for that Count, even though that defendant may have been a member of some other conspiracy.

Thus, the jury had to find that Singh participated in the *charged* conspiracy; if not, "even though [Singh] may have been a member of some other conspiracy," the jury was instructed to return a not guilty verdict.  It was the jury that had to decide whether a conspiracy or multiple conspiracies

36                UNITED STATES V. SINGH

existed, and the court's jury instruction adequately presented this theory. *See United States v. Loya*, 807 F.2d 1483, 1492–93 (9th Cir. 1987).

Singh also argues that there was insufficient evidence of a single conspiracy to sustain his conviction. Instead, he claims that the government proved only a "rimless conspiracy" under which his conviction could not stand. "Whether a single conspiracy has been proved is a question of the sufficiency of the evidence," and we review such claims de novo. *United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004), *as amended*, 425 F.3d 1248 (9th Cir. 2005).

To determine whether a single conspiracy or multiple conspiracies have been proven, we employ the following test:

> A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation. Typically, the inference of an overall agreement is drawn from proof of a single objective . . . or from proof that the key participants and the method of operation remained constant throughout the conspiracy. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the coconspirators knew of each other's participation or actually

benefitted    from    the    activities    of    his
coconspirators.

*Id.* (quoting *United States v. Duran*, 189 F.3d 1071, 1080
(9th Cir. 1999)).    "[I]f the indictment alleges a single
conspiracy, but the evidence at trial establishes only that
there    were    multiple    unrelated    conspiracies,    there    is
insufficient evidence to support the conviction on the crime
charged, and the affected conviction must be reversed." *Id.*
at    1226–27.    Nonetheless,    "[a]    single    conspiracy    may
involve    several    subagreements    or    subgroups    of
conspirators."    *United States v. Bibbero*, 749 F.2d 581, 587
(9th Cir. 1984).

The    Indictment    alleged    a    single    conspiracy.    Singh
argues that his only objective was to make money for his
social media business, not to influence elections.    Yet the
jury could reasonably have concluded that Singh's goal was
broader.    In an email from Dumanis to her campaign staff,
she reported that she "got a call, conference call, from Ernie
Encinas,    Susumo    Azano,    and    Ravi    Singh. . .    [Singh]
apparently flew to SD just to talk with Mr. A who wanted
him to talk to me!"    In an email between Singh and Encinas,
Encinas mentioned, "[Azano] was upset about the money he
said *he sent you to form a PAC* and do the social media."
These interactions with Azano suggested that Singh's role
was not limited to his social media business, but included
generally assisting Azano with the campaigns.

Furthermore,    the    key    participants    and    method    of
operations remained the same throughout the period of the
conspiracy.    All co-defendants acted from at least December
2011 to November 2012.    Singh spoke with Azano and then
flew to San Diego to meet with the Dumanis campaign at the
end of December.    At the same time, Chase and Hester

secured straw donors to contribute to Dumanis's campaign. Just as Chase, Hester, and Encinas concealed Azano's donations to the campaigns, so too Singh concealed Azano's patronage.    Once Dumanis lost the primary, all the participants proceeded to support the Filner campaign in much the same way.    The jury could reasonably have inferred an overall agreement from the proof of a single goal, or from proof that these key participants and their general operations remained constant throughout the conspiracy.

It might be a closer question whether Singh knew, or had reason to know, about the other co-conspirators' participation.  The government provided sufficient evidence that Singh knew Azano and Encinas and the role they played in coordinating efforts for the San Diego mayoral race, but there is no direct evidence that Singh knew of the subgroup who obtained straw donors.  However, the government did not need to show that Singh "knew all of the purposes of and all of the participants in the conspiracy." *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977).  Instead, while there may not have been proof of direct knowledge of Hester's, Cortes's, or Chase's contributions, there was proof that Singh benefitted from them, as they all worked towards election of mayoral candidates.  The straw donations that Hester, Cortes, and Chase obtained, whether for the individual campaigns or for PACs, affected Singh's success as a "volunteer" for the campaigns.  All of their efforts benefitted the common goal of electing Azano's chosen mayoral candidates.  Under the standard in *Fernandez*, this was sufficient to show a single conspiracy.

## V

Azano was also convicted of unlawfully possessing a firearm as an alien in violation of 18 U.S.C. § 922(g)(5)(B), which states,

(g) It shall be unlawful for any person—

. . .

(5) who, being an alien—

. . .

(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

. . .

to . . . possess in or affecting commerce, any firearm or ammunition. . .

Subsection "(g)(5)(B) . . . do[es] not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is . . . admitted to the United States for lawful hunting or *sporting purposes* or is in possession of a hunting license or permit lawfully issued in the United States." *Id.* § 922(y)(2) (emphasis added).

The State Department admitted Azano to the United States through several B1/B2 visas "issued to someone who wishes to visit the United States for personal pleasure and limited business." A nonimmigrant visitor for business is granted a B1 visa, while a visitor for pleasure is granted a B2 visa. 22 C.F.R. § 41.31(a). "The term pleasure . . . refers to legitimate activities of a recreational character, including

tourism, amusement, visits with friends or relatives, rest, medical treatment, and activities of a fraternal, social, or service nature." *Id.* § 41.31(b)(2).

Azano does not dispute that he was admitted under a nonimmigrant visa, but makes three arguments challenging his conviction under § 922(g)(5)(B).  First, Azano argues that § 922(g)(5)(B) is unconstitutional because it violates his Second Amendment right to possess a firearm.  Next, he argues that the possession of a gun can be "of a recreational character" and for "amusement" and thus, B2 visa holders qualify for § 922(y)(2)'s "sporting purposes" exception. Lastly, Azano alternatively argues that if the regulations and statute do not authorize B2 holders to possess a gun, the statute is unconstitutionally vague as applied to him.  We address each argument in turn.

## A.

Azano's Second Amendment challenge comes on the heels of our recent decision in *United States v. Torres*, where we held that § 922(g)(5)(A), which prohibits aliens illegally or unlawfully in the United States from possessing firearms, does not violate the Second Amendment.  911 F.3d 1253, 1264–65 (9th Cir. 2019).  We must now consider whether § 922(g)(5)(B), a similar prohibition that applies to nonimmigrant visa holders, violates the Second Amendment.

To analyze whether a statute violates the Second Amendment, we utilize a two-step test, which "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny."  *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).  Under the first step, we must determine whether the law burdens the Second

Amendment "based on a 'historical understanding of the scope of the [Second Amendment] right.'" *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (alteration in original) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008)). In *Torres*, we attempted to trace the historical understanding of the right by looking primarily at the Supreme Court's decision in *Heller* and decisions by our sister circuits. We noted that while *Heller* did not resolve who exactly possesses a Second Amendment right, the decision "described the Second Amendment as 'protect[ing] the right of *citizens*' and 'belong[ing] to all *Americans*.'" *Torres*, 911 F.3d at 1259 (alterations in original) (quoting *Heller*, 554 U.S. at 581, 595). Additionally, we observed that while all of our sister circuits that had analyzed the constitutionality of § 922(g)(5)(A) had found the statute constitutional, they had differed in their assessment of its historical scope. *Compare United States v. Portillo-Muno*z, 643 F.3d 437, 440 (5th Cir. 2011) (concluding that "the people" does not include illegal aliens given *Heller*'s descriptions of the right extending to those in "the political community"), *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) (agreeing with the Fifth Circuit), *and United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."), *with United States v. Meza-Rodriguez*, 798 F.3d 664, 670–72 (7th Cir. 2015) (applying the sufficient connections test in *United States v. Verdugo-Urquide*z, 494 U.S. 259 (1990), to determine that the unlawful alien had sufficient connections to the United States to be afforded Second Amendment rights), *and United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (refusing to determine whether unlawful aliens are within the scope of the Second Amendment and instead assuming it for the second part of

the analysis). After this analysis, we noted that "the state of the law precludes us from reaching a definite answer on whether unlawful aliens are included in the scope of the Second Amendment right." *Torres*, 911 F.3d at 1261.

Even though we address a lawfully admitted, nonimmigrant alien in this case, the same ambiguity exists. Some courts have read the historical right as one afforded only to citizens or those involved in the political community, while others have focused instead on an individual's connection to the United States. Nonimmigrant aliens, like those unlawfully present, are neither citizens nor members of the political community. By definition, "[a]n alien is classifiable as a nonimmigrant visitor for business (B-1) or pleasure (B-2) if . . . [t]he alien intends to leave the United States at the end of the temporary stay." 22 C.F.R. § 41.31(a). In order to grant such a visa, the government ensures that the individual "has permission to enter a foreign country at the end of the temporary stay" and "[a]dequate financial arrangements . . . to carry out the purpose of the visit to and departure from the United States." *Id.* The government argues that because such measures ensure a *temporary* visit, a short-term visitor could not be part of "the people" any more than unlawful or illegal aliens who attempt to permanently reside in the United States. While this argument does not lack force, we believe it prudent to follow *Torres*, "assume (without deciding) that the Second Amendment extends to" nonimmigrant visa holders, and proceed to the second step of the analysis. 911 F.3d at 1261.

In *Torres*, we determined that the appropriate level of scrutiny to apply to a Second Amendment challenge of § 922(g)(5) is intermediate. *Id.* at 1262–63 (explaining that "§ 922(g)(5) does not implicate the *core* Second Amendment right, and . . . its burden is tempered").

Intermediate scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139. The government does not need to show that the statute is "the least restrictive means of achieving its interest," but rather "only that [the statute] promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'" *Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)).

The government's interest in this case is straightforward. The government's interest is the same as in *Torres*—crime control and maintaining public safety. This objective has repeatedly been recognized as important within our circuit and elsewhere. *See, e.g.*, *Heller*, 554 U.S. at 626–27 (recognizing that regulations on gun possession or ownership may be lawful due to the government's interest in public safety); *Mahoney v. Sessions*, 871 F.3d 873, 882 (9th Cir. 2017); *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010).

Further, the statute reasonably serves this important interest. It carves out exceptions for visa holders who are less likely to threaten public safety. Section 922(y)(2), for example, exempts those that come to the United States for hunting or sporting purposes. And, § 922(y)(3) creates a broad waiver for visa holders who have "resided in the United States for a continuous period of not less than 180 days" if they receive a statement of support from their embassy or consulate, and the Attorney General confirms that they do not "jeopardize the public safety." 18 U.S.C. § 922(y)(3)(B)(i)–(ii), (C)(ii). We find this tailoring sufficient.

In summary, § 922(g)(5)(B)'s prohibition on firearm possession and ownership by nonimmigrant visa holders serves an important public interest in crime control and public safety, without substantially burdening a nonimmigrant visa holder's assumed Second Amendment right. We therefore hold that § 922(g)(5)(B) survives intermediate scrutiny.

**B.**

We turn next to Azano's claim that his possession of a gun fell within the "pleasure" designation in 22 C.F.R. § 41.31(b)(2) or automatically qualified as a "sporting purpose" pursuant to 18 U.S.C. § 922(y)(2). Azano further argues that if the regulations and statute are not interpreted this way, they are void for vagueness. We review the interpretation of a statute, and whether it is unconstitutionally vague, de novo. *United States v. Robertson*, 875 F.3d 1281, 1286–87 (9th Cir. 2017).

Azano first argues that all B2 nonimmigrant visa holders should be permitted to own firearms, as their very presence is an "activit[y] of a recreational character." 22 C.F.R § 41.31(b)(2). But the plain language of § 922(g)(5)(B) betrays Azano's argument. Section 922(g)(5)(B) applies directly to nonimmigrant visa holders. Azano agrees that B2 visa holders are nonimmigrant visa holders, yet simply states that we should interpret "pleasure" activities to include firearm ownership. However, "[a]bsent persuasive indications to the contrary, we presume Congress says what it means and means what it says." *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016).

Azano's next position—that firearm possession for "sporting purposes" is a pleasure activity—necessarily implies that all B2 visa holders fall under § 922(y)(2)'s

exception. "In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). This interpretive method guides our analysis here. Section 922(g)(5)(B) plainly prohibits firearm possession by B2 visa holders, subject only to limited exceptions clearly spelled out in § 922(y). Had Congress intended for the sporting purposes exception in § 922(y)(2)(A) to apply to all B2 visa holders, it would have said so explicitly.

Further, the record illustrates just how overinclusive Azano's proffered definition would be. Azano has never claimed that he engaged in hunting activities for pleasure or used the firearm for sporting purposes.[8] Instead, he offered evidence suggesting that he possessed the gun solely for protection. Concluding that firearm ownership automatically qualifies as a "pleasure" activity or "sporting purpose" would thus be difficult in the light of the facts of this case alone.

Azano's void-for-vagueness claim also fails. A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1048 (9th Cir. 2005) (en banc) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Section 922(g)(5)(B) quite clearly prohibits possession of firearms by all those admitted to the United States under a

---

[8] To the extent that Azano now claims that he qualified under § 922(y)(2), he failed to raise this affirmative defense below, and so it is forfeited. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996).

nonimmigrant visa.  Section 922(y)(2) includes an exception to this general rule for nonimmigrant visa holders who visit the United States for lawful hunting or sporting purposes. We interpret "sporting purposes" according to the narrow provision that includes it.  The exception reasonably implies sporting activities that involve the use of guns, such as target shooting, or trap and skeet shooting.  It does not suggest a broader definition including all recreational activities or possession of guns for pleasure.    Section 922(y)(2)'s legislative history also supports this interpretation:

> [I]f you are someone who has come to the United States for lawful hunting or sporting hunts . . . that person is exempt.  That person may purchase a gun while here for that purpose.

144 Cong. Rec. S8641 (daily ed. July 21, 1998) (statement of Sen. Durbin).

B1/B2 nonimmigrant visa holders do not automatically qualify for § 922(y)(2)'s exception and, by a plain reading of the statute, are subject to the prohibition on gun possession.    Furthermore,    § 922(y)(2)   is   not unconstitutionally vague as applied to B1/B2 visa holders. Accordingly, we affirm the district court's holdings and Azano's conviction under § 922(g)(5)(B).

## VI

Finally, Appellants seek our review of the district court's denial of several trial motions.  First, Azano argues that the district court abused its discretion in denying his motion for a new trial based on alleged ineffective assistance of his trial counsel, Michael Wynne.  Singh also argues that the district

court abused its discretion when denying his motion to sever the trial from co-defendants Cortes and Hester.

### A.

"[W]hen a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding." *United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (quoting *United States v. Brown*, 623 F.3d 104, 113 (2d Cir. 2010)). However, the decision of whether to review the claim "is best left to the discretion of the district court." *Id.* "We are mindful that district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of [ineffective assistance] claims prior to judgment, including . . . the . . . disruption of the proceedings." *Id.* at 898 (alterations in original) (quoting *Brown*, 623 F.3d at 113). Such considerations include "the existence of evidence already in the record indicating ineffective assistance of counsel," "the scope of the evidentiary hearing that would be required to fully decide the claim," and the need to relieve trial counsel, appoint new counsel, or consider the availability of post-conviction counsel if the claim is not heard until then. *Id.*

In denying Azano's motion for a new trial, the district court explained that "the trial record here is not sufficiently developed to enable the [c]ourt to resolve the multiple and varied ineffective assistance of counsel claims being asserted by Mr. Azano . . . . Mr. Azano sets forth, by my count, no less than a dozen separate grounds in support of that claim, each of which would have to be considered and evaluated individually." The court agreed with the government that there would be "a long delay in resolving

the case, and . . . [it] would run afoul of this [c]ourt's duty to promote the interest of justice and judicial economy."

The district court did not abuse its discretion. We agree with the court that there are a number of claims at issue even though Azano frames his motion as a single ineffective assistance of counsel claim. We observe, at a minimum, ineffective assistance of counsel claims for failure to proffer a defense, failure to introduce exculpatory evidence, and failure to adequately investigate. To address such claims, the court would have needed to examine counsel's reasons and motivations for taking and not taking certain actions, which would have resulted in a prolonged evidentiary hearing. Additionally, Azano's ability to retain post-conviction representation relieves concerns that the claim may not receive due consideration in a collateral proceeding.

Other considerations weigh in Azano's favor. Azano appointed another attorney for post-trial motions, eliminating the district court's need "to relieve the defendant's attorney, or in any event, to appoint new counsel in order to properly adjudicate the merits of the claim." *Id.* (quoting *Brown*, 623 F.3d at 113). Further, waiting for post-conviction relief may result in some prejudice to Azano by "weakening of memories and aging of evidence," as well as time Azano will be incarcerated waiting for the claims to be heard. *Id.* at 897. Still, given the considerations weighing against Azano, we cannot say the district court abused its discretion.

Azano also requests that we review his ineffective assistance of counsel claim directly on appeal. Generally, we will not entertain ineffective assistance of counsel claims on direct appeal because the record is often undeveloped "as to what counsel did, why it was done, and what, if any, prejudice resulted." *United States v. Andrews*, 75 F.3d 552,

557 (9th Cir. 1996) (quoting *United States v. Rewald*, 889 F.2d 836, 859 (9th Cir. 1989)). "This is so even if the record contains some indication of deficiencies in counsel's performance." *Massaro v. United States*, 538 U.S. 500, 504 (2003). We will consider an ineffective assistance claim on direct appeal only "where the record is sufficiently developed to permit review and determination of the issue, or the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Steele*, 733 F.3d at 897 (quoting *United States v. Rivera-Sanchez*, 222 F.3d 1057, 1060 (9th Cir. 2000)). Neither circumstance applies here.

## B.

Singh argues that the district court abused its discretion in denying his motion to sever his trial from all defendants except Azano. However, "[i]t is well settled that the motion to sever 'must be renewed at the close of evidence or it is waived.'" *United States v. Alvarez*, 358 F.3d 1194, 1206 (9th Cir. 2004) (quoting *United States v. Restrepo*, 930 F.2d 705, 711 (9th Cir. 1991)). The record does not show that Singh's counsel renewed the motion, nor does Singh proffer any reason as to why such waiver should not apply. Accordingly, we find that Singh waived this argument.

Relatedly, Singh argues that the joint trial compromised his due process rights due to the "irresponsible actions of Azano's attorney." Singh points us to *People v. Estrada*, 75 Cal. Rptr. 2d 17 (Ct. App. 1998), as authority for such a claim. In *Estrada*, the state court found that co-defendant's counsel improperly suggested that the defendant was more culpable than his client. *Id.* at 23. Even if we were to recognize that such conduct gives rise to a due process violation, the record does not show that Azano's counsel made any similar suggestion here.

## CONCLUSION

We reverse Azano's and Singh's convictions under count thirty-seven for falsification of campaign records, finding the evidence insufficient to support all material elements. We affirm all other convictions. We vacate Azano's and Singh's sentences and remand for re-sentencing in accordance with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED FOR RE-SENTENCING.**